FILED
2017 Jul-03  AM 09:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| MICHAEL W. RONDINI and CYNTHIA M. RONDINI, as the surviving parents of MEGAN ELIZABETH RONDINI, their deceased child; MICHAEL W. RONDINI, as Administrator and Personal Representative for the Estate of MEGAN ELIZABETH RONDINI, deceased, | ) ) ) ) ) ) ) | |
| | ) | **COMPLAINT** |
| Plaintiffs, | ) ) | **JURY TRIAL DEMANDED** |
| v. | ) ) ) | CASE NO. _____ |
| TERRY J BUNN, Jr., BETH HOWARD of the University of Alabama, CARA BLAKES of the University of Alabama, SHERIFF RONALD ABERNATHY of the Tuscaloosa Sheriff's Department, and INVESTIGATOR ADAM JONES and DEPUTY JOSHUA HASTINGS of the Tuscaloosa Sheriff's Department, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

### COMPLAINT AND JURY DEMAND

Plaintiffs, MICHAEL W. RONDINI and CYNTHIA M. RONDINI, surviving parents of MEGAN ELIZABETH RONDINI, their deceased child, and MICHAEL W. RONDINI, as Administrator and Personal Representative of the Estate of MEGAN ELIZABETH RONDINI, deceased, by and through undersigned counsel, file this Complaint and Jury Demand against Defendants, TERRY JACKSON BUNN, Jr., BETH HOWARD, SHERIFF RONALD ABERNATHY, and OFFICERS JONES AND HASTINGS, for compensatory and punitive damages for the subsequent acts and omissions of Defendants TERRY JACKSON BUNN, Jr., BETH HOWARD, CARA BLAKES, SHERIFF RONALD ABERNATHY, AND

1

INVESTIGATOR JONES AND DEPUTY HASTINGS. In support of their Complaint and Jury Demand, Plaintiffs allege the following:

## PRELIMINARY STATEMENT

1.      This is a civil action brought to vindicate the Plaintiffs' rights under the United States Constitution, the Alabama State Constitution, and under the statutory laws of the United States and Alabama.

2.      This is an action for damages that arises from the sexual assault of Megan Rondini by Terry Jackson Bunn, Jr. and from the subsequent faulty practices and mishandling of investigation and treatment by the Defendants named herein, ultimately leading to the suicidal death of Megan Elizabeth Rondini.

3.      This is an action for damages sustained by a citizen of the United States against the Title IX Coordinator at the University of Alabama, Beth Howard, as well as against Cara Blakes of the Women and Gender Resource Center at the University of Alabama, who deliberately and repeatedly denied services and mishandled accommodations with hostility towards Plaintiff's decedent, Megan Rondini.

4.      This is an action for damages sustained by a citizen of the United States against Sheriff Ronald Abernathy of the Tuscaloosa County Sheriff's Department, who failed to assure proper training and supervision of the personnel and employees, and to implement practices, policies, and procedures to discourage lawless official conduct, as well as against Investigator Adam Jones and Deputy Joshua Hastings of the Tuscaloosa County Sheriff's Department, who deliberately failed to practice and provide proper investigations to complainants.

## STATEMENT OF JURISDICTION

5.      Federal subject matter jurisdiction of this Court is invoked pursuant to 28 U.S.C.

§1331 and 1343(a)(3), (4) to obtain redress for the deprivation of rights guaranteed by the Fourth, Eighth, and Fourteenth Amendments to the Constitution of the United States pursuant to 42 U.S.C. § 1983.

6.     The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C § 1367.

7.     The Plaintiff also invokes jurisdiction under 28 U.S.C. § 1332 because of diversity of the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

8.     Venue is proper in the United States District Court for the Northern District of Alabama pursuant to 28 U.S.C. § 1391 because Defendants reside in the state of Alabama and the acts and omissions giving rise to this lawsuit occurred in the state of Alabama.

## PARTIES

9.     **Plaintiff Michael W. Rondini** is over the age of nineteen and is a resident and citizen of Austin, Travis County, Texas.  He is the biological father of Megan Elizabeth Rondini.

10.    **Plaintiff Cynthia M. Rondini** is over the age of nineteen and is a resident and citizen of Austin, Travis County, Texas.  She is the biological mother of Megan Elizabeth Rondini.

11.    **Plaintiff Michael W. Rondini** is also the Administrator and Personal Representative of the Estate of Megan Elizabeth Rondini, deceased, by appointment of the Probate Court for Travis County, Texas.

12.    **Plaintiff's decedent, Megan Rondini**, was a Texas citizen, maintaining her Texas driver's license, enrolled at The University of Alabama in Tuscaloosa, Alabama. She resided in Tuscaloosa, Alabama from approximately August 2013 through May 2014, August 2014 through July 5, 2015, and August 2015 through early October 2015 and was considered a non-Alabama resident for tuition purposes by the University of Alabama. Megan Rondini was 21 years old when

she took her life on February 26, 2016 in Dallas, Texas.

13.    **Defendant Terry Jackson Bunn, Jr.** (hereinafter "Defendant Bunn") is over the age of nineteen and is a resident and citizen of Tuscaloosa County, Alabama.

14.    **Defendant Beth Howard** (hereinafter "Defendant Howard") is the Title IX Office Coordinator at The University of Alabama in Tuscaloosa, Alabama. "As the University of Alabama's Title IX Coordinator, Defendant oversees the University's compliance with Title XI by managing complaints of gender discrimination, including reports of sexual harassment, sexual violence, and sexual assault. She is also charged with identifying and addressing any patterns or systemic issues that arise in reviewing such complaints." [1] Defendant BETH HOWARD is sued herein in her individual capacity.

15.    **Defendant Cara Blakes** (hereinafter "Defendant Blakes") is a graduate student providing counseling services to students by and through the Women and Gender Resource Center at the University of Alabama. Defendant BLAKES is sued herein in her individual capacity.

16.    **Defendant Sheriff Ronald Abernathy** (hereinafter "Defendant Abernathy") has been a high-ranking law enforcement officer employed by The Tuscaloosa County Sheriff's Office for the past decade. Sheriff Abernathy was elected Sheriff of Tuscaloosa County in November 2014. Defendant SHERIFF ABERNATHY is sued herein in his individual capacity.

17.    **Defendants Investigator Adam Jones and Deputy Joshua Hastings** (herein after "Defendant Jones" and "Defendant Hastings") are officers/employees of the Tuscaloosa Sheriff's Department, acting under color of state law and sued herein in their individual capacity.

18.    **Defendant, Fictitious Parties A through L** are those persons, entities or parties who participated in causing injury to Plaintiff's decedent, Megan Rondini.

---

[1] *See* The University of Alabama System website at http://titleix.ua.edu/coordinator.html

19.     **Defendant, Fictitious Parties M through P** are those persons, entities or parties who were responsible for ensuring that the sheriff's deputies employed by the Tuscaloosa Sheriff's Department understood the appropriate procedures to use in effectuating an arrest. The identifies of Fictitious Parties M through Z are currently unknown to the Plaintiffs.

20.     **Defendant, Fictitious Parties Q through V** are those persons, entities or parties who were responsible for ensuring that the University of Alabama by and through its administrators and employees provides its students adequate counseling, advisement, accommodations, and educational benefits and opportunities, including any procedure deemed appropriate. The identifies of Fictitious Parties Q through V are currently unknown to the Plaintiffs.

## FACTUAL ALLEGATIONS

21.     In July 2015, Megan was 20 years old and entering her junior year as a pre-med honors student at the University of Alabama majoring in biology with a 3.812 cumulative GPA.

22.     On or about the night of July 1, 2015, Megan went to Innisfree with friends. Innisfree is located in Tuscaloosa across the street from ST Bunn Construction Company. Defendant Terry Jackson Bunn, Jr., an employee of ST Bunn Construction Company, was a frequent patron of Innisfree.

23.     While at Innisfree, Megan saw Defendant Bunn, who is known to employees and frequent patrons of the bar, and Megan, as "Sweet T" and his friend Jason Stephen Barksdale.

24.     Defendant Bunn was 34 years old at the time and not a student at the University of Alabama.

25.     Upon information and belief, Megan became either intoxicated or drugged at Innisfree.

26.     At some point in the evening, Defendant Bunn, accompanied by Jason Barksdale, drove Megan to his house at 1570 Cedar Drive in Cottondale, Alabama in his white Mercedes.

27.     After arriving at his house, Megan repeatedly asked Defendant Bunn to take her home or back to her friend's residence and he refused.

28.     Instead, Defendant Bunn directed Megan to the bedroom, and demanded that she get on his bed. Megan complied with Defendant Bunn's demands against her will. Defendant Bunn forcefully removed her clothing and performed oral sex on her. Defendant Bunn placed his hands on her hips, held her down, and forced himself inside her vagina. Megan told investigators that she repeatedly informed Defendant Bunn that she did not want to have sex with him and that she needed to rejoin her friends.

29.     Defendant Bunn did not use a condom and he ejaculated in or on Megan.  Defendant Bunn sexually attacked, abused, and assaulted Megan for over 30 minutes against her will and without her consent.  Megan never retracted her refusal.

30.     When Defendant Bunn finally passed out, Megan discovered that Defendant Bunn had locked the only way out of the bedroom.

31.     At this point, Megan became very frantic and immediately contacted several of her friends through multiple text messages requesting urgent help and describing the terrifying circumstances she was in.

32.     Megan took the only possible means of escape by crawling through a window onto the roof and jumping to the ground two stories below. Megan then stood with anxiety and fear while she waited for help and for her friends to arrive at Defendant Bunn's home nearly 20 minutes away from campus.

33.     During the early morning hours of July 2, 2015, Megan called her parents to inform

them of the attack.

34.     Megan's mother immediately drove from her home in Austin, Texas to Tuscaloosa while Megan's father contacted the Women and Gender Resource Center (hereinafter "WGRC") at the University of Alabama (hereinafter "UA") and spoke to Nesha Smith to ensure an advocate was present at the hospital.

35.     Plaintiff Michael Rondini spoke with Defendant Jones the morning after the attack before Megan arrived for the second interview. Defendant Jones reassured Plaintiff Michael Rondini that they were trained to handle "high profile" cases such as this one. When Plaintiff Michael Rondini expressed concern about Megan not having an attorney present, Defendant Jones responded with, "whatever for?"

36.     Megan diligently sought assistance and care by arriving at DCH Regional Hospital and reporting the sexual attack to medical personnel and the Tuscaloosa Sheriff's Department. A rape kit, along with a urine sample, was performed at the hospital and delivered to law enforcement.

37.     Astonishingly, law enforcement deliberately failed to send Megan's rape kit and her urine for testing in furtherance of their investigation of a potential drug facilitated sexual assault.

38.     Megan's rape kit and her urine sample were never tested by a forensic lab in the state of Alabama despite the fact that Megan exhibited multiple signs that she had been a victim of a drug facilitated sexual assault.

39.     The only conclusive evidence gathered from the investigation was that Megan tested positive for a sexually transmitted disease that she contracted from non-consensual sex with Defendant Bunn.

40.     After Megan's father contacted UA's WGRC, an advocate arrived at DCH Regional Hospital hours after the WGRC was contacted.  UA's WGRC advocate took an "On-Call Incident Report" and abandoned Megan while still being questioned by police officers. UA's WGRC advocate suggested that Megan or her family contact the Title IX Coordinator at UA, Beth Howard.

41.     In order to preserve her memory, as well as physical evidence of the attack, Megan travelled directly from DCH to the Tuscaloosa Sheriff's Department, without taking the time to eat, sleep, or bathe. Megan diligently pursued the most immediate route to reporting the attack.

42.     Despite Megan's urgent cries for help to promptly report every detail of her attack, Defendant Jones failed to gather information requisite to conducting a thorough investigation. Many pertinent facts did not arise until after the investigation concluded.

43.     Defendant Jones failed to ask questions that shed additional light on a possible drug facilitated sexual assault. Defendant Jones also neglected to interview pertinent witnesses that were at Innisfree at the time of the possible drug facilitated sexual assault.

44.     Megan indicated to the investigators that she had gaps in memory about how she left the pub and how she ended up in Defendant Bunn's Mercedes. The investigators failed to ask Megan questions to determine what she did and did not remember, and try to pinpoint any point in the evening when someone may have administered a substance to her.

45.     The police deliberately ignored standard protocol by neglecting to conduct any interviews with any of Megan's companions that were with her at Innisfree or any Innisfree employees from the night of the sexual assault.

46.     While interviewing Megan, Defendant Jones again ignored protocol by failing to raise the important issues of the actual sexual encounter, and instead focusing on irrelevant

questions, such as whether she remembered the color of the sheets.

47.     Defendant Jones obtained only a skeleton description of the crime that Megan reported, and instead strayed from the investigation by focusing a great deal of his questioning on the trip to Megan's apartment and the possible criminal offenses he thought she might have committed during the assault.

48.     Defendant Jones asked Megan twice about why she did not call police right away when she was fleeing Defendant Bunn's home, indicating to her that she delayed in calling for help. However, Megan's delay in seeking help from the authorities was delayed only by her escape from imminent danger and not by compliancy or reluctance to report the issue entirely.

49.     When Defendant Jones placed great emphasis on the possibility that Megan had stopped at her apartment before proceeding to Defendant Bunn's home with Jason Barksdale, Megan correctly pointed out that any stop at her apartment would be irrelevant to the question of whether she consented to sex. Megan also stated that she did not have any recollection of going back to her apartment that night with Defendant Bunn.

50.     Due to Defendant Jones' lack of training and experience, he was unfamiliar with the typical patterns of predatory sexual conduct and therefore failed to perceive Defendant Bunn's predatory behavior as reported by Megan.

51.     Megan's crime report indicates the type of incident or offense as a "special inquiry." Labelling Megan's rape as a "special inquiry" means that the rape is not being counted among the official police rape and sexual assault statistics at the Tuscaloosa Sheriff's Department.

52.     While interviewing Megan, Defendant Jones failed to take any notes on what Megan was saying, although he did bring a pad of paper into the room.

53.     After returning to the police station following a trip to Megan's apartment to search

for her missing keys, Defendant Jones read Megan her Miranda Rights without the Victim Advocate from WGRC present.

54.     During the interview, without further inquiry, Defendant Jones reached an unfounded conclusion that she had not "kicked him or hit him," and that no rape had occurred.

55.     Megan informed Defendant Jones of frantically searching for her keys and instead found Defendant Bunn's wallet and a pistol. She took $3.00 in case she had to take a taxi home and the pistol "for safety." Megan also explained to Defendant Jones that she did not know how to handle guns and accidentally fired it before dropping and leaving the weapon on the ground.

56.     Inexplicably, the police shifted the focus to potentially prosecuting Megan for an accidental firearm discharge rather than investigating her assault. Megan ultimately was treated as a crime suspect and her status as a victim of a sex crime was completely disregarded.

57.     During Defendant Bunn's interview with Defendant Hastings on July 6, 2015, Defendant Hastings indicates that the police went to Defendant Bunn's house and woke him and Jason Barksdale up at 5:45a.m. on July 2, 2015. They did not record the July 2, 2015 conversation at 5:45 a.m. with Defendant Bunn where he allegedly denied having Megan over to his house in that first conversation. An interview with Jason Barksdale was recorded on July 2, 2015 at the home of Defendant Bunn around 8:55 a.m., stating he was aware of Megan's presence.

58.     Defendant Hastings failed to probe any details of the alleged sexual assault. Hastings made no attempt whatsoever to establish a detailed record of what happened that evening, from the time that Defendant Bunn left the bar until the police woke him up. With respect to the sexual encounter in particular, Defendant Hastings never asked Defendant Bunn about any specific details of how the two had sex, whether oral sex was involved, and what the two talked about.

59.     In addition, Defendant Hastings failed to challenge Defendant Bunn and failed to

identify and address any inconsistencies between Megan's account and Defendant Bunn's account.

60.     Although Hastings was supposed to interrogate Defendant Bunn as a rape suspect, he conveyed the clear impression that the police were united with Defendant Bunn against Megan. For instance, when Defendant Bunn's lawyer told Defendant Hastings "I know there's any number of ways this could go. We just want this to be over," Defendant Hastings responded with: "just kind of waiting to see how far she's gonna push this."

61.     On July 2, 2015, Megan's father sent an e-mail to Defendant Howard on Megan's behalf, notifying the Title IX office of the assault and requesting information, support and assistance for Megan under Title IX.

62.     However, Defendant Howard deliberately chose not to respond to Megan's father and Megan's father made an additional attempt to contact Defendant Howard on Megan's behalf.

63.     Defendant Howard and/or any other employee on behalf of UA's Title IX office deliberately refused to give Megan and her parents a response.

64.     While Megan and her parents made resilient efforts to get in contact with Defendant Howard, Defendant Howard was simultaneously responding to an e-mail from Kip Hart at the Tuscaloosa Sheriff's Department regarding Megan's assault on or about July 9, 2015 stating that there are some "issues" in the Rondini case. Following this communication, neither Hart nor Defendant Howard informed any of the Rondinis of this communication.

65.     On or about July 4, 2015, Megan returned to Austin, Texas. Megan continued to receive counseling for trauma from the attack by Defendant Bunn.

66.     Once home in Texas, Megan received medical attention for the sexually transmitted disease and began seeing a psychotherapist. Megan was diagnosed with anxiety, depression, and posttraumatic stress disorder (PTSD) resulting from the assault.

67.     On or about August 2, 2015, Megan was prescribed, by a licensed clinical social worker, to obtain a dog to serve as an emotional support animal. In Scarlett M. Doise's professional opinion, the presence of this animal was a necessary treatment for the mental health of Megan because its presence would mitigate the excruciating symptoms she was feeling from the trauma.

68.     Approximately three weeks after the assault, former District Attorney Lyn Head called Megan's father and apologized for taking three weeks to return the call that Megan's father made on July 2, 2015. District Attorney Lyn Head informed him that after reviewing the video-taped interview, that she would not bring the case before the grand jury. District Attorney Lyn Head stated that she considered the assault consensual, in part because Megan never referred to it as "rape" in her statement, only as "sexual assault."

69.     Even after suffering irreparable psychological harm, Megan decided to return to UA in August 2015 for sorority rush and fall semester in an attempt to regain normalcy and to be with her friends.

70.     Upon returning, Megan began to learn the true identity of Defendant Bunn, and that he and his family were well connected and powerful in the Tuscaloosa community, and were major financial supporters of UA.

71.     At no time was Defendant Bunn restricted from being on campus. Defendant Bunn had and continues to have free reign of UA's campus.

72.     Megan became fearful that she would encounter Defendant Bunn on campus, that he was following her, and would attack her again or retaliate against her for reporting the rape.

73.     To continue her healing process that she began in Texas, Megan sought counseling services and treatment at the UA's WGRC.

74.     Kathy Echols, the WGRC counselor met with Megan on or about August 28, 2015

and conducted an interview with Megan. During the interview, Megan revealed to Echols the gruesome details of the attack by Defendant Bunn, in hopes to confide in Echols. After the interview concluded, Echols notified Megan that there was a conflict of interest because she knew Defendant Bunn and his family personally. At this point, she informed Megan that she could no longer meet with her for counseling sessions.

75.     After leaving the interview with Echols, Megan was shocked that she had revealed the details of her assault to a close friend of the assailant. Megan felt betrayed and disheartened by the unprofessional treatment she received from the UA and its employees.

76.     Even though UA and the WGRC were aware and put on notice of the conflict of interest, no real alternative effort was made to accommodate Megan's treatment needs.  After Echols made the decision to withdraw as Megan's counselor, Megan agrees, still seeking help, to meet with a second therapist, Defendant Blakes, who inexplicably denied Megan counseling services until Megan sought out and took medication for her anxiety.

77.     After Defendant Blakes indicated to Megan that she cannot help or work with Megan until Megan obtained, and started taking anti-anxiety medication. Megan left the meeting and immediately called her father Plaintiff Michael Rondini in tears, explaining the situation and expressing a newfound lack of trust for anyone in the school and the Tuscaloosa system.

78.     On or about August 31, 2015, Megan signed the WGRC's "Release of Information" form to speak with UA's Title IX department regarding Megan's assault for the purpose of "personal advocacy."

79.     On September 14, 2015, more than two months after Title IX was initially notified of the assault, Defendant Howard finally spared a moment to respond to Megan about Megan's growing concerns of Defendant Bunn's presence on campus and at class-related activities.

80.     Megan took imperative steps and sought an immediate appointment with the UA counseling center for psychiatric treatment due to the serious nature of her mental and emotional distress from her increasing fears. To Megan's dismay, the UA counseling center failed Megan and she received no accommodations or assistance in obtaining an appointment at the UA counseling center.

81.     Megan finally received treatment at UA's Student Health Center after weeks of relentless efforts to obtain help. Dr. Susan Arnold conducted a psychiatric evaluation and formally diagnosed Megan with anxiety, depression, and post-traumatic stress disorder (PTSD) on or about September 25, 2015.

82.     From Megan's session with Dr. Arnold, Megan indicated to Dr. Arnold that she saw a suspicious car outside of her Houndstooth Apartment Complex on multiple instances and also described the fear and uneasiness she felt when saw Defendant Bunn on campus in fall of 2015.

83.     UA's policies and procedures acknowledge its commitment "to providing an environment free from sexual misconduct," accepting an obligation to provide "accommodations, interim protective measures, and support services," including "disability accommodations" for students. No one at UA, the Women's Resource Center, or Defendant Howard ever offered Megan or her family any assistance, or informed her of her Title II rights, any possible Title IX accommodations, or followed up to ensure she received any mental health or medical care after her sexual assault.

84.     The combined trauma due to Megan's treatment by the Tuscaloosa Sheriff's Department, the reporting process with UA, the additional anxiety of trying and failing to receive counseling as a result of her rape, and the influential position of her assailant in the community

14

ultimately made Megan feel unsafe on campus and that she could no longer remain at UA.

85.     The hostility that Megan encountered with UA, the WGRC, and the Title IX office deeply affected Megan's efforts and hopes to obtain proper mental health care for the remaining months of her life and she described it as it being violated again each time she sought out help.

86.     As a direct and proximate result of the sexual attack by Defendant Bunn and the deliberate acts, omissions, and failures of Defendant Howard, Megan's fears, anxiety, depression and PTSD grew increasingly and she withdrew from UA in October 2015, and returned home to Austin, Texas. She did not return to Alabama.

87.     Megan's decision to leave UA was directly caused by the school's refusal to provide her with adequate accommodations of her diagnosed anxiety, depression, PTSD, and indifference to the trauma she experienced while a student.

88.     In October, Megan notified Defendant Howard that she intended to withdraw from UA, Howard affirmatively stated in an e-mail that she would fully assist Megan throughout the withdrawal process.

89.     Specifically, Defendant Howard offered to expedite Megan's transcripts to assist with transfer, to prepare a formal outline of Megan's academic and scholarship status, to determine the refund of certain remaining fees, and assistance with subleasing her apartment.

90.     Despite what Defendant Howard stated she would provide for Megan's accommodations, Howard nor anyone in the Title IX office ever contacted professors to indicate that any accommodations should be offered. When Megan informed her professors and the head of the department of her withdrawal from the university, they were surprised and shocked at Megan's decision to withdraw from the university.

91.     Trusting that Defendant Howard would provide the assistance promised, Megan

began the process of transferring to a university in Texas to continue her pursuit of a college degree in hopes that she would be able to complete the education she started at the UA.

92.     Megan's new university required a letter of good standing from UA in order to complete her enrollment for the Spring 2016 semester.

93.     Megan and her parents repeatedly contacted Defendant Howard to finalize Megan's withdrawal and to obtain a letter of good standing from UA.  Howard ignored Megan's requests for assistance.

94.     After weeks without a response from Defendant Howard, Megan's father sent a letter to the UA president, Dr. Stuart R. Bell, requesting assistance with obtaining a letter of good standing and finalizing Megan's withdrawal from UA.

95.     Defendant Howard was directed by the UA's president's office to follow up with Plaintiff Michael Rondini following his e-mail. Once again, Plaintiff Michael Rondini received no follow up call or e-mail from Defendant Howard.

96.     Defendant Howard deliberately delayed her response to the Rondinis' request for assistance and responded nearly two months after Megan notified Defendant Howard of her request to withdraw under Title IX, and only after Plaintiff Cynthia Rondini called to notify Defendant Howard of the Rondinis' plans to retain an attorney.

97.     When Megan formally withdrew from UA and moved back to Texas, she sought medical, psychological and psychiatric help.  She had ever increasing fears, anxiety, sleeplessness, panic attacks, weight loss, feelings of worthlessness and hopelessness, loss of motivation, and decline of cognitive and overall functioning.  Megan continued treatment for depression, anxiety, and post-traumatic stress disorder (PTSD).  Megan believed that her injuries were permanent and that she could never recover, even with treatment.

98.     Megan completed a "Health History Form" on February 24, 2016 for psychiatric treatment purposes and indicated that she was having "Suicidal Thoughts" and problems with "PTSD, depression, [and] anxiety stemming from the sexual assault and rape on July 1, 2015." In answering whether "there had been major losses, changes, or crisis in [her] life," Megan stated she had been "raped, bullied by police, and changed university."

99.     On February 24, 2016, Megan communicated in a text message: "When all is said and done, I wonder what I could've accomplished if one man didn't completely rip everything away from me."

100.    Early in the morning between 2:00 a.m. and 8:30 a.m. of February 26, 2016, Megan deliberately took her own life by hanging.

101.    The autopsy report indicated that Megan "had post-traumatic stress disorder, depression and anxiety following a sexual assault in 2015."

102.    On the day of Megan's suicide, Defendant Bunn was arrested for driving under the influence in Tuscaloosa, Alabama by the Tuscaloosa Sheriff's Department at around 6:20 a.m.

## CAUSES OF ACTION

### COUNT I: WRONGFUL DEATH of Megan Rondini
### (Against all Defendants)

103.    Plaintiffs hereby adopt and reallege each and every allegation in paragraphs 1 through 103 of this complaint as if fully set out herein.

104.    This claim is brought pursuant to Ala. Code 1975 § 6-5-410, by and for the benefit of Michael and Cynthia Rondini, the biological parents of Megan.

105.    At all times set forth hereinabove, Defendants negligently, recklessly, wantonly, and/or wrongfully acted or failed to act in response to Megan's reported sexual assault.

106.    As a direct and proximate result of Defendants' intentional, wanton, and wrongful

conduct, Defendants caused Megan extreme depression, anxiety, PTSD, fear, panic attacks, decline of cognitive functions and general well-being, weight loss, and feelings of worthlessness and hopelessness, all of which directly led to Megan's loss of life.

107.    Because of Megan's death, her parents, individually and together, have sustained harm, injuries and damages under Alabama Law, and are entitled to at least the following damages:

     a.   The loss of the friendship, companionship, guidance, and nurturing of their daughter;

     b.   The loss of the services of their daughter;

     c.   Mental anguish, emotional distress, depression, and total loss suffered because of the death of their daughter;

     d.   Funeral and burial expenses;

     e.   The loss of their daughter's future earnings and financial support; and

     f.   All other incidental and consequential damages, fees and expenses.

108.    In addition, Megan's death was the direct and proximate result of Defendants' intentional, wanton, and malicious actions evidencing a conscious indifference to Megan's rights and welfare. Thus, under Alabama Law, Plaintiffs as Megan's parents, each of them individually, are entitled to exemplary and punitive damages.

109.    WHEREFORE, MICHAEL W. RONDINI, as Personal Representative of the Estate of MEGAN ELIZABETH RONDINI, their deceased child, demand judgment against the Defendants, jointly and severally, for compensatory and punitive damages, plus interest and costs.

**COUNT II: VIOLATION OF 42 U.S.C. § 1983 - NEGLIGENT HIRING, TRAINING AND SUPERVISION**
**(Against Defendant SHERIFF ABERNATHY)**

110.    Plaintiffs hereby adopt and reallege each and every allegation in paragraphs 1

through 110 of this complaint as if fully set out herein

111.    At all times relevant hereto, Defendant Abernathy owed a duty to the public, and specifically to Megan Rondini, to exercise reasonable care in the hiring, training, and supervision of his officers.

112.    Defendant Abernathy had knowledge of, and was deliberately indifferent to the fact that he did not apprehend or adequately investigate Megan Rondini's sexual assault on July 2, 2015. Defendant Abernathy and his employees acted with deliberate indifference and denied Megan Rondini of her rights and interests as a victim.

113.    The actions and inactions of Defendant Abernathy posed a known substantial risk of serious harm. Under the totality of circumstances, Defendant Abernathy's policies, procedures, practices, customs, and regulations as applied to an innocent and unaware citizen demonstrate a continuation of a pattern of action. Defendant Abernathy's lack of properly trained deputies and employees, his failure to supervise, and his sheer slipshod and recklessness resulted in deliberate indifference to the known substantial risk of serious harm to Megan Rondini and her safety needs, which violated her constitutionally protected rights under the Fourth, Eighth and Fourteenth Amendments of the United States Constitution.

114.    Defendant Abernathy knew, or should have known, that dangerous consequences could be suffered by individuals, specifically Megan Rondini, by failing to properly train and supervise its employees. Defendant Abernathy could have and should have pursued reasonable methods for the training and supervising of such employees, but failed to do so.

115.    Defendant Abernathy's policies, customs, or practices in failing to train and supervise his employees were the proximate cause of, and moving force behind, the violation of Megan Rondini's constitutional rights, which lead to her loss of life.

116.   WHEREFORE, PREMISES CONSIDERED, Plaintiff, MICHAEL W. RONDINI, as Personal Representative of the Estate of MEGAN ELIZABETH RONDINI, deceased, claims damages for the conscious pain and suffering incurred by decedent, as provided for under 42 U.S.C. § 1983.

## COUNT III: VIOLATION OF 42 U.S.C. § 1983 – EQUAL PROTECTION AGAINST INVESTIGATOR JONES AND DEPUTY HASTINGS
### (Against Defendant JONES and Defendant HASTINGS)

117.   Plaintiffs hereby adopt and reallege each and every allegation in paragraphs 1 through 117 of this complaint as if fully set out herein.

118.   At all relevant times herein, Defendant Jones and Defendant Hastings acted under color of law.

119.   At all relevant times herein, Defendant Jones and Defendant Hastings with deliberate indifference, intentionally, willfully, and wantonly and/or with reckless disregard deprived Megan Rondini of rights and/or privileges secured by the Constitution, including but not limited to:

   a.   Defendant Jones and Defendant Hastings violated Plaintiff's decedent, Megan Rondini's property interests in her rape kit, which had been provided by DCH Regional Hospital and stored the Tuscaloosa Sheriff's Department, and their right to redress in the courts, by failing to investigate, submit sexual evidence kits or arrest the accused; and

   b.   Defendant Jones and Defendant Hastings violated Megan Rondini of Due Process Clause property interests in their persons, by failing to investigate, submit sexual assault evidence kits or arrest the accused.

120.   Defendant Jones and Defendant Hastings with deliberate indifference, failed to

implement established procedures that are necessary to provide a proper investigation to complainants.

121.  Defendant Jones and Defendant Hastings' deliberate indifference, willful and wanton conduct created a danger of an increased risk of harm to the victims of sexual abuse, which are disproportionately females, by failing to investigate sexual assault crimes.

122.  Defendant Jones and Defendant Hastings' deliberate indifference, willful and wanton conduct created a danger of an increased risk of harm to the victims of sexual abuse, which are disproportionately females, by fostering an environment whereby the perpetrator of the sexual assault was allowed to continue to prey on victims without fear of investigation by the Tuscaloosa Sheriff's Department.

123.  Defendant Jones and Defendant Hastings' conduct was motivated by gender.

124.  Defendant Jones and Defendant Hastings' conduct was intentional and due to Megan Rondini's female gender.

125.  The above described conduct of Defendant Jones and Defendant Hastings constitutes a violation of 42 U.S.C. § 1983.

126.  As a direct and proximate result of Defendant Jones and Hastings' actions, omissions, policies, practices and customs, all committed or adopted with deliberate indifference, Plaintiff's decedent was denied the rights afforded to her, given the circumstances, thus causing a deterioration of her mental condition, all in violation of her rights afforded by the Constitution.

127.  As a result of the actions and omissions of the Defendant Jones and Defendant Hastings, Plaintiff's decedent suffered extreme emotional pain and suffering, which ultimately lead to her loss of life.

128.  WHEREFORE, MICHAEL W. RONDINI, as Personal Representative of the Estate of MEGAN ELIZABETH RONDINI, their deceased child, demand judgment against the

Defendant ADAM JONES and Defendant JOSHUA HASTINGS, jointly and severally, for compensatory and punitive damages, plus interest and costs.

## COUNT IV: VIOLATION OF 42 U.S.C. § 12101
### (Against Defendant BLAKES)

129.   Plaintiffs hereby adopt and incorporate by reference the allegations of preceding paragraphs 1 through 128 of this complaint as if fully set out herein.

130.   Title II of The Americans with Disabilities Act (ADA) provides that no qualified individual with disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of a public entity, or be subjected to discrimination by such entity.

131.   Title II of the ADA requires that a public entity take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others.

132.   Title II of the ADA also requires a public entity to furnish appropriate auxiliary aids and services where necessary to afford an individual with disability an equal opportunity to participate in, and enjoy the benefits of a service, program, or activity conducted by a public entity.

133.   To be protected by the ADA one must have a disability, defined by the ADA as "(a) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (b) a record of such an impairment; or (c) being regarded as having such an impairment." 42 U.S.C. § 12102(2) (1994); 29 C.F.R. § 1630.2(g) (1996).

134.   The ADA rule defines "mental impairment" to include "any mental or psychological disorder, such as . . . emotional or mental illness." 29 C.F.R. § 1630.2(h)(2) (1996).

135.   Defendant Blakes was aware of Megan's disability as her physician in Texas diagnosed Megan with depression, anxiety, and PTSD.

136.   Depression, anxiety, and PTSD are recognized by the ADA as mental disabilities.

137.     As a governmental and public entity charged with ensuring compliance with federal law, Defendant Blakes knew or should have known her duties and obligations under Title II of the ADA.

138.     Despite this knowledge and based on the facts alleged herein, Defendant Blakes intentionally refused adequate compliance with Title II of the ADA and failed to afford Megan with disability accommodations in a setting appropriate to her needs, in violation of 42 U.S.C. § 12182.

139.     Defendants subjected Megan to discrimination by denying her full access to equal education and health services, including the enjoyment of benefits of a service, program or activity conducted by the university which ultimately lead to her loss of life.

140.     WHEREFORE, MICHAEL W. RONDINI, as Personal Representative of the Estate of MEGAN ELIZABETH RONDINI, their deceased child, demand judgment against the Defendant CARA BLAKES, jointly and severally, for compensatory and punitive damages, plus interest and costs.

## COUNT V: VIOLATION OF 42 U.S.C. § 1983 SUBSTANTIVE DUE PROCESS - LOSS OF PARENT/CHILD RELATIONSHIP FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION
### (Against All Defendants)

141.     Plaintiffs hereby adopt and incorporate by reference the allegations of preceding paragraphs 1 through 140 of this complaint as if fully set out herein.

142.     Such conduct by said Defendants "shocks the conscience."

143.     As a direct and proximate result of said Defendants' conduct, Plaintiffs suffered injuries and damages as alleged herein including pain and suffering and emotional distress.

144.      The aforementioned acts and/or omissions of the individually named Defendants were willful, wanton, malicious, reckless, and oppressive, thereby justifying an award of exemplary and

punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

145.    WHEREFORE, PREMISES CONSIDERED, Plaintiffs, MICHAEL W. RONDINI and CYNTHIA M. RONDINI, surviving parents of MEGAN ELIZABETH RONDINI, their deceased child, demand judgment against the Defendants, jointly and severally, for compensatory and punitive damages, plus interest and costs.

## PRAYER FOR RELIEF

146.    THEREFORE, Plaintiffs respectfully request the following relief:

a) A declaratory judgment that Defendant Abernathy's actions, policies, and practices complained of herein violated Megan Rondini's rights as secured by the Fourth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

b) Injunctive relief to prohibit future constitutional violations against Defendant Abernathy including, but not limited to, inadequate training, inadequate supervision, and failure to provide safe conditions to citizens around criminal investigations and arrests and for any and all other relief to which is proper under the circumstances;

c) A joint and several judgment against all Defendants for all general and special compensatory damages caused by the conduct of the Defendants in an amount exceeding the minimum amount required for federal court jurisdiction in diversity of citizenship cases;

d) The cost of litigating this case;

e) Attorney fees and costs as allowable under 42 U.S.C. § 1988 and other applicable laws;

f) A joint and several judgment against all Defendants for punitive damages in an amount necessary and sufficient to punish Defendants and deter Defendants and others from similar conduct in an amount exceeding the minimum amount required for federal court jurisdiction in diversity of citizenship cases;

g) A trial by jury;

h) All other relief to which Plaintiffs are entitled or that the Court deems just and proper.

## **JURY DEMAND**

147.   Plaintiffs request a trial by jury.


DATED this is the 2nd day of July, 2017.


Respectfully submitted,
/s/ Leroy Maxwell, Jr.
Leroy Maxwell, Jr.
Attorney for Plaintiffs

**Of-Counsel:**
**Maxwell Law Firm**
2100 1st. Ave. N. Suite 370
Birmingham, Alabama 35203
T: (205) 216-3304
F: (205) 409-4145
Maxwell@MxLawfirm.com

25