FILED

2017 Jul-26  PM 02:44
U.S. DISTRICT COURT
N.D. OF ALABAMA



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISON

| | | |
|---|---|---|
| MICHAEL W. RONDINI AND CYNTHIA M. RONDINI, as the surviving parents of MEGAN ELIZABETH RONDINI, their deceased child; MICHAEL W. RONDINI, as Administrator and Personal Representative FOR THE ESTATE OF MEGAN ELIZABETH RONDINI, deceased, Plaintiffs, v. THE UNIVERSITY OF ALABAMA at TUSCALOOSA, DR. STUART R. BELL, in his official capacity as PRESIDENT of the University of Alabama, TERRY J. BUNN, Jr., SHERIFF RONALD ABERNATHY of the Tuscaloosa Sheriff's Department, and INVESTIGATOR ADAM JONES AND DEPUTY JOSHUA HASTINGS of the Tuscaloosa Sheriff's Department, Defendants. | § § § § § § § § § § § § § § § § § § § § | Civil Action No. 7:17-cv-01114-TMP |

## FIRST AMENDED COMPLAINT AND JURY DEMAND

Plaintiffs, MICHAEL W. RONDINI and CYNTHIA M. RONDINI, surviving parents of MEGAN ELIZABETH RONDINI, their deceased child, and MICHAEL W. RONDINI, as Administrator and Personal Representative of the Estate of MEGAN ELIZABETH RONDINI, deceased, by and through undersigned counsel, file this Complaint and Jury Demand against Defendants, THE UNIVERSITY OF ALABAMA, DR. STUART R. BELL, in his official capacity as the President of the University of Alabama, TERRY JACKSON BUNN, Jr., SHERIFF RONALD ABERNATHY, and OFFICERS ADAM JONES AND JOSHUA HASTINGS, for compensatory and punitive damages for the subsequent acts and omissions of Defendants THE

UNIVERSITY OF ALABAMA at TUSCALOOSA, PRESIDENT DR. STUART R. BELL, TERRY JACKSON BUNN, Jr., SHERIFF RONALD ABERNATHY, AND INVESTIGATOR ADAM JONES, AND DEPUTY JOSHUA HASTINGS. In support of their Complaint and Jury Demand, Plaintiffs allege the following:

## PRELIMINARY STATEMENT

1.      This is a civil action brought to vindicate the Plaintiffs' rights under the United States Constitution, the Alabama State Constitution, and under the statutory laws of the United States and Alabama.

2.      This is an action for damages that arises from the sexual assault of Megan Rondini by Terry Jackson Bunn, Jr. and from the subsequent faulty practices, mishandling of investigation, and deliberate indifference by the Defendants named herein, ultimately leading to death by suicide of Megan Elizabeth Rondini.

3.      This is an action for damages sustained by a citizen of the United States against the University of Alabama at Tuscaloosa, which was deliberately indifferent to the Title IX complaints of Plaintiff's decedent, Megan Rondini, and which retaliated against Ms. Rondini after she made her Title IX complaints.

4.      This is an action for damages sustained by a citizen of the United States against Sheriff Ronald Abernathy of the Tuscaloosa County Sheriff's Department, who failed to assure proper training and supervision of the personnel and employees, and to implement practices, policies, and procedures to discourage lawless official conduct, as well as against Investigator Adam Jones and Deputy Joshua Hastings of the Tuscaloosa County Sheriff's Department, who deliberately violated Megan Rondini's constitutional rights.

## STATEMENT OF JURISDICTION

5.      Federal subject matter jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331 and 1343(a)(3)-(4) to obtain redress for the deprivation of rights guaranteed by the Fourth, Eighth, and Fourteenth Amendments to the Constitution of the United States pursuant to 42 U.S.C. § 1983 and pursuant to 20 U.S.C.A § 1681(a), *et seq*.

6.      The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C § 1367.

7.      The Plaintiff also invokes jurisdiction under 28 U.S.C. § 1332 because of diversity of the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

8.      Venue is proper in the United States District Court for the Northern District of Alabama pursuant to 28 U.S.C. § 1391 because Defendants reside in the state of Alabama and the acts and omissions giving rise to this lawsuit occurred in the state of Alabama.

## PARTIES

8.      Plaintiff Michael W. Rondini is over the age of nineteen and is a resident and citizen of Austin, Travis County, Texas.  He is the biological father of Megan Elizabeth Rondini.

9.      Plaintiff Cynthia M. Rondini is over the age of nineteen and is a resident and citizen of Austin, Travis County, Texas.  She is the biological mother of Megan Elizabeth Rondini.

10.     Plaintiff Michael W. Rondini is also the Administrator and Personal Representative of the Estate of Megan Elizabeth Rondini, deceased, by appointment of the Probate Court for Travis County, Texas.

11.     Plaintiff's decedent, Megan Rondini, was a Texas citizen, maintaining her Texas driver's license, enrolled at The University of Alabama in Tuscaloosa, Alabama. She resided in Tuscaloosa, Alabama from approximately August 2013 through May 2014, August 2014 through

July 5, 2015, and August 2015 through early October 2015 and was considered a non-Alabama resident for tuition purposes by the University of Alabama. Megan Rondini was 21 years old when she took her life on February 26, 2016 in Dallas, Texas.

12.     Defendant the University of Alabama ("UA") is a public institution of higher education located in Tuscaloosa, Alabama, and is a recipient of federal financial assistance within the meaning of 20 U.S.C. § 1681(a).

13.     Defendant Dr. Stuart R. Bell ("President Bell") is President of the University of Alabama. President Bell was ultimately responsible for managing all Title IX personnel, policies, and procedures, ensuring UA's compliance with its own policies and with federal and state gender non-discrimination laws and guidance. President Bell is sued herein in his official capacity.

14.     Defendant Terry Jackson Bunn, Jr. ("Defendant Bunn") is over the age of nineteen and is a resident and citizen of Tuscaloosa County, Alabama.

15.     Defendant Sheriff Ronald Abernathy ("Defendant Abernathy") has been a high-ranking law enforcement officer employed by The Tuscaloosa County Sheriff's Office for the past decade. Sheriff Abernathy was elected Sheriff of Tuscaloosa County in November 2014. Defendant Abernathy is sued herein in his official capacity.

16.     Defendants Investigator Adam Jones and Deputy Joshua Hastings ("Defendant Jones" and "Defendant Hastings") are officers/employees of the Tuscaloosa Sheriff's Department, acting under color of state law and sued herein in their individual capacities.

17.      Defendant Fictitious Parties A through L are those persons, entities, or parties who participated in causing injury to Plaintiff's decedent, Megan Rondini.

18.     Defendant Fictitious Parties M through P are those persons, entities, or parties who were responsible for ensuring that the sheriff's deputies employed by the Tuscaloosa Sheriff's

Department understood the appropriate procedures to use in effectuating an arrest. The identities of Fictitious Parties M through P are currently unknown to the Plaintiffs.

19.     Defendant Fictitious Parties Q through V are those persons, entities or parties who were responsible for ensuring that the University of Alabama by and through its administrators and employees provides its students adequate counseling, advisement, accommodations, and educational benefits and opportunities, including any procedure deemed appropriate. The identities of Fictitious Parties Q through V are currently unknown to the Plaintiffs.

## **FACTUAL ALLEGATIONS**

## **BACKGROUND FACTS RELEVANT TO THE TITLE IX COUNTS AGAINST THE UNIVERSITY OF ALABAMA**

20.     The Office for Civil Rights ("OCR"), a division of the United States Department of Education ("DOE"), is responsible for the implementation, interpretation, and enforcement of Title IX. The DOE was authorized by Congress, pursuant to 20 U.S.C.A. § 1682, to promulgate regulations to govern the enforcement of Title IX.

21.     The OCR has promulgated numerous documents outlining the requirements for an educational institution to comply with Title IX, including the Dear Colleague Letter of April 4, 2011 ("DCL"). The DCL is a "significant guidance document," intended to provide educational institutions with clarity as to the requirements they must follow if they wish to retain federal funding.

22.     With respect to the protection of students from sexual harassment and sexual assault, the DCL requires schools "to publish a notice of nondiscrimination and to adopt and publish grievance procedures." The DCL also requires school employees to be "trained so that

they know to report harassment to appropriate school officials, and so that employees with the authority to address harassment know how to respond properly."

23.     If a student files a complaint with a school receiving federal funding, the school must process the complaint in accordance with its established procedures, regardless of where the conduct occurred. The school's inquiry into any such complaint must be prompt, thorough, and impartial, and it must disclose any real or perceived conflict of interest to the complainant. A law enforcement investigation does not relieve a school of its independent Title IX obligation to investigate a claim of assault.

24.     Under Title IX, a school must take prompt steps to protect the complainant as necessary, including taking interim steps before the final outcome of an investigation, and taking steps to minimize the burden on the complainant.  Further, schools must "tell the complainant that Title IX prohibits retaliation, and that school officials will not only take steps to prevent retaliation but also strong responsive action if it occurs."

25.     University of Alabama Sexual Misconduct/Title IX policy (revised August 2016) (the "Policy" or the "Title IX Policy") commits UA to providing "an environment free from sexual misconduct." The Policy covers all students and employees of UA, regardless of where the harassment occurs (on campus or off campus) if it affects the campus or access to education of a student.

26.     The Policy also applies to third parties who are not official members of the UA community. When a third party violates the Policy, UA "shall" subject the violator to appropriate sanctions, which may include, but are not limited to, a no contact order, verbal counseling, written counseling or warning, mandatory counseling, educational assignment, fines, restitution, prohibition on employment or volunteer activities at the University, campus ban/no trespass

warning from UAPD, ineligibility for programs open to various groups, notification to the entity with which the violator is associated, and a referral to proper law enforcement authorities for prosecution.

BACKGROUND FACTS RELEVANT TO THE UNIVERSITY OF ALABAMA

27.     Sexual assault claims are nothing new to UA. As detailed in a June 27, 2017, opinion piece entitled "Our View: University of Alabama must take action to stop sexual assault," the Editorial Board of the University of Alabama student newspaper points out the complete failure of UA to fulfill its Title IX obligations to Megan Rondini and other young women before her. The piece reads: "Sexual assault has been brought to the forefront of campus dialogue once again. Unfortunately, this is an all-too-common occurrence that The University of Alabama has chosen to ignore time and time again. A recent article published by Buzzfeed News told the story of former student Megan Rondini, who accused Defendant T.J. Bunn, Jr., a member of a prominent Tuscaloosa family, of sexual assault. Ultimately, Rondini was failed by the larger justice system of Tuscaloosa, but most importantly to this publication, by The University of Alabama. Her story, while devastating, revealed many of the inadequacies of the Tuscaloosa Police Department and UA policy regarding sexual assaults that many Alabama women already know too well. Too many women each year are forced to go through the same trials of victim blaming and inadequate support that ultimately cost Rondini her life."

28.     The facts underlying the failures of UA and the other defendants to protect Megan and to prefer its relationship with a wealthy donor family are shocking. ST Bunn Construction Company is headquartered in Tuscaloosa; the Company claims to have paved every road in the town. Its main offices are on University Boulevard, directly across from the University and the Innisfree Irish Pub frequented by Defendant Bunn.  ST Bunn Construction is a member of the

Lifetime Giving Society of the influential Crimson Tide Foundation for having given between $99,000 and $500,000 in lifetime gifts to UA Athletics. (The Crimson Tide Foundation paid off Football Coach Nick Saban's $3.1 million home in 2013).

29.     S.T. Bunn is President of ST Bunn Construction Company. He is a prominent Alabaman and a prominent member of the UA community. He was a major donor to former Alabama Governor Robert J. Bentley's election campaign, and he served as a member of Gov. Bentley's transition team. S.T. Bunn currently serves as a member of the UA Engineering Leadership Board and as a member of President Bell's "President's Cabinet," a consultative invitation-only group of elite donors and businesspeople. The Bunn family jet frequently transports boosters and UA officials to Crimson Tide away football games.

30.     Defendant Bunn is an alumnus of UA and is Vice President of the ST Bunn Construction Company. In 2013, he was named a member of the Alabama Conservation Advisory Board by former Governor Bentley. According to police records, he is 37 years old; he has been detained by the police numerous times for driving while under the influence of alcohol. He is known throughout the Tuscaloosa community as a "big game hunter."

### FACTS RELATED TO MEGAN RONDINI'S COMPLAINTS OF RAPE

31.     In July 2015, Megan was 20 years old and entering her junior year at UA as a pre-med honors student. She was majoring in biology and had a 3.812 cumulative GPA.

32.     On or about the night of July 1, 2015, Megan went to the Innisfree Irish Pub with several friends. Innisfree is located directly across the street from ST Bunn Construction Company. Defendant Terry Jackson Bunn, Jr., Vice President of ST Bunn Construction Company, was a frequent patron of Innisfree.

FIRST AMENDED COMPLAINT AND JURY DEMAND - Page 8

33.    While at Innisfree, Megan saw Defendant Bunn and his friend Jason Stephen Barksdale. Over the course of the evening, Megan had several beers, which impaired her judgment. By the time she left Innisfree, Megan either was intoxicated or she was under the influence of a drug administered to her surreptitiously.

34.    Megan's recollection of the evening had gaps, establishing her clear impairment. At some point in the evening, Defendant Bunn, accompanied by Jason Barksdale, drove Megan to his home at 1570 Cedar Drive in Cottondale, Alabama in his white Mercedes.  Defendant Bunn insisted that Megan have sex with him; Megan repeatedly resisted. She asked Defendant Bunn numerous times to take her home or back to her friend's residence. He refused.

35.    Instead, Defendant Bunn took Megan to his bedroom, where he forcefully removed her clothing and forced her to engage in oral sex. He then used his superior strength to hold Megan down, and he forced himself on her and raped her.  Defendant Bunn's attack lasted for over 30 minutes. The sexual assault was against Megan's will and without her consent.

36.    When Defendant Bunn finally fell asleep, Megan discovered that he had locked the only door to his bedroom, and she was imprisoned. She became frantic and immediately began contacting friends through multiple text messages describing her terrifying circumstances and urgently seeking help.

37.    Seeing no alternative, Megan took the only possible means of escape by crawling through Defendant Bunn's bedroom window onto the roof and jumping to the ground two stories below. Megan waited alone in the pitch dark in the early morning hours, knowing help from her friends on campus was at least 20 minutes away. Although she had no money on her person, she also called a cab to get away from Defendant Bunn's house as soon as possible.

38.     Terrified, Megan looked in Defendant Bunn's car hoping to find her keys (which she had not found prior to escaping from Defendant Bunn's room). Instead, she found a loaded gun. When she picked up the gun, she accidentally discharged it, frightening herself further.

39.     Not finding her keys, and knowing Defendant Bunn was passed out, Megan climbed back up on the roof and slipped into Defendant Bunn's room to try to locate her keys. She did not find them, but she found $3 in Bunn's pants pocket (on the floor), which she took.

40.     When Megan's friends arrived, they took her to their apartment and then immediately to DCH Hospital in Tuscaloosa. At DCH, Megan reported the attack to medical personnel and the Tuscaloosa Sheriff's Department. A rape kit, along with a urine sample, was performed at the hospital and delivered to law enforcement. Immediately following completion of the rape examination, Megan travelled from DCH to the Tuscaloosa Sheriff's Department for a second interview.

41.     During the early morning hours of July 2, 2015, Megan also had called her parents. Megan's mother Cindy immediately began to drive from her home in Austin, Texas to Tuscaloosa. Megan's father Michael contacted the Women and Gender Resource Center ("WGRC") at UA to ensure that a victim advocate would be present at the hospital to support Megan through the exams and interviews. He also sent an email to the UA Title IX Coordinator, Beth Howard, notifying her of the assault and requesting information on Megan's rights and the support and assistance Megan could expect to receive under Title IX.

42.     Despite Michael's call, the advocate from the WGRC did not appear until hours later. Although the advocate eventually accompanied Megan to the Sheriff's Department, she admitted to Megan that she was aware that Megan's rapist was Defendant Bunn, and that she knew of his prominence in the community. She later abandoned Megan while she was still being

questioned by police.  As she was deserting Megan at the Sheriff's Department, the advocate suggested that Megan or her family might want to contact the Title IX Coordinator at UA, Beth Howard.

43.     Michael Rondini spoke with Defendant Jones of the Tuscaloosa Sheriff's Department in the early morning after the attack, and before Megan arrived there for the second round of interviews. When he learned of Defendant Bunn's prominence in the community, Michael expressed reservations about the interviews. Defendant Jones assured Michael that the officers assigned to Megan's complaint were trained to handle "high profile" cases such as this one. In view of the influence of the Bunn family, Michael became concerned that Megan did not have an attorney to protect her during questioning. When Michael expressed his concern that Megan did not have an attorney, Defendant Jones responded, "Whatever for?"

44.     Despite the seriousness of the matter he was investigating, Defendant Jones failed to observe even the most basic of protocol. Astonishingly, he failed to take a single note during his interview of Megan. Of the questions he did ask, Defendant Jones wholly avoided those that would have led to information further incriminating Defendant Bunn. For instance, despite gaps in Megan's memory about how she left the pub and ended up in Defendant Bunn's Mercedes, he failed to ask Megan questions that would have shed light on the possibility that her sexual assault was facilitated by the use of a date rape drug.

45.     Defendant Jones also failed to obtain any significant testimony from Megan about the actual sexual encounter. Instead, he focused on trivial questions suggesting his bias against Megan, such as whether she remembered the color of the sheets on Defendant Bunn's bed.  He also focused much of his questioning on conduct prior to the rape, including an alleged trip to Megan's apartment by Megan, Defendant Bunn, and Jason Barksdale. In addition to stating that

she had no recollection of going back to her apartment that night with Defendant Bunn, Megan also correctly pointed out that any stop made at her apartment would be irrelevant to the question of whether she consented to sex at Defendant Bunn's house.

46.    Defendant Jones also displayed his bias by focusing on the three dollars Megan took from Defendant Bunn's pocket and the accidental discharge of the weapon Defendant Bunn had been transporting when he drove Megan to his house. Defendant Jones failed to explore why she had jumped out of his window if the sex was consensual, but asked her twice why she did not call police "right away." Apparently, Megan's coming to the hospital for a rape kit as soon as her friends picked her up, and immediately thereafter to the Sheriff's Office was not sufficient for Defendant Jones.

47.    During the interview, without further inquiry, Defendant Jones reached an unfounded conclusion that she had not "kicked him [Bunn] or hit him," and that no rape had occurred.

48.    Early on the morning of July 2, 2015, the police went to Defendant Bunn's house to speak with Defendant Bunn and Jason Barksdale. The police inexplicably did not record the interview with Defendant Bunn. In response to questioning, Defendant Bunn lied and denied having Megan over to his house.

49.    During the time that Sheriff's Department officers were at his house, Defendant Bunn was left alone, and officers heard him shut a window outside their presence. When officers confronted Defendant Bunn, he demanded an attorney.

50.    Although failing to record the Defendant Bunn interview, Sheriff's agents did videotape the Bunn home as they walked through it. The videotape shows the officers having a congenial discussion with Defendant Bunn, the focus of which was not on the sexual assault, but

on an allegation by Defendant Bunn that Megan stole credit cards from his wallet. This allegation was false, and was later proven to be false.

51.     After police went to Defendant Bunn's house and interviewed him, they methodically began to shift the focus away from the rape reported by Megan to prosecuting her for the accidental firearm discharge after her escape from Defendant Bunn's room.  Shortly after returning to the Sheriff's Department, Defendant Jones read Megan her Miranda Rights. This decision to treat Megan as a crime suspect, rather than a crime victim, completed the smoke and mirrors "investigation" of the Sheriff's Department, and Megan's status as a victim of a sex crime was completely forgotten. At the time, Megan was completely on her own, without any assistance from the UA Victim Advocate who should have been present.

52.     On the same day Megan was raped, Defendants Jones and Defendant Hastings informed Megan that they intended to pursue felony charges against Megan for Breaking & Entering and Theft of Property.

53.     Defendants Jones and Defendant Hastings attempted and used the threat of felony charges to bully Megan into dropping her claim against Defendant Bunn. Instead of fully investigating Megan's assault claim, Defendants Jones and Defendant Hasting decided to do little and wait for Megan to fold under the pressure of potential felony charges.

54.     In addition to the sham investigation, the Sheriff's Department chose not to send Megan's rape kit or her urine sample for testing.  Thus, the Department shut and locked the door on any evidence that would have established whether Megan had been drugged, in addition to being raped.

55.     Ultimately, the only conclusive medical/forensic evidence gathered from the Sheriff's Department investigation was that Megan tested positive for a sexually transmitted disease that she contracted from having sexual contact with Defendant Bunn.

56.     Defendant Hastings subsequently interviewed Defendant Bunn on July 6, 2015. In this interview, Defendant Hastings failed to probe any details of the alleged sexual assault. He made no attempt to establish a record of what transpired from the time that Defendant Bunn left the bar until the police woke him up at his house. Defendant Hastings did not ask Defendant Bunn about any of the specific details reported by Megan of the alleged assault.

57.     Although Defendant Hastings was supposed to interrogate Defendant Bunn as a rape suspect, he conveyed that the police were united with Defendant Bunn against Megan. When Defendant Bunn's lawyer told Defendant Hastings "I know there's any number of ways this could go. We just want this to be over," Defendant Hastings said: "[We're] just kind of waiting to see how far she's gonna push this."

58.     When Title IX Coordinator Beth Howard did not respond to his first email on July 2, 2015, Mr. Rondini made a second additional attempt to contact her. By this time, UA was fully aware that Megan had accused Defendant Bunn of raping her. Despite her position and her duties under Title IX, neither Beth Howard nor any other employee in UA's Title IX Office responded to Mr. Rondini or Megan.

59.     While Megan and her parents were making efforts to communicate with Beth Howard, unbeknownst to the Rondini family, Beth Howard was communicating with Kip Hart at the Tuscaloosa Sheriff's Department. On July 9, Mr. Hart sent Ms. Howard an email advising her that there were "issues" in the Rondini case. Neither Hart nor Howard informed the Rondinis of the contact or the potential conflict of interest.

60.     On or about July 4, 2015, Megan returned to Austin, Texas.  Once home in Texas, Megan received medical attention for the sexually transmitted disease she had received from Defendant Bunn, and she began seeing a psychotherapist for trauma. Megan was diagnosed with anxiety, depression, and post-traumatic stress disorder (PTSD) from the assault.

61.     On or about August 2, 2015, a licensed clinical social worker prescribed Megan a dog to serve as an emotional support animal to help mitigate the painful symptoms she was experiencing from the assault and the aftermath of her rape report.

62.     Approximately three weeks after the assault, former District Attorney Lyn Head called Megan's father and apologized for taking three weeks to return a call that Megan's father had made to her on July 2, 2015. District Attorney Head was not unaware of the Bunn family; rather, she has close political ties to the ST Bunn Construction Company and to S.T. Bunn. The District Attorney advised Mr. Rondini that after reviewing Megan's videotaped interview, she had decided not to bring the case before the grand jury. She concluded that the assault was consensual, in part because Megan did not use the word "rape" in her statement, and instead called it a "sexual assault."

63.     Despite the rape and her subsequent mistreatment by all Defendants, Megan decided to return to UA in August 2015 to fulfill a leadership responsibility during sorority recruitment.  She also hoped to continue with her education in the fall semester as a step toward regaining a normal life with friends she trusted.

64.     Under UA's Sexual Misconduct Policy, complainants such as Megan have a right to "an investigation and conduct process that is prompt, fair, impartial, sensitive, supportive, and respectful."  In violation of its own Policy and federal law, UA never investigated Megan's complaint.

65.     Due to its failure to discharge its Title IX responsibilities with an investigation, UA never ordered Defendant Bunn not to contact Megan. It never restricted Defendant Bunn from volunteer work on campus, or from being on campus at all. It failed to take such steps despite knowledge that Megan was frightened of Defendant Bunn and of seeing him on campus. Instead of limiting him, Defendant Bunn had and continues to have free reign of UA's campus.

66.     As she learned more about Defendant Bunn and his family, Megan became rightfully fearful that she would encounter Defendant Bunn on campus, and that he would attack her again or retaliate against her for reporting the rape. In addition to these fears, Megan reported to Beth Howard that she believed that Defendant Bunn would be hosting a barbeque at his home for a required Honors course she was taking involving Habitat for Humanity. The class had been told that a local "big game hunter" would be hosting the event, an identification that matched Defendant Bunn well.  Instead of inquiring into the barbeque with course instructors and/or prohibiting Defendant Bunn from hosting the event, Ms. Howard "assisted" Megan in dropping the Honors course. Thus, because of UA's repeated Title IX failures, Megan was deprived of the educational opportunity of completing this required Honors course.

67.     To continue her healing process that she began in Texas, Megan sought counseling services and treatment at the UA's WGRC.  Kathy Echols, the WGRC counselor, met with Megan on or about August 28, 2015, in order, ostensibly, to conduct an interview with her. During the interview, upon prodding from Ms. Echols, Megan revealed in confidence the complete and horrific details of the attack by Defendant Bunn. Not until after the interview concluded did Echols notify Megan that she knew Defendant Bunn and his family personally. At that point, she informed Megan that she could no longer meet with her for counseling sessions.

FIRST AMENDED COMPLAINT AND JURY DEMAND - Page 16

68.     Megan was shocked that Echols, who knew that Defendant Bunn was the accused, had forced her to tell the complete and traumatic story of the assault when she knew she had a conflict and would not be able to continue to treat Megan. Megan felt enormously betrayed, and she greatly regretted revealing the details of her assault to Echols. She was nearly hysterical when she left Echols's office.

69.     Even though UA and the WGRC were on notice of the conflict of interest with Echols, no real alternative effort was made to accommodate Megan's treatment needs.  After Echols withdrew as Megan's counselor, Megan continued seeking assistance.  She agreed to meet with a second therapist at the WGRC, Cara Blakes. Ms. Blakes, however, inexplicably informed Megan that she could not see her for counseling services until Megan sought out and took medication for her anxiety.

70.     After this communication with Blakes, Megan called her father in tears, explaining what had happened and expressing a newfound lack of trust for UA and the Tuscaloosa justice system.

71.     Despite her concerns about Blake, Megan took the steps Blake required, and she sought an appointment with the UA counseling center for psychiatric treatment for her mental and emotional distress related to the rape. She also signed WGRC's "Release of Information" form on August 31, 2015, authorizing WGRC to speak with UA's Title IX Office regarding her assault for the purpose of "personal advocacy."

72.     To Megan's dismay, the UA Student Health Center offered no assistance to ensure that Megan obtained an emergency appointment at the UA Counseling Center. Instead, Megan was forced to wait several weeks before any professional examined her.

FIRST AMENDED COMPLAINT AND JURY DEMAND - Page 17

73.     After weeks of effort to obtain support and assistance at UA, Megan finally was scheduled for an appointment with Dr. Susan Arnold at UA's Student Health Center on September 25, 2015. As part of her psychiatric evaluation of Megan, Dr. Arnold obtained specific information from Megan regarding the incident and her then state of mind. Megan described fear and uneasiness associated with seeing Defendant Bunn on campus. She also told Dr. Arnold that she had seen a suspicious car outside of her apartment complex on several instances. Based on her examination, Dr. Arnold diagnosed Megan with anxiety, depression, and post-traumatic stress disorder.

74.     UA's Title IX Coordinator Howard did not initiate any communication with Megan until September 14, 2015, more than two months after the Title IX Office was notified of Defendant Bunn's assault.   By that time, Megan was extremely fearful of Defendant Bunn's presence on campus and at class-related activities and she was distrustful of UA and its employees and agents.

75.     No one at UA, not the Women's Gender Resource Center, or the Title IX Office ever offered Megan or her family the assistance required under federal law and UA's own Policy. No one informed Megan of her Title II (ADA) rights to receive counseling despite her anxiety; no one informed her of her rights under Title IX; no one conducted an investigation into her complaint against Defendant Bunn; no one offered her any protective measures—interim or permanent; no one restricted Defendant Bunn from contacting her or from access to the UA campus; no one informed her that she had a right not to be retaliated against by counselors or anyone at UA despite making a complaint against a prominent donor; no one followed up with her at any time to ensure she received any mental health or medical care after her sexual assault.

76. The trauma of her wrongful treatment by the Tuscaloosa Sheriff's Department and the wrongful and retaliatory response of the Title IX and WGRS Offices, both occasioned by the influential position of the Bunn family, made Megan feel unsafe and unwelcome on campus. The hostility that Megan encountered from UA, the WGRC, and the Title IX Office deeply affected Megan's efforts and hopes to obtain proper mental health care for the remaining months of her life. She told her parents that she could not trust counselors, and that she felt violated again each time she sought out help.

77. As a direct and proximate result of the sexual attack by Defendant Bunn and the deliberate indifference, acts, omissions, and failures of UA, Megan's fears, anxiety, depression and PTSD grew increasingly worse. She withdrew from UA in October 2015 and returned home to Austin, Texas. She never returned to Alabama.

78. Megan's decision to leave UA was directly caused by the school's refusal to provide her with adequate accommodations of her diagnosed anxiety, depression, and PTSD. It was also directly caused by UA's deliberate indifference to her complaints of the trauma she experienced while a student, evidenced by its complete refusal to respond to her requests for assistance, to provide her any support or counseling (except for the very belated session with Dr. Arnold who diagnosed her with depression, anxiety, and PTSD), to provide her any support as the result of this diagnosis, or to do what it could to protect her from Defendant Bunn. Although Defendant Bunn should have been forbidden access to the UA campus, to protect Megan and other women, there is no evidence that the Title IX Coordinator ever contacted the University of Alabama Police Department to seek assistance, much less requested the entry of a no contact/no trespass warning to Bunn.

79.     In October 2015, Megan notified Beth Howard that she intended to withdraw from UA. Howard affirmatively stated that she would fully assist Megan throughout the withdrawal process. Howard offered to expedite Megan's receipt of her UA transcripts, to assist with their transfer to the schools to which Megan would be applying, to prepare a formal outline of Megan's academic and scholarship status, to refund certain remaining UA fees, and to assist Megan with subleasing her apartment. She also offered to assist Megan in withdrawing from her fall semester classes at UA.

80.     Despite her representations, neither Howard nor anyone else in UA's Title IX Office ever contacted Megan's professors to advise them of her withdrawal and to ensure that she received the promised academic considerations. When Megan informed her professors and the head of her department that she was withdrawing from the UA, they were uniformly surprised and shocked.

81.     Megan began the process of transferring to a university in Texas. She hoped that she could continue her pursuit of a college degree closer to home and away from the unsafe environment at UA. Megan's new college, Southern Methodist University, required a letter of good standing from UA to complete her enrollment for the spring 2016 semester. Megan and her parents contacted Beth Howard on multiple occasions to finalize Megan's withdrawal and to obtain a letter of good standing from UA. Howard failed to provide the requested letter for over seven weeks.

82.     When Ms. Howard continued not to respond, Michael Rondini sent an email to the UA president, Dr. Stuart R. Bell, informing him of Megan's withdrawal from UA for Title IX reasons. He requested assistance with finalizing Megan's withdrawal and obtaining the letter of good standing that Ms. Howard had promised but had not facilitated.

83.     Because the function of the Title IX Office is to protect students and their access to educational opportunities, President Bell should have been alarmed that a student's father had to contact him to assist in processing his daughter's withdrawal after her Title IX complaint. Yet when President Bell heard that Megan was withdrawing from UA for Title IX reasons, and that the Title IX Office had been unresponsive to Megan's needs, he failed to demonstrate any real concern. He neither contacted Mr. Rondini nor Beth Howard, and he handed Michael's email off to one his subordinates (Amy) to handle.

84.     Amy then contacted Jennifer Greer, a Provost at the UA, providing her with Michael's email and asking her to follow up with Mr. Rondini.  When Dr. Greer saw Michael's email, she also should have been alarmed. Yet, similar to the response of every other UA agent, Dr. Greer did nothing to investigate Megan's situation. Instead, she forwarded the email to the Beth Howard, apparently expecting the same request to yield a different result. She asked Ms. Howard to contact Mr. Rondini and to advise her after she had contacted him. She did not ask Ms. Howard about the circumstances of Megan's withdrawal from UA or the reasons for Howard's non-responsiveness to the Rondini family.

85.     Both Dr. Greer and President Bell were deliberately indifferent to the failures of UA's Title IX Office. Neither Dr. Greer nor President Bell followed up with Mr. Rondini or with Beth Howard to remediate the failures of the Title IX Office, or even to ensure that Ms. Howard promptly responded to the requests made by Mr. Rondini.

86.     Thus, without an appropriate response from the President Bell or a Provost, Ms. Howard continued her silence. Only after Megan's mother called the Title IX Office to notify it of the Rondinis' plans to retain an attorney—almost two months after Megan first notified Ms. Howard of her request to withdraw—did Ms. Howard respond.

87.    When Megan formally withdrew from UA and moved back to Texas, she sought medical, psychological, and psychiatric help. She had ever-increasing fears, anxiety, sleeplessness, panic attacks, weight loss, feelings of worthlessness and hopelessness, loss of motivation, and a severe decline in her cognitive and overall functioning.  Megan continued treatment for depression, anxiety, and PTSD. She was leery of mental health professionals, and based on her treatment by UA professionals, she believed that no one would or could help her. She ultimately believed that her injuries were permanent, and that she could never recover.

88.    On February 24, 2016, Megan completed a "Health History Form" to receive counseling at Southern Methodist University. On the form, she indicated that she was having suicidal thoughts and problems with "PTSD, depression, [and] anxiety stemming from the sexual assault and rape on July 1, 2015."  In answering whether "there had been major losses, changes, or crisis in [her] life," Megan wrote that she had been "raped, bullied by police, and changed university."

89.    On February 24, 2016, Megan communicated in a text message: "When all is said and done, I wonder what I could've accomplished if one man didn't completely rip everything away from me."

90.    Early in the morning between 2:00 a.m. and 8:30 a.m. on February 26, 2016, Megan took her own life, by hanging herself in her apartment. The autopsy report indicated that Megan "had post-traumatic stress disorder, depression and anxiety following a sexual assault in 2015."

91.    On the day of Megan's suicide, Defendant Bunn was arrested for driving under the influence in Tuscaloosa, Alabama by the Tuscaloosa Sheriff's Department at around 6:20 a.m.

## CAUSES OF ACTION

### COUNT I: WRONGFUL DEATH of Megan Rondini

92.     Plaintiffs hereby adopt and reallege each and every allegation in the foregoing paragraphs of this Complaint as if fully set out herein.

93.      This claim is brought pursuant to Ala. Code 1975 § 6-5-410, by and for the benefit of Michael and Cynthia Rondini, the biological parents of Megan.

94.     At all times set forth hereinabove, Defendants negligently, recklessly, wantonly, and/or wrongfully acted or failed to act in response to Megan's reported sexual assault.

95.     As a direct and proximate result of Defendants' intentional, wanton, and wrongful conduct, Defendants caused Megan extreme depression, anxiety, PTSD, fear, panic attacks, decline of cognitive functions and general well-being, weight loss, and feelings of worthlessness and hopelessness, all of which directly led to Megan's loss of life.

96.     Because of Megan's death, her parents, individually and together, have sustained harm, injuries and damages under Alabama Law, and are entitled to at least the following damages:

a.     The loss of the friendship, companionship, guidance, and nurturing of their daughter;

b.     The loss of the services of their daughter;

c.     Mental anguish, emotional distress, depression, and total loss suffered because of the death of their daughter;

d.     Funeral and burial expenses;

e.     The loss of their daughter's future earnings and financial support; and

f.     All other incidental and consequential damages, fees and expenses.

97.     In addition, Megan's death was the direct and proximate result of Defendants' intentional, wanton, and malicious actions evidencing a conscious indifference to Megan's rights

and welfare. Thus, under Alabama Law, Plaintiffs as Megan's parents, each of them individually, are entitled to exemplary and punitive damages.

98.     WHEREFORE, MICHAEL W. RONDINI, as Personal Representative of the Estate of MEGAN ELIZABETH RONDINI, his deceased child, demands judgment against the Defendants, jointly and severally, for compensatory and punitive damages, plus interest and costs.

### COUNT II: VIOLATION OF 42 U.S.C. § 1983 - NEGLIGENT HIRING, TRAINING AND SUPERVISION
### (Against Defendant SHERIFF ABERNATHY)

99.     Plaintiffs hereby adopt and reallege each and every allegation in the foregoing paragraphs of this Complaint as if fully set out herein.

100.     At all times relevant hereto, Defendant Abernathy owed a duty to the public, and specifically to Megan Rondini, to exercise reasonable care in the hiring, training, and supervision of his officers.

101.     Defendant Abernathy had knowledge of, and was deliberately indifferent to the fact that he did not apprehend or adequately investigate Megan Rondini's sexual assault on July 2, 2015. Defendant Abernathy and his employees acted with deliberate indifference and denied Megan Rondini of her rights and interests as a victim.

102.     The actions and inactions of Defendant Abernathy posed a known substantial risk of serious harm. Under the totality of circumstances, Defendant Abernathy's policies, procedures, practices, customs, and regulations as applied to an innocent and unaware citizen demonstrate a continuation of a pattern of action. Defendant Abernathy's lack of properly trained deputies and employees, his failure to supervise, and his sheer slipshod and recklessness resulted in deliberate indifference to the known substantial risk of serious harm to Megan Rondini and her safety needs,

which violated her constitutionally protected rights under the Fourth, Eighth and Fourteenth Amendments of the United States Constitution.

103.    Defendant Abernathy knew, or should have known, that dangerous consequences could be suffered by individuals, specifically Megan Rondini, by failing to properly train and supervise its employees. Defendant Abernathy could have and should have pursued reasonable methods for the training and supervising of such employees, but failed to do so.

104.    Defendant Abernathy's policies, customs, or practices in failing to train and supervise his employees were the proximate cause of, and moving force behind, the violation of Megan Rondini's constitutional rights, which led to her loss of life.

105.    WHEREFORE, PREMISES CONSIDERED, Plaintiff, MICHAEL W. RONDINI, as Personal Representative of the Estate of MEGAN ELIZABETH RONDINI, his deceased child, claims damages for the conscious pain and suffering incurred by decedent, as provided for under 42 U.S.C. § 1983.

### COUNT III: VIOLATION OF 42 U.S.C. § 1983 – EQUAL PROTECTION AGAINST INVESTIGATOR JONES AND DEPUTY HASTINGS (Against Defendant JONES and Defendant HASTINGS)

106.    Plaintiffs hereby adopt and reallege each and every allegation in the foregoing paragraphs of this Complaint as if fully set out herein.

107.    At all relevant times herein, Defendant Jones and Defendant Hastings acted under color of law.

108.    At all relevant times herein, Defendant Jones and Defendant Hastings with deliberate indifference, intentionally, willfully, and wantonly and/or with reckless disregard deprived Megan Rondini of rights and/or privileges secured by the Constitution, including but not limited to:

a.   Defendant Jones and Defendant Hastings violated the property interests of Plaintiff's decedent, Megan Rondini, in her rape kit, which had been provided by DCH Regional Hospital and stored the Tuscaloosa Sheriff's Department, and their right to redress in the courts, by failing to investigate, submit sexual evidence kits or arrest the accused; and

b.   Defendant Jones and Defendant Hastings violated Megan Rondini's Due Process Clause property interests in their persons, by failing to investigate, submit sexual assault evidence kits or arrest the accused.

109.   Defendant Jones and Defendant Hastings with deliberate indifference, failed to implement established procedures that are necessary to provide a proper investigation to complainants.

110.   Defendant Jones and Defendant Hastings' deliberate indifference, willful and wanton conduct created a danger of an increased risk of harm to the victims of sexual abuse, which are disproportionately females, by failing to investigate sexual assault crimes.

111.   Defendant Jones and Defendant Hastings' deliberate indifference, willful and wanton conduct created a danger of an increased risk of harm to the victims of sexual abuse, which are disproportionately females, by fostering an environment whereby the perpetrator of the sexual assault was allowed to continue to prey on victims without fear of investigation by the Tuscaloosa Sheriff's Department.

112.   Defendant Jones and Defendant Hastings' conduct was motivated by gender.

113.   Defendant Jones and Defendant Hastings' conduct was intentional and due to Megan Rondini's female gender.

114.    The above described conduct of Defendant Jones and Defendant Hastings constitutes a violation of 42 U.S.C. § 1983.

115.    As a direct and proximate result of Defendant Jones and Defendant Hastings' actions, omissions, policies, practices and customs, all committed or adopted with deliberate indifference, Plaintiff's decedent was denied the rights afforded to her, given the circumstances, thus causing a deterioration of her mental condition, all in violation of her rights afforded by the Constitution.

116.    As a result of the actions and omissions of the Defendant Jones and Defendant Hastings, Plaintiff's decedent suffered extreme emotional pain and suffering, which ultimately led to her loss of life.

117.    WHEREFORE, MICHAEL W. RONDINI, as Personal Representative of the Estate of MEGAN ELIZABETH RONDINI, his deceased child, demand judgment against the Defendant ADAM JONES and Defendant JOSHUA HASTINGS, jointly and severally, for compensatory and punitive damages, plus interest and costs.

## COUNT IV: VIOLATION OF 42 U.S.C. § 1983 ABUSE OF PROCESS
### (Against Defendant JONES and Defendant HASTINGS)

118.    Plaintiffs hereby adopt and reallege each and every allegation in the foregoing paragraphs of this Complaint as if fully set out herein.

119.    At all relevant times herein, Defendant Jones and Defendant Hastings acted under color of law.

120.    At all relevant times herein, Defendant Jones and Defendant Hastings with deliberate indifference, intentionally, willfully, and wantonly and/or with reckless disregard deprived Megan Rondini of rights and/or privileges secured by the Constitution.

121.     At all relevant times herein, Defendant Jones and Defendant Hastings, with an ulterior purpose, perverted the use of the criminal processes to Megan Rondini's detriment.

122.     As a result of the actions and omissions of the Defendant Jones and Defendant Hastings, Plaintiff's decedent suffered extreme emotional pain and suffering, which ultimately lead to her loss of life.

123.     WHEREFORE, MICHAEL W. RONDINI, as Personal Representative of the Estate of MEGAN ELIZABETH RONDINI, his deceased child, demands judgment against the Defendant ADAM JONES and Defendant JOSHUA HASTINGS, jointly and severally, for compensatory and punitive damages, plus interest and costs.

## COUNT V: VIOLATION OF 42 U.S.C. § 12101
### (Against Defendant UNIVERSITY OF ALABAMA)

124.     Plaintiffs hereby adopt and reallege each and every allegation in the foregoing paragraphs of this Complaint as if fully set out herein.

125.     Title II of The Americans with Disabilities Act (ADA) provides that no qualified individual with disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of a public entity, or be subjected to discrimination by such entity.

126.     Title II of the ADA requires that a public entity take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others.

127.     Title II of the ADA also requires a public entity to furnish appropriate auxiliary aids and services where necessary to afford an individual with disability an equal opportunity to participate in, and enjoy the benefits of a service, program, or activity conducted by a public entity.

128.     To be protected by the ADA one must have a disability, defined by the ADA as "(a) a physical or mental impairment that substantially limits one or more of the major life activities

of [an] individual; (b) a record of such an impairment; or (c) being regarded as having such an impairment." 42 U.S.C. § 12102(2) (1994); 29 C.F.R. § 1630.2(g) (1996).

129.   The ADA rule defines "mental impairment" to include "any mental or psychological disorder, such as . . . emotional or mental illness." 29 C.F.R. § 1630.2(h)(2) (1996).

130.   The University of Alabama was aware of Megan's disability as her physician in Texas diagnosed Megan with depression, anxiety, and PTSD.

131.   Depression, anxiety, and PTSD are recognized by the ADA as mental disabilities.

132.   As a governmental and public entity charged with ensuring compliance with federal law, UA knew or should have known its duties and obligations under Title II of the ADA.

133.   Despite this knowledge and based on the facts alleged herein, UA intentionally refused adequate compliance with Title II of the ADA and failed to afford Megan with disability accommodations in a setting appropriate to her needs, in violation of 42 U.S.C. § 12182.

134.   UA subjected Megan to discrimination by denying her full access to equal education and health services, including the enjoyment of benefits of a service, program or activity conducted by the university which ultimately led to her loss of life.

135.   WHEREFORE, MICHAEL W. RONDINI, as Personal Representative of the Estate of MEGAN ELIZABETH RONDINI, his deceased child, demands judgment against the Defendant THE UNIVERSITY OF ALABAMA at Tuscaloosa, jointly and severally, for compensatory and punitive damages, plus interest and costs.

### COUNT VI: VIOLATION OF 42 U.S.C. § 1983 SUBSTANTIVE DUE PROCESS - LOSS OF PARENT/CHILD RELATIONSHIP FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION
### (Against All Defendants except UNIVERSITY OF ALABAMA and DR. STUART R. BELL)

136.    Plaintiffs hereby adopt and reallege each and every allegation in the foregoing paragraphs of this Complaint as if fully set out herein.

137.    Such conduct by said Defendants "shocks the conscience."

138.    As a direct and proximate result of said Defendants' conduct, Plaintiffs suffered injuries and damages as alleged herein including pain and suffering and emotional distress.

139.     The aforementioned acts and/or omissions of the individually named Defendants were willful, wanton, malicious, reckless, and oppressive, thereby justifying an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

140.    WHEREFORE, PREMISES CONSIDERED, Plaintiffs, MICHAEL W. RONDINI and CYNTHIA M. RONDINI, surviving parents of MEGAN ELIZABETH RONDINI, their deceased child, demand judgment against the Defendants, jointly and severally, for compensatory and punitive damages, plus interest and costs.

### COUNT VII:   VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, 20 U.S.C.S. § 1681(a) et seq., (Against Defendants UNIVERSITY OF ALABAMA and DR. STUART R.  BELL)

141.    Plaintiffs hereby adopt and reallege each and every allegation in the foregoing paragraphs of this Complaint as if fully set out herein.

142.    At all times relevant hereto, UA received federal funding for its educational programs, and was subject to the provisions of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), *et. seq*., which guaranteed Megan Rondini equal access without discrimination to all educational programs at the UA.

143.    The University's and President Bell's actions and failures to act perpetrated against Megan amounted to unlawful sexual harassment and discrimination on the basis of her gender.

The harassment and discrimination was sufficiently severe and pervasive to create an abusive and hostile educational environment for Megan, sufficient that she was forced to leave the campus, and was ultimately a cause of her loss of life.

144.    At all times relevant to this complaint, one or more of the University's administrators or officials with authority to take corrective and supportive action on Megan's behalf, including President Bell, Provost Greer, Beth Howard, Kathy Echols, and Cara Blakes, had actual notice of Megan's Title IX complaint and failed to adequately and reasonably respond, in violation of Title IX and the University of Alabama's Sexual Misconduct and other policies, subjecting Megan to further abuse and harassment.

145.    UA was deliberately indifferent to Megan's complaints of rape by Defendant Bunn, the member of an important donor family in Tuscaloosa. Its retaliatory actions towards Megan for filing the complaint and its non-action in supporting and protecting her rights under Title IX were clearly unreasonable in light of the known circumstances. As a result, Megan was subject to continuing harassment, a loss of educational opportunity, and ultimately, the loss of her life.

146.    One or more of the University's administrators and officials, including Beth Howard, Kathy Echols, and Cara Blakes engaged in retaliatory behavior against Megan because of her complaint. President Bell and Provost Greer were aware, or should have been aware, of Beth Howard's retaliatory acts. Those failures amounted to deliberate indifference to Megan's complaint and her need for support and services after being assaulted by Defendant Bunn. The failures also amounted to deliberate indifference to the retaliatory conduct that had occurred, was occurring, and was likely to continue to occur. As a result, Megan was subject to continuing harassment, a loss of educational opportunity, and ultimately, the loss of her life.

147.    UA acted with deliberate indifference in deviating significantly from the statutory standard of care requirements of Title IX outlined in the U.S. Department of Education's guidance letters and from the requirements of its own policies and procedures.

148.    President Bell failed, in his duties as chief administrative officer of the University, to enact and/or disseminate and/or implement proper or adequate procedures to discover, prohibit, or remedy the kind of discrimination that Megan suffered. This failure included, without limitation, non-existent or inadequate customs, policies, or procedures for training staff and faculty in Title IX requirements, including the recognition, reporting, investigation, and correction of unlawful Title IX discrimination and retaliation such as Megan experienced. President Bell knew or should have known that dangerous consequences could be suffered by individuals, including UA student Megan Rondini, by failing to properly train and supervise his employees. These failures amounted to deliberate indifference toward the unlawful sexual conduct and retaliatory conduct that had occurred, was occurring, and was likely to continue occurring to Megan. As a result, Megan was subject to continuing harassment and a loss of educational opportunities at the UA.

149.    UA's policies, customs, or practices in failing to train and supervise its employees in proper procedure for responding to Title IX complaints fairly, equitably, and without retaliation, were the proximate cause of, and moving force behind, the violation of Megan Rondini's rights under Title IX, which led to her loss of life.

150.    WHEREFORE, PREMISES CONSIDERED, Plaintiff MICHAEL W. RONDINI, as Personal Representative of the Estate of MEGAN ELIZABETH RONDINI, deceased, demands judgment against the Defendant UNIVERSITY OF ALABAMA and Defendant DR. STUART R. BELL, jointly and severally, for compensatory damages, plus interest and costs.

## **PRAYER FOR RELIEF**

THEREFORE, Plaintiffs respectfully request the following relief:

a.   A declaratory judgment that Defendant Abernathy's actions, policies, and practices complained of herein violated Megan Rondini's rights as secured by the Fourth, Eighth, and Fourteenth Amendments to the U.S. Constitution and by Title IX of the Education Amendments of 1972.

b.   Injunctive relief to prohibit future constitutional violations against Defendant Abernathy including, but not limited to, inadequate training, inadequate supervision, and failure to provide safe conditions to citizens around criminal investigations and arrests and for any and all other relief to which is proper under the circumstances;

c.   Injunctive relief to prohibit future Title IX violations against UA and President Bell, including, but not limited to, training, supervision, and management of Title IX policies and procedures;

d.   A joint and several judgment against all Defendants except for President Bell for all general and special compensatory damages caused by the conduct of the Defendants in an amount exceeding the minimum amount required for federal court jurisdiction in diversity of citizenship cases;

e.   The cost of litigating this case;

f.   Attorney fees and costs as allowable under 42 U.S.C. § 1988, 20 U.S.C. § 1681(a), *et. seq.*, and other applicable laws;

g.   A joint and several judgment against all Defendants except for President Bell and UA for punitive damages in an amount necessary and sufficient to punish Defendants and deter Defendants and others from similar conduct in an amount exceeding the minimum amount required for federal court jurisdiction in diversity of citizenship cases;

h.  A trial by jury;

i.  All other relief to which Plaintiffs are entitled or that the Court deems just and proper.

<u>**JURY DEMAND**</u>

Plaintiffs request a trial by jury.

Respectfully submitted,

By:   <u>/s/ *Leroy Maxwell Jr.*</u>

Leroy Maxwell, Jr.
**MAXWELL LAW FIRM**
2100 1st Ave North
Birmingham, AL 35203
205-216-3304
205-409-4145 (fax)
**maxwell@mxlawfirm.com**

**Of-Counsel:**
Julie E. Heath
**FARROW-GILLESPIE & HEATH LLP**
1700 Pacific Ave., Suite 3700
Dallas, Texas 75201
(214) 361-5600 (telephone)
(214) 203-0651 (fax)
**julie.heath@fghlaw.com**

Patricia H. Davis
**FARROW-GILLESPIE & HEATH LLP**
1700 Pacific Ave., Suite 3700
Dallas, Texas  75201
(214) 361-5600 (telephone)
(214) 203-0651 (fax)
Patricia.Davis@fghlaw.com

**Attorneys for the Defendants:**

**Thomas Coleman, Jr**
**SMITH SPIRES & PEDDY PC**
**2015 2nd Avenue North**
**Suite 200**
**Birmingham, AL 35203**
**205-251-5885**

FIRST AMENDED COMPLAINT AND JURY DEMAND - Page 34

205-214-8642 (fax)
tom@ssp-law.com

Jay M Ezelle
STARNES DAVIS FLORIE LLP
P O Box 598512
Birmingham, AL 35259-8512
205-868-6000
205-868-6099 (fax)
JEzelle@starneslaw.com

Robert Spence
Rosen Harwood, PA
2200 Jack Warner Parkway
Suite 200
Post Office Box 2727
Tuscaloosa, AL  35403-2727
(205)344-5000 ext 2415
(205)758-8358 (Fax)
rspence@rosenharwood.com