# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **MICHAEL W. RONDINI, et al.,** | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **Case No.:  7:17-cv-01114-RDP** |
| | } | |
| **TERRY J. BUNN, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## <u>MEMORANDUM OPINION</u>

This case is before the court on (1) Defendant Terry J. Bunn, Jr.'s Motion to Dismiss (Doc. # 9), (2) Defendant Adam Jones's Motion to Dismiss (Doc. # 16), (3) Defendant Bunn's Motion to Strike (Doc. # 34), (4) Defendants Ron Abernathy and Joshua Hastings's Amended Motion to Dismiss (Doc. # 38), and (5) Defendants University of Alabama at Tuscaloosa (hereinafter the "University") and Stuart Bell's Motion to Dismiss (Doc. # 45).  The Motions are fully briefed (*see* Docs. # 26, 28, 31, 33, 38-1, 42, 44-1, 46-47, 52-53), and the court held oral argument on the motions on November 16, 2017.  For the reasons explained below, the court concludes that: (1) Defendant Bunn's Motion to Dismiss is due to be granted in part and denied in part; (2) Defendant Jones's Motion to Dismiss is due to be granted; (3) Defendant Bunn's Motion to Strike is due to be granted in part and denied in part; (4) Defendants Abernathy and Hastings's Motion to Dismiss is due to be granted; and (5) Defendants Bell and the University's Motion to Dismiss is due to be granted in part and denied in part.

# I.      The Amended Complaint's Allegations

Plaintiffs Michael and Cynthia Rondini have sued Defendants and asserted claims related to the alleged sexual assault of their daughter, Megan Rondini, the investigation into that assault, the University's response to requests for assistance, and Megan's tragic suicide. The court begins its review of the allegations by outlining the assertions regarding the sheriff's department's investigations into Megan's rape complaint.[1] The court then discusses the assertions about the interactions between the Rondinis and University personnel.

## A.      The July 1, 2015 Alleged Sexual Assault and Sheriff's Department Investigation

According to the Amended Complaint,[2] 20-year-old Megan Rondini met Defendant Bunn, a 34-year-old man, at a Tuscaloosa pub on July 1, 2015. (Doc. # 7 at ¶¶ 30-33). She "was intoxicated or [ ] under the influence of a drug administered to her surreptitiously" when she left the pub. (*Id.* at ¶ 33). Defendant Bunn drove Megan to his residence in Cottondale, Alabama and "insisted that Megan have sex with him." (*Id.* at ¶ 34). When Megan refused, Bunn reportedly "removed her clothing and forced her to engage in oral sex." (*Id.* at ¶ 35). Then, Plaintiffs allege that Bunn raped Megan and left her in a locked bedroom. (*Id.* at ¶¶ 35-36). Megan escaped from the bedroom by leaping through a second-story window. (*Id.* at ¶ 37). Plaintiffs assert that, while searching for her keys, Megan accidentally discharged a firearm and took $3 from Bunn's wallet. (*Id.* at ¶¶ 38-39).

Megan's friends took her to DCH Hospital in Tuscaloosa, where she reported to medical personnel and the Tuscaloosa Sheriff's Department that she had been raped. (*Id.* at ¶ 40).

---

[1] For ease of reference, this Memorandum Opinion often refers to Megan Rondini, Michael Rondini, and Cynthia Rondini by their first names. All other individuals are referred to by their surnames.

[2] The statement of facts is based upon Plaintiffs' well-pleaded allegations in their Amended Complaint. (Doc. # 7).

Megan underwent a rape examination, and a rape kit was sent to law enforcement. (*Id.*). Megan then traveled from DCH Hospital to the Sheriff's Department for a second interview. (*Id.*). Michael Rondini spoke with Defendant Adam Jones, an investigator for the Tuscaloosa Sheriff's Department, before that interview. (*Id.* at ¶¶ 16, 43). Michael "expressed reservations about the interviews" due to Bunn's prominent stature in Tuscaloosa. (*Id.* at ¶ 43). Defendant Jones assured him that the officers handling the case were properly trained, and he dissuaded Michael from obtaining an attorney for Megan. (*Id.*).

Plaintiffs question several aspects of the interview by Defendant Jones. (*Id.* at ¶¶ 44-47). First, Plaintiffs object to Jones's failure to take notes. (*Id.* at ¶ 44). Second, Plaintiffs state that Jones avoided asking Megan questions that would have elicited incriminating testimony against Bunn. (*Id.*). Third, Plaintiffs allege that Jones focused on "trivial questions suggesting his bias against Megan," rather than "the actual sexual encounter." (*Id.* at ¶ 45). Fourth, Plaintiffs charge that Defendant Jones displayed bias against Megan "by focusing on the three dollars Megan took from Defendant Bunn's pocket and the accidental discharge of the weapon" rather than the sexual assault and by questioning Megan on her failure to immediately call the police. (*Id.* at ¶ 46). Ultimately, according to Plaintiffs, Defendant Jones concluded his investigation by finding that Bunn did not rape Megan. (*Id.* at ¶ 47).

Officers spoke with Defendant Bunn and Jason Barksdale at Bunn's residence on the morning of July 2, 2015. (*Id.* at ¶ 48). The officers did not record their interview with Bunn. (*Id.*). Bunn denied Megan's presence at his residence during the prior evening. (*Id.*). After "officers heard him shut a window outside their presence" and confronted him, Bunn demanded an attorney. (*Id.* at ¶ 49). The officers videotaped the Bunn residence while interviewing Bunn,

during which they discussed Bunn's charge that Megan had stolen credit cards from him. (*Id.* at ¶ 50).

After Defendant Jones returned to the Sheriff's Department, he read Megan her *Miranda* rights. (*Id.* at ¶ 51). Defendant Jones and Defendant Joshua Hastings, a sheriff's deputy for the Tuscaloosa Sheriff's Department, "informed Megan that they intended to pursue felony charges against Megan for Breaking & Entering and Theft of Property." (*Id.* at ¶¶ 16, 52). According to Plaintiffs, Jones and Hastings "used the threat of felony charges to bully Megan into dropping her claim against Defendant Bunn." (*Id.* at ¶ 53). The Sheriff's Department did not send the rape kit or a urine sample to a laboratory for testing. (*Id.* at ¶ 54). Defendant Hastings interviewed Defendant Bunn on July 6, 2015. (*Id.* at ¶ 56). Plaintiffs allege that Hastings failed to interrogate Bunn about the details of the charges Megan made against him. (*Id.*). Moreover, according to Plaintiffs, Hastings "conveyed that the police were united with Defendant Bunn against Megan." (*Id.* at ¶ 57). "When Defendant Bunn's lawyer told [Deputy] Hastings 'I know there's any number of ways this could go. We just want this to be over,' [Deputy] Hastings said: '[We're] just kind of waiting to see how far she's gonna push this.'" (*Id.*).

During an August 2015 phone call with Michael Rondini, a district attorney informed Michael of her decision to not bring the rape charge before a grand jury. (*Id.* at ¶ 62). The district attorney allegedly told Michael that the incident "was consensual, in part because Megan did not use the word 'rape' in her statement, and instead called it a 'sexual assault.'" (*Id.*).

### B.     The Rondinis' Interactions with the University, the WGRC, and University Personnel

On July 2, 2015, Michael contacted the University's Women and Gender Resource Center ("WGRC") and asked for a victim advocate to support Megan at the hospital. (*Id.* at ¶ 41). An advocate from the WGRC arrived at the hospital "hours later" and accompanied Megan

to the Sheriff's Department. (*Id.* at ¶ 42). That advocate "admitted to Megan that she was aware that Megan's rapist was Defendant Bunn, and that she knew of his prominence in the community." (*Id.*). The advocate left the Sheriff's Department while the interview between Megan and Defendant Jones was ongoing. (*Id.*).

Michael emailed the University's Title IX Coordinator, Beth Howard, on July 2, 2015, but received no response. (*Id.* at ¶ 58). He alleges that despite his attempt to contact her again, neither Michael nor Megan received a response from the University's Title IX office. (*Id.*). Nevertheless, Howard communicated with Kip Hart in the Tuscaloosa Sheriff's Department regarding the case. (*Id.* at ¶ 59). Hart informed Howard on July 9, 2015 of unspecified "issues" in the Rondini case. (*Id.*).

In July 2015, Megan, a Texas resident, returned to Austin, Texas and saw a psychotherapist, who diagnosed her with anxiety, depression, and post-traumatic stress disorder ("PTSD"). (*Id.* at ¶ 60). In August 2015, a social worker prescribed Megan an emotional support animal due to the after-effects of the assault. (*Id.* at ¶ 61). Megan returned to the University in August 2015 for the fall semester. (*Id.* at ¶ 63). Nevertheless, Plaintiffs assert that the University never investigated Megan's complaint about Bunn's sexual assault, despite being required to do so by its own sexual misconduct policy. (*Id.* at ¶ 64).

In August 2015, Megan met with Kathy Echols, a WGRC counselor. (*Id.* at ¶ 67). Echols interviewed Megan and allegedly "prodd[ed]" her to reveal the complete details of the sexual assault. (*Id.*). At the end of the interview, Echols told Megan that she knew Bunn's family personally and could not counsel Megan. (*Id.*). Megan felt betrayed by Echols's recusal because Echols had interviewed her despite knowing that Bunn was the accused rapist. (*Id.* at ¶ 68). Megan agreed to meet with a second WGRC counselor, Cara Blakes, but Blakes refused to

counsel her until she obtained a prescription for anxiety medication. (*Id.* at ¶ 69). Megan signed a release on August 31, 2015, that allowed WGRC to speak with the Title IX office about the assault as her advocate. (*Id.* at ¶ 71). Howard communicated with Megan for the first time on September 14, 2015. (*Id.* at ¶ 74). "By that time, Megan was extremely fearful of Defendant Bunn's presence on campus and at class-related activities[,] and she was distrustful of [the University] and its employees and agents." (*Id.*). According to Plaintiffs, the University's student health center failed to help Megan obtain an emergency counseling appointment in August and September 2015. (*Id.* at ¶ 72). She saw a doctor at the University's health center on September 25, 2015, and was diagnosed with anxiety, depression, and PTSD by that doctor. (*Id.* at ¶ 73).

At some point during the fall semester of 2015, Megan reported to Howard that she believed Defendant Bunn would be hosting an event for a required Honors course she was enrolled in. (*Id.* at ¶ 66). Her belief was based on her understanding that a "big game hunter" would be hosting the event, and Bunn matched such a description. (*Id.*). Plaintiffs allege that Howard assisted Megan in dropping the Honors course, but should have "inquir[ed] into the barbeque with course instructors and/or prohibit[ed] Defendant Bunn from hosting the event." (*Id.*). Plaintiffs further contend that no University personnel or office informed Megan of her rights under Title II of the Americans with Disabilities Act ("ADA") or Title IX of the Education Amendments of 1972. (*Id.* at ¶ 75). Megan withdrew from the University in October 2015 and returned to Texas. (*Id.* at ¶ 77).

According to the Amended Complaint, Howard informed Megan that the University's Title IX office would help her by expediting transcripts, facilitating her transfer, preparing "a formal outline of Megan's academic and scholarship status," refunding certain fees, assisting

with subletting an apartment, and approving her withdrawal from the fall semester classes. (*Id.* at ¶ 79). But, Plaintiffs allege that for over seven weeks the Title IX office failed to contact Megan's professors or facilitate a letter of good standing requested by the Rondinis. (*Id.* at ¶¶ 80-81). Michael emailed Defendant Stuart Bell, the University's president, for assistance in obtaining the letter of good standing and informed Bell that his daughter was withdrawing "for Title IX reasons," but Bell delegated the issue to a subordinate. (*Id.* at ¶¶ 82-83). That subordinate contacted a provost with the request, and the provost forwarded the request back to the Title IX office. (*Id.* at ¶ 84). According to Plaintiffs, the Rondinis received a response from Howard after Cynthia Rondini called and threatened to retain an attorney. (*Id.* at ¶ 86).

On February 24, 2016, Megan filled out a health history form to receive counseling at Southern Methodist University. (*Id.* at ¶ 88). She reported suicidal thoughts on the form. (*Id.*). She recounted her history of anxiety, depression, and PTSD following the July 2015 incident. (*Id.*). She reported the rape, police bullying, and her change of universities as major losses, changes, or crises in her life. (*Id.*). On the morning of February 26, 2016, Megan committed suicide. (*Id.* at 90). Her autopsy report recounted that she suffered from anxiety, depression, and PTSD following the 2015 sexual assault. (*Id.*).

## II.    Standard of Review

The Federal Rules of Civil Procedure require that a complaint provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, the complaint must include enough facts "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Pleadings that contain nothing more than "a formulaic recitation of the elements of a cause of action" do not meet Rule 8 standards, nor do pleadings suffice that are based merely upon "labels and conclusions" or

"naked assertion[s]" without supporting factual allegations. *Id.* at 555, 557. In deciding a Rule 12(b)(6) motion to dismiss, courts view the allegations in the complaint in the light most favorable to the non-moving party. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007).

To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although "[t]he plausibility standard is not akin to a 'probability requirement,'" the complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A plausible claim for relief requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" to support the claim. *Twombly*, 550 U.S. at 556.

In considering a motion to dismiss, a court should "1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" *Kivisto v. Miller, Canfield, Paddock & Stone, PLC*, 413 F. App'x 136, 138 (11th Cir. 2011) (quoting *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010)). That task is context specific and, to survive the motion, the allegations must permit the court based on its "judicial experience and common sense . . . to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679. If the court determines that well-pleaded facts, accepted as true, do not state a claim that is plausible, the claims are due to be dismissed. *Twombly*, 550 U.S. at 570.

## III.    Motion to Strike

Defendant Bunn asks the court to strike: (1) Plaintiffs' allegation in paragraph 90 of the Amended Complaint reporting a statement from Megan's autopsy report about her anxiety, depression, and PTSD; (2) Plaintiffs' allegation in paragraph 91 of the Amended Complaint that Bunn was arrested on the day Megan committed suicide; and (3) examination notes attached to an opposition brief.  (Doc. # 34).  Plaintiffs agree that the allegations in paragraph 91 are due to be struck as irrelevant.  (Doc. # 42-1 at 4).  Accordingly, without objection, paragraph 91 of the Amended Complaint is due to be stricken from the Amended Complaint.

With regard to the allegation in paragraph 90 of the Amended Complaint, Federal Rule of Civil Procedure Rule 12(f) states that a court "may strike from a pleading . . . any redundant, immaterial, or scandalous matter."  Fed. R. Civ. P. 12(f).  However, a motion to strike is a "drastic remedy to be resorted to only when required for the purposes of justice . . . ." *Augustus v. Bd. of Pub. Instruction of Escambia Cty. Fla.*, 306 F.2d 862, 868 (5th Cir.1962) (quoting *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953)).  This standard has been interpreted to mean that a motion to strike should be denied unless the challenged allegations in the complaint "have no possible relationship to the controversy, may confuse the issues, or otherwise prejudice a party." *Royal Ins. Co. of Am. v. M/Y Anastasia*, 1997 WL 608722, at *3 (N.D. Fla. Jan. 30, 1997) (citing *Reyher v. Trans World Airlines, Inc.*, 881 F. Supp. 574, 576 (M.D. Fla. 1995)).  The allegations from the autopsy report are relevant to Plaintiffs' assertion that Megan suffered from anxiety, depression, and PTSD, which, in turn, is relevant to Plaintiffs' wrongful-death and Title II claims.  Regardless of whether the autopsy report is ultimately admissible, it is related to the controversy and its inclusion in the Amended

Complaint causes no confusion or prejudice to Defendant Bunn. Therefore, Defendant Bunn's request to strike the sentence in paragraph 90 describing the autopsy report is due to be denied.[3]

With regard to the examination notes, in almost all circumstances, a court cannot consider evidence that is not attached to the complaint in deciding whether to dismiss a claim. *See SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010) (explaining that an extrinsic document can be considered in deciding a motion to dismiss if it is central to a plaintiff's claim and its authenticity is not challenged). Plaintiffs do not claim that the examination notes are central to the viability of their Amended Complaint. So, because Plaintiffs' attached examination notes cannot be (and have not been) considered by the court in analyzing Defendant Bunn's Motion to Dismiss, the court finds that Defendant Bunn will not be prejudiced by leaving the submitted exhibit in the record. Therefore, Bunn's request to strike the examination notes is due to be denied.

## IV. Analysis

All Defendants in this suit seek dismissal of the claims brought against them. In light of the overlapping nature of the motions to dismiss, the court will address the motions on a claim-by-claim basis.

### A. Plaintiffs' Wrongful-Death Claims (Counts I through IV)

Plaintiff Michael Rondini, as personal representative of the Estate of Megan Rondini (hereinafter the "Personal Representative"), has brought a wrongful-death claim in diversity against Defendants under Alabama Code § 6-5-410. (Doc. # 7 at ¶¶ 92-98). Plaintiffs charge that Defendants negligently, recklessly, wantonly, or wrongfully acted or failed to act in response

---

[3] To the extent Defendant Bunn is concerned about prejudice caused by referencing the report in front of a jury, Defendant may, at an appropriate time, raise appropriate evidentiary issues by filing a motion in limine. That is, the court's decision on the Motion to Strike does not foreclose Defendant Bunn from contesting the admissibility of any exhibit at the summary judgment stage and/or trial stage, if necessary.

to the reported sexual assault, and that Megan developed extreme depression, anxiety, and PTSD due to their wrongful conduct.  (*Id.* at ¶¶ 94-95).  Plaintiffs also allege that the mental conditions resulting from the sexual assault and insufficient response directly led to Megan's suicide.  (*Id.* at ¶ 95).

### 1. Plaintiffs Cannot Maintain a Wrongful-Death Action in Their Individual Capacities

Plaintiffs Michael and Cynthia Rondini, in their individual capacities, also seek compensatory and punitive damages for Defendants' conduct that led to Megan's suicide.  (Doc. # 7 at ¶¶ 96-97).  Their wrongful-death claim cannot go forward, though, because Alabama law only permits an estate's personal representative to bring a wrongful-death suit if the deceased is an adult.  Ala. Code. § 6-5-410(a).  A father or mother may bring a wrongful-death suit for a minor child, Ala. Code. § 6-5-391(a), but Megan was an adult when she died.

### 2. The Personal Representative Cannot Recover Compensatory Damages

A personal representative pursuing a state-law wrongful-death claim cannot recover compensatory damages because damages recoverable for such a claim are solely punitive, not compensatory.  *Ex parte Cincinnati Ins. Co.*, 689 So. 2d 47, 50 (Ala. 1997).

### 3. Some Defendants are Due to be Excluded from the Wrongful-Death Claim

The Personal Representative has conceded that he does not intend to maintain a wrongful-death claim against Defendants Stuart Bell and the University.  (Doc. # 52 at 6 n. 1).  Accordingly, any such claim against Defendants Bell and the University is due to be dismissed without prejudice.

### 4.    Plaintiffs Have Not Pled Any Plausible § 1983 Wrongful-Death Claim Against Defendants Jones, Abernathy, or Hastings

Defendants Jones, Abernathy, and Hastings argue that they are entitled to sovereign immunity or state-agent immunity on Plaintiffs' wrongful-death claims. (Docs. # 16 at 12; 38-1 at 6-9). In response, Plaintiffs assert that they may maintain a wrongful-death action against the officers under 42 U.S.C. §§ 1983 and 1988.[4] (Doc. # 26 at 12-14).

"[W]hen a constitutional violation actually causes the injured party's death, a § 1983 claim can be asserted through the Alabama wrongful death statute[.]" *Estate of Gilliam ex rel. Waldroup v. City of Prattville*, 639 F.3d 1041, 1047 (11th Cir. 2011). But, here, Plaintiffs seek to bring § 1983 claims against the sheriff of Tuscaloosa County, a deputy sheriff, and an investigator employed by the Tuscaloosa County Sheriff's Department. (Doc. # 7 at ¶¶ 15-16). Therefore, the court initially must determine whether Defendants Abernathy, Jones, and Hastings have immunity from the claims asserted against them. Defendant Abernathy is sued in his official capacity as sheriff of Tuscaloosa County. (*Id.* at ¶ 15). Therefore, under Alabama law, he has absolute immunity from the § 1983 wrongful-death claim brought against him, and the claim against him contained in Count II is due to be dismissed. *Melton v. Abston*, 841 F.3d 1207, 1234 (11th Cir. 2016).

Defendants Jones and Hastings argue that (1) Plaintiffs have failed to state a § 1983 claim against them, and (2) they are entitled to qualified immunity on the § 1983 claims.[5] Qualified

---

[4] To the extent Plaintiffs bring claims against Defendants Abernathy, Jones, and Hastings under 42 U.S.C. § 1983 for constitutional violations that did not result in Megan's death, Plaintiffs conceded at oral argument that those claims are barred by Alabama's survivorship statute, Alabama Code § 6-5-462, because they were not brought to court before Megan's death. *Estate of Gilliam ex rel. Waldroup v. City of Prattville*, 639 F.3d 1041, 1046, 1049-50 (11th Cir. 2011).

[5] Defendant Hastings also argues that he is entitled to state-law immunity for the wrongful-death claims against him. (Doc. # 38-1 at 8-9). It appears that Defendant Hastings asserted this immunity based on the belief that Plaintiffs raise a state-law wrongful-death claim against him. Plaintiffs have since clarified that the wrongful-death claims against Defendants Jones and Hastings are § 1983 claims. Accordingly, the court will disregard the

immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity utilizes an objective reasonableness standard, "giving a government agent the benefit of the doubt unless her actions were so obviously illegal in the light of then-existing law that only an official who was incompetent or who knowingly was violating the law would have committed them." *GJR Invs., Inc. v. Cty. of Escambia, Fla.*, 132 F.3d 1359, 1366 (11th Cir. 1998), *overruled on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010). The Eleventh Circuit has cautioned that "courts should think long and hard before stripping defendants of immunity." *Ray v. Foltz*, 370 F.3d 1079, 1082 (11th Cir. 2004). "We generally accord . . . official conduct a presumption of legitimacy." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 179 (1991).

Whether a defendant is entitled to qualified immunity is determined by engaging in a three-step analysis. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1136-37 (11th Cir. 2007). The initial burden is on an official claiming qualified immunity to establish that he or she was acting within his or her discretionary authority. *Id.* Here, Plaintiffs have not disputed that Jones and Hastings acted within their discretionary duties when committing the conduct underlying the § 1983 claims (*see* Docs. # 26 at 11-12; 44-1 at 4-5), and, to be sure, Plaintiffs' own pleadings indicate that they were. Because that showing has been made, the burden shifts to Plaintiffs to show that the "defendant's conduct violated a statutory or constitutional right." *Skop*, 485 F.3d at 1137. Finally, "the plaintiff must show that the violation was 'clearly established.'" *Id.*; *Snider v. Jefferson State Cmty. Coll.*, 344 F.3d 1325, 1328 (11th Cir. 2003) ("When case law is

---

invocation of state-law immunity against those claims, but will address whether Defendants are entitled to qualified immunity at this stage of the litigation.

needed to 'clearly establish' the law applicable to the pertinent circumstances, we look to decisions of the U.S. Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state." (citing *Marsh v. Butler Cty., Ala.*, 268 F.3d 1014, 1032-33 n. 10 (11th Cir. 2001) (en banc)).

       a.       **Plaintiffs Have Not Adequately Pled that Jones or Hastings Violated Megan's Due Process or Equal Protection Rights**

Plaintiffs first allege that Jones and Hastings violated Megan's Due Process property interests by failing to investigate evidence submitted to support the alleged sexual assault. (Doc. # 7 at ¶ 108). Plaintiffs have not explained in their opposition briefs how the alleged failure to investigate the rape kit violated any of Megan's due process property rights. (*See* Docs. # 26 at 9; 44-1 at 3-4). The Supreme Court has held that a "property interest" must consist of more than "an abstract need or desire" or "a unilateral expectation"; instead, to have a property interest in a governmental benefit, a plaintiff must "have a legitimate claim of entitlement to it." *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005) (quoting *Bd. of Regents of St. Colleges v. Roth*, 408 U.S. 564, 577 (1972)). "[A] benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Id.* Here, Plaintiffs have offered no authority or source of law that gave Megan an entitlement to an investigation of evidence she submitted in support of a criminal complaint. *Cf. Vinyard v. Wilson*, 311 F.3d 1340, 1356 (11th Cir. 2002) (addressing a Georgia plaintiff's procedural due process claim and finding no "federal or state court decision, statute, regulation or other source of law that gives [plaintiff] an entitlement to an internal investigation by the Sheriff's Office of her complaints of police brutality"); *Harder v. Hunter*, 572 F. App'x 904, 907-08 (11th Cir. 2014) (holding that Florida law established no requirement for law enforcement officers to investigate all criminal complaints). Therefore, any

procedural due process claim against Defendants Jones and Hastings is due to be dismissed for failure to allege Megan's protected property interest.

Next, Plaintiffs allege that Jones and Hastings "created a danger of an increased risk of harm to the victims of sexual abuse, which are disproportionately females, by fostering an environment whereby the perpetrator of the sexual assault was allowed to continue to prey on victims without fear of investigation by the Tuscaloosa Sheriff's Department." (Doc. # 7 at ¶ 111). They assert that Jones and Hastings failed to conduct a proper investigation of the alleged assault because of Megan's gender. (*Id.* at ¶¶ 112-13). After careful review, the court discerns no plausible equal protection claim against the officers, as the alleged gender discrimination rests on wholly conclusory allegations of discriminatory intent.

To state a claim under the Equal Protection clause of the Fourteenth Amendment, a plaintiff typically must plead that (1) she is similarly situated to other persons who received more favorable treatment, and (2) her discriminatory treatment was based on a constitutionally protected interest such as race or gender. *Jones v. Ray*, 279 F.3d 944, 946-47 (11th Cir. 2001). A plaintiff must also allege that the defendant acted with the intent to discriminate against her, and conclusory allegations of personal belief of disparate treatment are insufficient to state a claim. *Ardis v. Danheisser*, 2014 WL 103232, at *6 (N.D. Fla. Jan. 10, 2014) (citing *McClesky v. Kemp*, 481 U.S. 279, 292 (1987); *E & T Realty v. Strickland*, 830 F.2d 1107, 1113 (11th Cir. 1987); *GJR Invs., Inc.*, 132 F.3d at 1367-68; *Coon v. Ga. Pac. Corp.*, 829 F.2d 1563, 1569 (11th Cir. 1987)).

Plaintiffs' equal protection claim against Jones and Hastings wholly fails to explain how similarly situated males received more favorable treatment from these Defendants. (*See* Doc. # 7 at ¶¶ 106-17). Moreover, Plaintiffs offer no additional factual allegations to support the assertion

that Defendants' conduct during the July 2015 investigation was based on Megan's gender. While in their opposition briefs Plaintiffs point to charges filed against female perpetrators on behalf of male victims of sexual assault (*e.g.*, Doc. # 44-1 at 4), these arguments suffer from the fatal flaw of being improper attempts to amend the claims in the Amended Complaint. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."). But, even more significantly, Plaintiffs' briefs do not show that the male victims were similarly situated to Megan, they received more favorable treatment during the criminal investigations than Megan, or Defendants Jones and/or Hastings were involved in those investigations. For these reasons, Plaintiffs have not alleged a violation of Megan's equal protection rights by Defendants Jones or Hastings.

Finally, in the interest of completeness, the court has examined whether Plaintiffs could plead a "class of one" equal protection claim against Jones and Hastings based on their unequal treatment of Rondini and Bunn during the investigation. They cannot. A "class of one" equal protection claim is one "where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Under such an equal protection claim, a plaintiff must be "*prima facie* identical in all relevant respects" to a proposed comparator who received more favorable treatment. *Campbell v. Rainbow City, Ala.*, 434 F.3d 1306, 1314 (11th Cir. 2006). The court must evaluate the allegedly disparate decision in light of all the factors that an objectively reasonable decisionmaker would have considered. *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1203 (11th Cir. 2007). Thus, as a general matter, a plaintiff will have more difficulty meeting the similarly situated element for a "class of one" claim where

the governmental decision at issue requires the decisionmaker to weigh several factors, rather than a one-dimensional decision based upon a single answer to a single question.  *See id.* at 1203-04 (discussing the Supreme Court's precedents for "class of one" claims and observing that successful "class of one" claims involved one-dimensional decisions).  By their very nature, law enforcement and prosecution decisions rest on a wide variety of variables, including "the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan."[6]  *United States v. Armstrong*, 517 U.S. 456, 465 (1996) (discussing factors at issue in prosecution decisions).

The Tenth Circuit considered a similar "class of one" equal protection claim against law enforcement officers investigating a sexual assault in *Jennings v. City of Stillwater*, 383 F.3d 1199 (10th Cir. 2004).  There, the plaintiff, a college student, reported a rape committed by members of the Oklahoma State University's football team.  *Id.* at 1200.  The detective assigned to her complaint interviewed the four accused football players, but met with the players and a coach before the interviews.  *Id.* at 1201.  Thereafter, the detective interviewed the plaintiff and challenged her account of the assault, based on the contradictions between her testimony and the accused players' testimony.  *Id.*  The detective also questioned the plaintiff about whether she had leaked information about the reported rape to media.  *Id.*  When the plaintiff expressed reluctance to pursue criminal charges against the football players, the detective presented her a waiver of prosecution form that she then signed, even though the detective had never used such a form in any other rape investigation.  *Id.*  Another officer interviewed the plaintiff the next day

---

[6]  *See also Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 603-04 (2008) (explaining, in *dicta*, that a "class of one" equal protection claim not premised on class-based discrimination would be inappropriate for an officer who issued a ticket to one individual on a highway where drivers often drove above the speed limit, since officers naturally cannot issue tickets to all speeding drivers and discretion is inherent in determining which drivers receive tickets).

after she asked to withdraw the prosecution waiver. *Id.* at 1202-03. After the investigation, the detective recommended to a district attorney that the football players not be prosecuted. *Id.* at 1203. His report addressed inconsistencies in the plaintiff's account, but did not discuss inconsistencies in the football players' testimony. *Id.* Moreover, the detective's report construed ambiguous testimony by the plaintiff in a light that suggested the plaintiff consented to sex with two of the four players. *Id.* at 1203-04. The district attorney decided to not pursue criminal charges from the rape complaint. *Id.* at 1204.

Despite the Tenth Circuit's suggestion that the officers conducted an inadequate investigation, *see id.* at 1215, it held that the plaintiff failed to present a triable "class of one" equal protection claim against the law enforcement officers. *Id.* at 1209-15. The *Jennings* opinion explained that "class of one" equal protection analysis is ill-suited to examining the conduct of law enforcement because "a certain degree of randomness and irrationality necessarily 'abounds at the bottom rung of law enforcement.'" *Id.* at 1211 (quoting *Bell v. Duperrault*, 367 F.3d 703, 712 (7th Cir. 2004) (Posner, J., concurring)). *See also Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 603-04 (2008) (discussing, in *dicta*, the discretion inherent in patrol officers issuing speeding tickets). Among other grounds, the Tenth Circuit affirmed summary judgment for the defendant officers because the plaintiff failed to submit "information regarding the allegedly similarly situated rape victims." *Id.* at 1214-15. It noted several distinguishing factors that could differentiate rape cases, including the relative strength of the cases, the amount of evidence supporting a consent defense, whether the victim admitted to intoxication or an inability to identify suspects, and whether the victim expressed hesitation about participating in a prosecution. *See id.* at 1215 (concluding that a jury or court could not

examine a "class of one" equal protection claim without information concerning the variety of factors law enforcement officers could consider).

Here, as in *Jennings*, the court finds no plausible "class of one" equal protection claim because the First Amended Complaint fails to plead that Megan's case was identical in all relevant respects to one where the crime victim received more favorable treatment from Defendants Jones or Hastings. As discussed above, Plaintiffs have not provided enough detail about the sexual abuse cases mentioned in their opposition briefs (*State v. Jessica Acker* and *State v. Katherine Nelson*) to show that Megan was similarly situated in all relevant respects to the victims in those cases. (*See* Doc. # 26 at 9). *Cf. Jennings*, 383 F.3d at 1215 (explaining some aspects in which sexual assault claims can differ). And, while the court agrees with Plaintiffs that the crime Megan accused Defendant Bunn of committing was more serious than the crimes Bunn accused Megan of committing, the court cannot say that Megan's criminal complaint and Bunn's criminal complaint shared the degree of similarity the Eleventh Circuit has required for "class of one" equal protection claims. *See Campbell*, 434 F.3d at 1314 (requiring cases to be identical in all relevant respects). Simply put, the fact that Megan and Bunn accused each other of vastly different crimes is likely enough, standing alone, to foreclose any "class of one" equal protection claim based on the officers' respective treatment of them.

### b. Plaintiffs Have Not Pled Any Abuse of Process

Plaintiffs argue that Defendants Jones and Hastings abused the criminal process by threatening her with criminal charges in an attempt to coerce her to drop the criminal accusation against Bunn. (Doc. # 26 at 10) (referring to Doc. # 7 at ¶¶ 52-54). The problem with Plaintiffs' abuse-of-process § 1983 claim is that the allegations fail to demonstrate an abuse of process that violates Alabama law. It is well settled that, in defining the contours of a § 1983 claim, courts

first look to the common law of torts and often "adopt wholesale the rules that would apply in a suit involving the most analogous tort." *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 920 (2017). Thus, in defining the contours of a § 1983 malicious prosecution claim, the Eleventh Circuit held that a plaintiff must prove (1) a violation of his or her Fourth Amendment right to be free from unreasonable seizures and (2) the elements of the common law tort of malicious prosecution. *Wood v. Kesler*, 323 F.3d 872, 881 (11th Cir. 2003). Thus, at a minimum, to allege a § 1983 abuse of process claim, Plaintiffs must first allege an abuse of process.

The elements of a cause of action for abuse of process under Alabama law are malice, the existence of an ulterior purpose, and the wrongful use of process. *See Triple J. Cattle, Inc. v. Chambers*, 621 So. 2d 1221, 1225 (Ala. 1993) (citing *Drill Parts & Serv. Co. v. Joy Mfg. Co.*, 619 So. 2d 1280, 1290 (Ala. 1993)). This distinguishes an abuse of process claim from one for malicious prosecution. "[M]alicious prosecution concerns the wrongful *issuance* of process; abuse of process concerns the wrongful *use* of process *after it has been issued*." *Kizer v. Finch*, 730 So. 2d 1197, 1200 (Ala. Civ. App. 1998) (italics in original) (quoting *C.C. & J., Inc. v. Hagood*, 711 So. 2d 947, 950 (Ala. 1998)). In order for an abuse of process claim to be sustained, a lawsuit must have been legally filed for a proper purpose, but some process of the court must have been improperly used after the lawsuit was filed. *Ramsey v. Leath*, 706 F.2d 1166, 1170 (11th Cir. 1983) (quoting *Ancora Corp. v. Stein*, 445 F.2d 431, 433 (5th Cir. 1971)). An abuse of process claim in Alabama may not rest solely on allegations that the suit originated out of some ulterior motive and with malice. *See id.*

Here, Plaintiffs have not alleged that Jones or Hastings improperly used a process of a court after a criminal action had been filed against Megan. Instead, they allege that Jones and Hastings improperly threatened to institute a criminal action that ultimately was not instituted for

nefarious purposes. Under Alabama law, an abuse of process claim will not lie for such conduct that occurs before the institution of a legal action. *See Ramsey*, 706 F.2d at 1170. Because Plaintiffs have not pled a necessary element of an abuse of process claim under Alabama law, their § 1983 abuse of process claim in Count IV must be dismissed for failure to state a claim.

### 5. Megan's Suicide is an Efficient Intervening Cause Barring Wrongful-Death Claims Premised on Negligence, Recklessness, or Wantonness, But Not Wrongful-Death Claims Based on Intentional Torts

Defendants argue that the Personal Representative's wrongful-death claim is implausible because Megan's commission of suicide was an intentional, intervening cause that broke the causal connection between their alleged wrongful conduct and Megan's death. (Docs. # 9 at 6-13; 16 at 10-12; 38-1 at 5-6). The Personal Representative responds that Defendant Bunn caused Megan's mental conditions by sexually assaulting her and that those conditions resulted in her suicide. (Doc. # 28 at 9-10). Moreover, the Personal Representative argues that the officers' actions caused Megan's mental deterioration and her suicide because she reported a few days before her death that she had been bullied by police. (Docs. # 26 at 13; 44-1 at 6-7, 12-13).

Under Alabama's wrongful-death statute, a personal representative of a deceased individual can bring suit to recover damages for "the wrongful act, omission, or negligence of any person, persons, or corporation" that caused the decedent's death. Ala. Code § 6-5-410(a). Here, Plaintiff's wrongful-death claim is based on negligent, wanton, and wrongful conduct and negligent, wanton, and wrongful failures to act "in response to Megan's reported sexual assault." (Doc. # 7 at ¶ 94). Regardless of whether the wrongful-death claim is premised on negligence or wantonness, the plaintiff must show proximate cause between the defendant's breach of duty and the actionable damage or injury. *Lemley v. Wilson*, 178 So. 3d 834, 841-42 (Ala. 2015). "Proximate cause is an act or omission that in a natural and continuous sequence, unbroken by

any new independent causes, produces the injury and without which the injury would not have occurred." *Martin v. Arnold*, 643 So. 2d 564, 567 (Ala. 1994). The threshold issue presented in this case is whether Megan's commission of suicide, as a matter of law, qualifies as an independent cause that necessarily broke the causation chain between Defendants' alleged misconduct and her death.

In *Gilmore v. Shell Oil Company*, 613 So. 2d 1272 (Ala. 1993), the Alabama Supreme Court addressed when a decedent's commission of suicide is an "intervening efficient cause" that breaks the chain of causation flowing from a defendant's negligence. 613 So. 2d at 1275. The Alabama Supreme Court held in *Gilmore* that a plaintiff's conduct can qualify as an intervening efficient cause if: (1) it occurs after the defendant's negligent conduct; (2) it would have been unforeseeable to the defendant at the time he or she acted; (3) it is "sufficient to be the sole cause-in-fact of the plaintiff's injury"; (4) it is "so highly extraordinary or unexpected that it can be said to fall without the realm of reasonable foreseeability as a matter of law"; and (5) it "is more than mere contributory negligence and is of a higher culpability level than the defendant's negligence." *Id.* at 1275 (citing *Gen. Motors Corp. v. Edwards*, 482 So. 2d 1176, 1194-95 (Ala. 1985), and 57A Am. Jur. 2d *Negligence* §§ 650, 652 (1989)). Moreover, it concluded that a decedent's suicide after the alleged negligence that allowed the decedent to access a loaded handgun "was unforeseeable as a matter of law and was sufficiently culpable to supersede the defendants' negligence as the proximate cause of [the decedent's] death." *Id.* at 1275-76. The Alabama Supreme Court proceeded to discuss two situations where a defendant can be held liable for negligence that causes a decedent to commit suicide: (1) where the negligent conduct causes a mental condition "that proximately results in an uncontrollable impulse to commit suicide"; and (2) where the defendant faces a duty to prevent suicide in a situation where suicide

is foreseeable. *Id.* at 1276 (quoting *Krieg v. Massey*, 781 P.2d 277, 278-79 (Mont. 1989)).   In

explaining why there was no substantial evidence to dispute the finding of a suicide in Gilmore's

case, the Alabama Supreme Court explained that suicides "defy rational explanation, and courts

should not pretend otherwise." *Id.* at 1277-78 (quoting *Watters v. TSR, Inc.*, 904 F.2d 378, 384

(6th Cir. 1990)).   It expounded on the chain of causation as follows:

> [W]e recognize that such acts are not the ordinary and naturally flowing
> consequences of the defendants' negligent conduct in leaving the handgun under
> the cashier's counter where it was accessible to those persons who might find
> themselves behind the cashier's counter.   What relieves the defendants of any
> liability for [the decedent's] death is that [the decedent], by his own hands, acted
> intentionally and deliberately in a manner that was calculated to result in his own
> death.   Except for circumstances where the relationship between a decedent and
> defendant is such that we expect the defendant to take affirmative steps to protect
> the decedent from deliberate and self-destructive injury at the decedent's own
> hand, we do not expect the ordinary person to be able to predict, much less guard
> against and prevent, another person's deliberate and self-destructive actions.
> Therefore, we hold that, except in the previously discussed situations, suicide
> and/or deliberate and intentional self-destruction is unforeseeable as a matter of
> law, and civil liability will not be imposed upon a defendant for a decedent's
> suicide.

*Id.* at 1278.

In *Prill v. Marrone*, 23 So. 3d 1 (Ala. 2009), the Alabama Supreme Court explained

when a defendant's negligent conduct causes a decedent to experience an "uncontrollable

impulse" to commit suicide.   23 So. 3d at 8.   Adopting Wisconsin law and the rule from the

Restatement (Second) of Torts, the Alabama Supreme Court stated that "an 'uncontrollable

impulse' consists of 'a delirium, frenzy or rage, during which the deceased commits suicide

'without conscious volition to produce death.'" *Id.* (quoting *McMahon v. St. Croix Falls Sch.

Dist.*, 596 N.W.2d 875, 880 (Wis. Ct. App. 1999), and citing *Restatement (Second) of Torts* §

455 (1965)).   It concluded that the defendants in *Prill* did not cause the decedent to enter a

"delirium, frenzy or rage" because the record testimony revealed that: (1) the decedent's mother

noticed nothing odd or unusual seconds before he shot himself; (2) the defendants did not cause the decedent "to surrender his own free will"; and (3) the decedent recklessly grabbed the gun and pointed it to his head without warning before pulling the trigger. *Id.*

Here, if the Personal Representative had presented a wrongful-death action solely based on Defendants' negligence, Megan's suicide would constitute an intervening efficient cause foreclosing liability. The Personal Representative plainly alleges that Megan committed suicide. (Doc. # 7 at ¶ 90). Under Alabama law, a decedent's commission of suicide is considered to be unforeseeable to a defendant as a matter of law. *Gilmore*, 613 So. 2d at 1278. And, the Personal Representative has not plausibly alleged that Defendants' conduct created an "uncontrollable impulse" to commit suicide. *See Prill*, 23 So. 3d at 8. While the facts as pled show that Megan developed mental conditions following the alleged sexual assault and deficient police investigation, including anxiety, depression, and PTSD, (*see* Doc. # 7 at ¶¶ 60, 73, 77), they also show that Megan acted to alleviate those mental conditions. She sought psychotherapy in Texas and at the University (*id.* at ¶¶ 60, 67-69, 71-73), she withdrew from the University when her mental conditions "grew increasingly worse," (*id.* at ¶ 77), she continued treatment for her mental conditions in Texas during fall 2015, (*id.* at ¶ 87), and she reported her suicidal thoughts to Southern Methodist University when she sought counseling there. (*Id.* at ¶ 88). Plaintiffs' own allegations about Megan's consistent efforts to alleviate her deteriorating mental condition over an eight-month period show that Defendants' tortious conduct did not cause an irresistible "delirium, frenzy or rage." *Cf. Prill*, 23 So. 3d at 8. If this case merely involved negligence allegations, the court would agree with Defendants that the Personal Representative's wrongful-death claim is implausible on causation grounds.[7]

---

[7] To be clear, Defendant Bunn's request to dismiss the wrongful-death claim is due to be granted to the extent that the Personal Representative claims Defendant Bunn caused Megan's death through negligent, reckless, or

But, the Personal Representative has pointed to more than negligent or wanton conduct to support the wrongful-death claim. He alleges that Defendant Bunn intentionally raped Megan (Doc. # 7 at ¶ 35), and that Defendants Jones and Hastings intentionally threatened to charge her with felonies in order to force her to drop the allegations against Bunn. (*Id.* at ¶¶ 53, 57). *Gilmore* and *Prill* both addressed whether a decedent's commission of suicide superseded alleged negligence as the cause of the decedent's death, not whether a suicide superseded intentional tortious conduct as the cause of death.[8]  *See Prill*, 23 So. 3d at 5 ("First, [the personal representative] asserts that she presented substantial evidence indicating that [defendants'] negligence caused [the decedent's] death."); *Gilmore*, 613 So. 2d at 1275 (explaining when a plaintiff's actions are intervening efficient conduct that breaks the chain of causation from a defendant's negligent act). Indeed, the rule established in *Gilmore* asserts that a plaintiff's actions are "intervening efficient conduct" only if they are of a higher level of culpability than the defendant's conduct. *Gilmore*, 613 So. 2d at 1275. The intentional acts allegedly committed by Defendants Bunn, Jones, and Hastings are at least of an equally culpable level as Megan's alleged commission of suicide.

At oral argument, Defendant Bunn's counsel insisted that Alabama case law does not support a difference between causation standards for intentional torts and non-intentional torts. The court agrees insofar as no binding authority from Alabama courts has addressed the issue of

---

wanton (as opposed to intentional) conduct. (*See* Doc. # 7 at ¶ 94). This is because Megan's suicide constitutes an unforeseeable intervening cause as a matter of law, and her commission of suicide would supersede Bunn's negligence, recklessness, or wantonness. *See Gilmore*, 613 So. 2d at 1275.

[8] Defendant Bunn also relies on *Missildine v. City of Montgomery*, 907 F. Supp. 1501 (M.D. Ala. 1995), to argue that his conduct could not have proximately caused Megan's death. The court finds this case distinguishable from *Missildine*. The court in *Missildine* described the issue presented as "whether Mr. Missildine's subsequent act of intentionally and deliberately killing himself was unforeseeable as a matter of law and sufficiently culpable to supersede the defendants' *negligence* as the proximate cause of Mr. Missildine's death." 907 F. Supp. at 1505 (emphasis added). Thus, while the facts discussed in the opinion indicate that Missildine's wrongful-death claim was based on intentional battery, the *Missildine* opinion never addressed directly whether *Gilmore*'s intervening cause standard extends to intentional torts that result in a decedent's suicide.

whether *Gilmore*'s intervening efficient cause rule for suicides applies when a plaintiff claims that an intentional tort caused the decedent to commit suicide. But, *Gilmore* plainly addressed whether suicide is an intervening efficient cause breaking the chain of causation from a defendant's *negligence*. 613 So. 2d at 1275. The *Gilmore* opinion adopted a rule from the American Jurisprudence, Second Edition encyclopedia's definition of negligence for intervening efficient causes. *Id.* (citing, among other sources, 57A Am. Jur. 2d *Negligence* §§ 650, 652 (1989)). This argument accordingly cuts against Defendant Bunn because Alabama case law has not expressly *extended Gilmore*'s rule that a decedent's suicide constitutes an intervening efficient cause to wrongful-death cases based on intentional torts committed against the decedent.

Thus, because the holdings of *Gilmore* and *Prill* do not squarely apply to the wrongful-death claims based on Defendants' intentional conduct, and "the question of proximate cause is almost always a question of fact to be determined by the jury," *Dixon v. Bd. of Water & Sewer Comm'rs of City of Mobile*, 865 So. 2d 1161, 1165 (Ala. 2003), the motion seeking dismissal of the Personal Representative's wrongful-death claim is due to be denied to the extent it is alleged that Defendant Bunn's intentional tortious conduct caused Megan's death.[9]

### B.     Plaintiffs' Title II Claim (Count V)

The Personal Representative has brought a claim under Title II of the ADA against the University. (Doc. # 7 at ¶¶ 124-35). The Personal Representative alleges that although the University was aware of Megan's depression, anxiety, and PTSD (*id.* at ¶¶ 130-31), the University failed to comply with Title II because it did not accommodate her disabilities. (*Id.* at ¶ 133). Moreover, it is alleged that the University discriminated against Megan by not offering

---

[9] As explained above, the wrongful-death claims against Defendants Abernathy, Jones, and Hastings are due to be dismissed for reasons unrelated to proximate causation.

her full access to education and health services. (*Id.* at ¶ 134). The University argues that this Title II ADA claim is implausible, barred by Eleventh Amendment immunity, and barred for lack of standing. (Doc. # 46 at 11-13, 22-25, 29-31). The court addresses each of these arguments, in turn.

### 1. Sufficiency of Plaintiffs' Title II Claim

"In order to state a Title II claim, a plaintiff generally must prove[:] (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability." *Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072, 1083 (11th Cir. 2007). "A plaintiff can proceed on theories of intentional discrimination, disparate treatment, or failure to make reasonable accommodations." *Rylee v. Chapman*, 316 F. App'x 901, 906 (11th Cir. 2009) (citing *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1212 n. 6 (11th Cir. 2008)). The Personal Representative's Title II claim appears to present both intentional discrimination and reasonable accommodation claims. (*See* Doc. # 7 at ¶¶ 133-34). The parties do not contest at this time that Megan was a qualified individual with a disability or that the University is a public entity subject to Title II. Rather, the University claims it could not have discriminated against Megan because of her anxiety, depression, or PTSD because it did not know of those conditions at the time its employees allegedly discriminated against Megan. (Doc. # 46 at 11-12). Moreover, the University insists that Plaintiff was not denied access to any service. (*Id.* at 12-13).

"In cases alleging a failure to make reasonable accommodations, the defendant's duty to provide a reasonable accommodation is not triggered until the plaintiff makes a 'specific

demand' for an accommodation." *Rylee*, 316 F. App'x at 906 (quoting *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999)). Likewise, in cases involving disability discrimination, a plaintiff cannot establish a *prima facie* case of discrimination without proof that the decisionmaker actually knew of his or her disability. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1184-86 (11th Cir. 2005) (explaining the Eleventh Circuit's denial of a constructive knowledge standard for ADA discrimination claims, and stating that "[i]ts fundamental flaw lies in the fact that a decision-maker who lacks actual knowledge of an employee's disability cannot fire the employee 'because of' that disability").

Here, the Amended Complaint plausibly alleges that Cara Blakes knew of Megan's mental conditions, but it does not indicate that Beth Howard, the Title IX coordinator, or Kathy Echols, a WGRC counselor, knew of those conditions. According to the Amended Complaint, a Texas psychotherapist diagnosed Megan with anxiety, depression, and PTSD before the fall 2015 semester. (Doc. # 7 at ¶ 60). However, the Amended Complaint does not state whether (or when) Megan reported those diagnoses to any University employee. A doctor at the University's student health center diagnosed Megan with those conditions on September 25, 2015, but the incidents involving Echols and Blakes occurred before that date.[10] (*See id.* at ¶¶ 68-69, 73). Nothing in the Amended Complaint indicates that the diagnoses were shared with Beth Howard or that Megan's mental conditions contributed to Howard's alleged decision to help Megan drop the honors course rather than acting in accordance with the University's alleged duties under Title IX. (*See id.* at ¶ 66). Having said that the Amended Complaint clearly alleges that Blakes knew about Megan's anxiety condition because she reportedly refused to provide counseling services due to that anxiety condition. (*Id.* at ¶ 69). Accordingly, the court concludes that

---

[10] The Amended Complaint does not state when Megan informed Beth Howard about her concerns that Defendant Bunn would host an event for her honors class. (Doc. # 7 at ¶ 66).

Plaintiffs have sufficiently alleged that Blakes had actual knowledge of Megan's alleged disabilities, but these allegations fall short of plausibly alleging that Howard and Echols had actual knowledge of those disabilities. Therefore, the Personal Representative has not pled a Title II intentional discrimination claim against the University premised on Howard's or Echols's conduct. *See Cordoba*, 419 F.3d at 1184-86.

The Personal Representative argues that Echols and Blakes knew of Megan's depression and PTSD because she expressed symptoms of those conditions when seeking counseling from the WGRC, and "[s]uch counselors know depression and PTSD when they see it." (Doc. # 52 at 21). This argument relies on the premise that an ADA discrimination claim can be based on constructive knowledge of a disability formed from observations. As stated above, that premise has been rejected by the Eleventh Circuit. *See Cordoba*, 419 F.3d at 1184-86.

To the extent the Personal Representative seeks to raise a Title II claim based on the University's failure to accommodate Megan's mental conditions, the claim cannot go forward because there is no allegation that Megan requested accommodations for her mental conditions. Although the Personal Representative has explained that Megan sought counseling and treatment for her anxiety, depression, and PTSD from the WGRC and that one counselor denied services due to her anxiety (Doc. # 7 at ¶¶ 67, 69), the Personal Representative has not pointed to an accommodation she sought from a WGRC employee. Moreover, the Amended Complaint does not allege that Megan requested an accommodation regarding the honors course event due to her anxiety, depression, or PTSD. (*See id.* at ¶ 66). Instead, it asserts that Megan sought assistance from an employee responsible for the University's Title IX compliance and contends that Megan lost an "educational opportunity" due to the University's non-compliance with Title IX. (*See id.*). Thus, the Personal Representative's claim regarding Howard's alleged insufficient

assistance with the honors course cannot be construed as a failure-to-accommodate claim under Title II. *Cf. Rylee*, 316 F. App'x at 906. And, any other Title II failure-to-accommodate claim is also due to be dismissed for failure to allege that Megan requested an accommodation.

The Title II intentional-discrimination claim against the University related to Blakes's alleged denial of counseling does state a claim, however. The court is not convinced by the University's argument that the delay in offering counseling services is not a denial of health care benefits. The University has offered no authority in support of its argument that the alleged multi-week delay in its provision of counseling services offered to the University's student population to Megan, based on Megan's failure to obtain a specific form of treatment for a mental condition (anxiety), fails to constitute an exclusion from the University's benefits "by reason of [Megan's] disability." *See* 42 U.S.C. § 12132. Therefore, at this stage, the court cannot dismiss the Title II claim against the University related to Blakes's denial of counseling services.[11]

### 2. The Title II Claim Is Not Barred by Eleventh Amendment Immunity

In the alternative, the University asserts Eleventh Amendment immunity as to the Title II claim because (1) none of the alleged Title II violations present a violation of the Fourteenth Amendment, and (2) Title II, as applied to the conduct presented in the Amended Complaint, is not a congruent and proportional response to the history and pattern of any unconstitutional treatment identified by Congress in the legislative history for the ADA. (Doc. # 46 at 22-25). The Personal Representative responds that the Eleventh Circuit has already resolved this issue in its *Association for Disabled Americans, Inc. v. Florida International University* decision. 405 F.3d 954 (11th Cir. 2005). The court agrees with the Personal Representative.

---

[11] As discussed below, the court will grant Plaintiffs an opportunity to replead their complaint and add additional factual allegations to support the Title IX claims raised against the University. Plaintiffs are also free to also include additional allegations to support their Title II claims.

In *Association for Disabled Americans*, the plaintiffs sued a Florida public university under Title II for failing to provide sign language interpreters and other auxiliary aids to hearing-impaired students and for not ensuring physical access to certain programs and facilities. 405 F.3d at 956. In deciding whether Congress abrogated the states' sovereign immunity in passing Title II, the Eleventh Circuit explained that Congress unequivocally expressed its intent to abrogate state sovereign immunity in 42 U.S.C. § 12202. *Id.* at 956-57. Then, the court addressed whether Title II's abrogation of sovereign immunity was a valid exercise of Congress's authority under Section 5 of the Fourteenth Amendment. *Id.* at 957. The court applied the "congruence and proportionality" test from *City of Boerne v. Flores*, 521 U.S. 507 (1997) and determined that Title II was a constitutional abrogation of the states' sovereign immunity "in the context of a public education institution." *Id.* First, it concluded that, in passing Title II, Congress sought to enforce a "constitutional right to equality in education" that was "vital to the future success of our society," though not a fundamental right. *Id.* at 957-58. Second, it concluded that Congress found a history of unconstitutional discrimination against the disabled in public education, along with other public services. *Id.* at 958 (relying on the Supreme Court's determinations about Title II in *Tennessee v. Lane*, 541 U.S. 509 (2004)). Finally, it concluded that Title II was appropriate prophylactic legislation to combat disability discrimination in public education because (1) states retained the discretion to exclude persons from education services for other reasons, and (2) Title II only requires public entities to make reasonable modifications to benefits and services. *Id.* at 958-59. Thus, the *Association for Disabled Americans* opinion held that Title II was a valid exercise of Congress's enforcement power under Section 5 of the Fourteenth Amendment "as applied to access to public education." *Id.* at 958.

In light of the clear Eleventh Circuit authority upholding the constitutionality of Title II's sovereign-immunity waiver in the context of public education, the University cannot rely on Eleventh Amendment immunity to defeat the Title II claim presented against it.[12] *Association for Disabled Americans*, 405 F.3d at 958-59. The University argues that Title II's waiver of sovereign immunity is not congruent and proportional in this context because, to the extent Title II prohibits discrimination in "failing to provide immediate access to mental health or university administrative services," it is not an appropriate response to the history of unconstitutional conduct found by Congress when enacting Title II. (Doc. # 46 at 24). To the contrary, *Association for Disabled Americans* establishes that Title II is a valid abrogation of sovereign immunity for claims based on access to public education, and Plaintiffs' Title II claim plausibly alleges that the University denied her access to a public education service (*i.e.*, counseling Megan needed to address her mental disabilities).

3.      **The Title II Claim Survives Megan's Death Under Federal Common Law**

In the alternative, the University argues that the Personal Representative lacks standing to bring a Title II claim because the claim is a personal injury action that did not survive Megan's death. (Doc. # 46 at 29-31). Plaintiffs respond that the Middle District of Alabama declined to apply the survivorship holding discussed above from *Estate of Gilliam* to an ADA claim. (Doc. # 52 at 28) (discussing *Moore v. Chilton Cty. Bd. of Educ.*, 936 F. Supp. 2d 1300, 1315 (M.D. Ala. 2013)). And, Plaintiffs argue that the Title II claim should survive Megan's death because it is a claim for compensatory relief, not a claim meant to penalize the offender. (*Id.* at 28-29).

_____

[12] The University contends that the holding from *Association for Disabled Americans* should be revisited by the Eleventh Circuit because of later Supreme Court authority, including *United States v. Georgia*, 546 U.S. 151 (2006), and other authorities that propose limiting Congress's enforcement power to abrogate sovereign immunity to situations where Congress seeks to vindicate a fundamental constitutional right or protect a suspect class. (Doc. # 46 at 23-24 n. 13). This court must apply the Eleventh Circuit's binding authority from *Association for Disabled Americans*. The argument against Title II's waiver of sovereign immunity is for the Eleventh Circuit to decide, not this court.

The question of whether Megan's Title II claim survives her untimely death is ultimately less simple than the survivorship of her § 1983 claims.

No party has identified (and the court is not aware of) any survivorship provision in the ADA. *See Pokorney v. Miami Valley Career Tech. Ctr.*, 1997 WL 1764769, at *5 (S.D. Ohio Mar. 31, 1997). "In the absence of an expression of contrary intent, the survival of a federal cause of action is a question of federal common law."[13] *United States v. NEC Corp.*, 11 F.3d 136, 137 (11th Cir. 1993). Under federal common law, "remedial actions survive the death of the plaintiff, while penal actions do not." *Id.* "A remedial action is one that compensates an individual for specific harm suffered, while a penal action imposes damages upon the defendant for a general wrong to the public." *Id.* To determine whether a particular federal statute is penal or remedial, the court must consider: (1) "whether the purpose of the statute was to redress individual wrongs or more general wrongs to the public"; (2) "whether recovery under the statute runs to the harmed individual or to the public"; and (3) "whether recovery authorized by the statute is wholly disproportionate to the harm suffered." *Id.* (internal quotation marks omitted). "Under this test, courts following the federal common law approach conclude that, with the exception of claims for punitive damages, actions under the ADA survive the plaintiff's death." *Green ex rel. Estate of Green v. City of Welch*, 467 F. Supp. 2d 656, 666 (S.D.W.V. 2006); *Pokorney*, 1997 WL 1764769, at *5 (explaining how an application of the three factors weighed in favor of the ADA's status as a remedial statute); *Estwick v. U.S. Air Shuttle*, 950 F. Supp. 493, 498 (E.D.N.Y. 1996).

The survivability choice-of-law question is muddled, though, by the gap-filling provision found at 42 U.S.C. § 1988(a). That provision provides:

---

[13] The survival of a claim is distinct from the statute of limitations applicable to a claim. Unlike survivorship, "[w]here a federal statute does not contain a limitations period courts should look to the most analogous state statute of limitations." *Everett v. Cobb Cty. Sch. Dist.*, 138 F.3d 1407, 1409 (11th Cir. 1998).

> The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of titles 13, 24, and 70 of the Revised Statutes for the protection of all persons in the United States in their civil rights, . . . shall be exercised and enforced in conformity with the laws of the United States, . . . but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts . . . .

42 U.S.C. § 1988(a). "The ADA, which is codified at 42 U.S.C. §§ 12131, *et seq.*, is not among the statutes specifically enumerated in § 1988(a)." *Green*, 467 F. Supp. 2d at 665. Nevertheless, several courts have applied § 1988(a)'s gap-filling mechanism, which incorporates state law, to claims raised under the ADA. *Id.* at 666 (listing opinions). But these decisions do not persuade the court because such an expansion of § 1988(a) is contrary to the plain language of the statute, which lists the portions of the Revised Statutes to which the gap-filling provision applies. *Id.* at 665 ("Under the principle that a court's analysis must end with a statute's plain language absent ambiguity in the language of the statute, it would seem that § 1988(a) is inapplicable to the ADA."). As the court's analysis of the statute must end with its plain language absent ambiguity, *Coggin Auto. Grp. v. C.I.R.*, 292 F.3d 1326, 1332 (11th Cir. 2002), and the court has found no binding authority expressly applying § 1988(a)'s gap-filling provision to an ADA action, the court declines to do so here.

For the reasons explained above, Megan's Title II claim against the University survives her death and may be brought by the Personal Representative without relying on the wrongful-death statute, except for her request for punitive damages.

C.     **Plaintiffs' Substantive Due Process Claim for Loss of Parent/Child Relationship (Count VI)**

Plaintiffs Michael and Cynthia Rondini allege a substantive due process claim against Defendants Abernathy, Jones, and Hastings for conduct that shocks the conscience.[14]  (Doc. # 7 at ¶¶ 136-40).  They allege that Defendants' conduct caused the loss of their parent-child relationship with Megan.  The court agrees with Defendants Abernathy and Hastings that this claim is foreclosed by *Robertson v. Hecksel*, in which the Eleventh Circuit held that the Fourteenth Amendment's substantive due process protections do not extend to the relationship between a parent and an adult child.  420 F.3d 1254, 1255 (11th Cir. 2005).  Therefore, Count VI is due to be dismissed for failure to state a claim.

D.     **Plaintiffs' Title IX Claims (Count VII)**

Plaintiffs bring Title IX claims against Defendants Bell and the University for their deliberate indifference to Megan's rape complaints and alleged retaliatory acts taken against her after the report.  (*See* Doc. # 7 at ¶¶ 144-46).  The court will address several arguments raised by Defendants against this claim.  Ultimately, for the reasons explained below, the court concludes that (1) the Title IX claim against Defendant Bell is due to be dismissed, (2) Plaintiffs will receive an opportunity to supplement their factual allegations in support of the Title IX claims, (3) the Title IX claims are not barred by Eleventh Amendment immunity, and (4) the Personal Representative's Title IX claims survive Megan's death under federal common law.

1.     **Plaintiffs' Title IX Claim Against Defendant Bell is Due to be Dismissed**

As an initial matter, Plaintiffs' Title IX claim against Defendant Bell cannot go forward because Bell is an individual employee of the University, not a funding recipient.  "Title IX does

---

[14]  Plaintiffs Michael and Cynthia concede that this claim should not go forward against Defendant Bunn. (Doc. # 28 at 7).  To that extent, Defendant Bunn's motion to dismiss is due to be granted.

not allow claims against individual school officials; only funding recipients can be held liable for Title IX violations." *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1300 (11th Cir. 2007). And, to the extent the claim is being brought against Bell in an official capacity (*see* Doc. # 7 at ¶ 13), it is duplicative because the University is also being sued under Title IX. Therefore, the claim against Defendant Bell is due to be dismissed.

> **2.** **Plaintiffs' Title IX Retaliation and Deliberate Indifference Claims are Due to be Reconsidered After Providing Plaintiff an Opportunity to Replead**

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Supreme Court has held that Title IX's private right of action includes claims of retaliation against an individual because she complained about sex discrimination. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-75 (2005). Most courts have imported the retaliation standards for a retaliation claim under Title VII of the Civil Rights Act to establish the elements necessary to constitute a retaliation claim under Title IX, while recognizing that Title IX retaliation can occur outside of an employer-employee relationship. *See Ross v. Corp. of Mercer Univ.*, 506 F. Supp. 2d 1325, 1359 (M.D. Ga. 2007). According to the First Circuit, "a plaintiff may establish a prima facie case for a Title IX retaliation claim by alleging facts sufficient to show that she engaged in activity protected by Title IX, that the alleged retaliator knew of the protected activity, that the alleged retaliator subsequently undertook some action disadvantageous to the actor, and that a retaliatory motive played a substantial part in prompting the adverse action." *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 67 (1st Cir. 2002). The Eleventh Circuit has suggested, in an unpublished opinion, that the retaliatory act must be one materially adverse to a

reasonable student. *Bowers v. Bd. of Regents of Univ. Sys. of Ga.*, 509 F. App'x 906, 911 (11th Cir. 2013).

"Sexual harassment is discrimination in the school context under Title IX and in certain narrow circumstances, a plaintiff may be able to recover for student-on-student harassment." *Williams*, 477 F.3d at 1293 (internal quotations omitted). Five elements must be met for there to be liability in connection with a student-on-student Title IX harassment claim:

> First, the defendant must be a Title IX funding recipient. Second, an "appropriate person" must have actual knowledge of the alleged discrimination or harassment. Third, the discrimination or harassment—of which the funding recipient had actual knowledge under element two—must be "severe, pervasive, and objectively offensive." Fourth, the plaintiff must prove the funding recipient acted with deliberate indifference to known acts of harassment in its programs or activities. Fifth, the plaintiff must demonstrate the discrimination or harassment effectively barred the victim's access to an educational opportunity or benefit.

*Hill v. Cundiff*, 797 F.3d 948, 970 (11th Cir. 2015) (internal citations and quotation marks omitted).

After careful review, the court finds that the arguments pertaining to the Title IX retaliation claim are not sufficiently briefed, and, thus, not ripe for a decision. Plaintiffs insist that the University has not challenged the Title IX retaliation claim in this set of motions. (Doc. # 52 at 29-30). The University has attempted to remedy that oversight in its reply brief, but has only offered a single paragraph of argument. (Doc. # 53 at 10). The University claims that Megan did not engage in protected conduct, but it does not explain why the communications between Megan, Michael, and the University's Title IX office do not constitute protected conduct. (*See id.*). Likewise, it insists that none of the alleged retaliatory conduct can be considered adverse action, but it does not explain why the University's failure to send a letter of good standing in a timely manner cannot be considered adverse action as a matter of law. On an initial review, it appears plausible that a student of reasonable fitness could be deterred from

reporting sexual misconduct by a university's withholding of documentation needed for a transfer to another institution of higher learning. And, Plaintiffs suggested to the court at oral argument that they could plead additional facts to support their Title IX claims. As such, the court will grant Plaintiffs an opportunity to file an amended complaint before deciding whether the Title IX retaliation claim is due to go forward.

Likewise, the court finds it appropriate to grant Plaintiffs an opportunity to replead the Title IX deliberate indifference claim against the University before a final decision on whether that claim is due to go forward. At oral argument, the court expressed its concern that the authority provided to the court only supported a Title IX deliberate indifference claim where student-on-student harassment occurred. *See Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 632 (1999) ("Petitioner brought suit . . . , alleging that her fifth-grade daughter had been the victim of sexual harassment by another student in her class."); *Williams*, 477 F.3d at 1288-91; *Doe 1 v. Baylor Univ.*, 240 F. Supp. 3d 646, 652 (W.D. Tex. 2017) ("Each of the ten plaintiffs in this case allege that while they were students at Baylor University they were sexually assaulted by another student . . . ."); *Kinsman v. Fla. St. Univ. Bd. of Trustees*, 2015 WL 11110848, at *1 (N.D. Fla. Aug. 12, 2015). Plaintiffs argue in their opposition brief that their claim presents a "practice of eschewing [the University's] Title IX Sexual Misconduct Policy in preference to major donor relationships." (Doc. # 52 at 13). Because, at a minimum, the Title IX retaliation claims are due to be reviewed again, the court will grant Plaintiffs the opportunity to lay out that deliberate indifference claim in an amended complaint and additional briefing before making a final ruling on the viability of such a Title IX claim.

### 3.    The Title IX Retaliation Claim is Not Barred by Eleventh Amendment Immunity

The University insists that the Title IX claim presented in this suit should be barred by the Eleventh Amendment because it lacked adequate notice that it could be held liable for harm arising from sexual misconduct committed by an individual over whom it had no control.  (Doc. # 46 at 25-26).  The court concludes that this sovereign immunity defense is meritless in the context of the Title IX retaliation claim.  In *Jackson*, the Supreme Court rejected the argument that a funding recipient lacked notice of its Title IX liability for retaliatory conduct.  544 U.S. at 181-84.  Any argument that the University lacked notice of potential Title IX liability for intentional retaliation against a Title IX complainant is all the more meritless twelve years after the issuance of the *Jackson* opinion.

Likewise, the court disagrees with the University that a plausible Title IX deliberate indifference claim would exceed Congress's Spending Clause powers.  The Supreme Court has held that deliberate indifference to certain kinds of sexual harassment (*e.g.*, student-on-student harassment and teacher-on-student harassment) is intentional sex discrimination proscribed by Title IX.  *Jackson*, 544 U.S. at 182-83.  The more pressing question presented in this case is whether the off-campus donor-on-student harassment alleged here falls within the bounds of conduct regulated by Title IX.  The court will carefully evaluate that question after an amended complaint is filed.

### 4.    The Title IX Claims Survive Megan's Death

As with the Title II claim, the University insists that Plaintiffs lack standing to bring any Title IX claim because the claim did not survive Megan's death.  (Doc. # 46 at 29-31).  Like Title II of the ADA, Title IX is silent on the issue of whether a claim survives the victim's death. *Lopez v. Regents of Univ. of Cal.*, 5 F. Supp. 3d 1106, 1116 (N.D. Cal. 2013).  And, like Title II

of the ADA, Title IX is not expressly mentioned in the gap-filling provision of 42 U.S.C. § 1988(a) discussed above. *Id.* at 1116-17. Unsurprisingly, courts have split on the issue of whether federal common law or § 1988(a) provides the rule of decision for determining the survivability of Title IX claims. *Id.* at 1117-18 (describing the split in authority). For the reasons explained above, the court declines to apply § 1988(a) to determine survivability and will apply the common-law test described in *NEC Corporation*. 11 F.3d at 137.

Courts that have addressed whether Title IX claims are remedial or penal in nature conclude that Title IX claims are remedial, except to the extent a plaintiff seeks punitive damages. *Lopez*, 5 F. Supp. 3d at 1119-20. The court agrees. First, one of Congress's two principal objectives in enacting Title IX was "to provide individual citizens effective protection against those [discriminatory] practices." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998) (internal quotation marks omitted). Second, when available, monetary damages for a Title IX violation are awarded to a plaintiff, not to the public. Finally, the court finds that the monetary damages recoverable under Title IX are not disproportionate to the harm suffered. This is particularly the case because any punitive damages claim does not survive the victim's death under federal common law. For these reasons, Megan's Title IX claim against the University survives her death and may be brought by the Personal Representative without relying on Alabama's wrongful-death statute, except for the punitive damages request.

### E. Plaintiffs Lack Standing to Seek Injunctive Relief

As a final matter, Plaintiffs seek Title IX injunctive relief against the University and Bell. (Doc. # 7 at 33). Defendants insist that Plaintiffs lack standing to seek such injunctive relief. (Doc. # 46 at 31-32). Plaintiffs have not responded to this specific standing challenge, and the court agrees with Defendants' arguments which explain why Plaintiffs cannot obtain prospective

injunctive relief against the University or Bell. *See Williams*, 477 F.3d at 1303 ("[B]ecause injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate—as opposed to a merely conjectural or hypothetical—threat of future injury."). Thus, Plaintiffs' request for injunctive relief against Defendants Bell and the University is due to be dismissed for lack of standing.

## V.     Conclusion

For the reasons explained above, (1) Defendant Bunn's Motion to Dismiss (Doc. # 9) is due to be granted in part and denied in part; (2) Defendant Jones's Motion to Dismiss (Doc. # 16) is due to be granted; (3) Defendant Bunn's Motion to Strike (Doc. # 34) is due to be granted in part and denied in part; (4) Defendants Abernathy and Hastings's Motion to Dismiss (Doc. # 38) is due to be granted; and (5) Defendants Bell and the University's Motion to Dismiss (Doc. # 46) is due to be granted in part and denied in part. An Order consistent with this Memorandum Opinion will be entered.

**DONE** and **ORDERED** this January 8, 2018.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE