FILED
2018 Aug-01  PM 04:12
U.S. DISTRICT COURT
N.D. OF ALABAMA



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| MICHAEL W. RONDINI, as Administrator and Personal Representative FOR THE ESTATE OF MEGAN ELIZABETH RONDINI, deceased, | § § § § | |
| Plaintiff, | § § | |
| v. | § | Civil Action No.  7:17-cv-01114-RDP |
| | § | |
| TERRY J. BUNN, Jr., | § | |
| Defendant. | § § | |
| | § § | |

## FOURTH AMENDED COMPLAINT AND JURY DEMAND

Plaintiff, MICHAEL W. RONDINI, as Administrator and Personal Representative of the Estate of MEGAN ELIZABETH RONDINI, deceased, by and through undersigned counsel, file this Complaint and Jury Demand against Defendant TERRY JACKSON BUNN, Jr., for punitive damages for the malicious and intentional acts of the Defendant. In support of its Complaint and Jury Demand, Plaintiff alleges the following:

## PRELIMINARY STATEMENT

1.    This is a civil action brought to vindicate the Plaintiff's rights under the United States Constitution, the Alabama State Constitution, and under the statutory laws of the United States and Alabama.

2.    This is an action for damages that arise from the wrongful imprisonment and sexual assault of Megan Rondini by Terry Jackson Bunn, Jr., which ultimately and directly led to death by suicide of Megan Elizabeth Rondini.

## STATEMENT OF JURISDICTION

3.      The Plaintiff invokes jurisdiction under 28 U.S.C. § 1332 because of diversity of the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

4.      The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

5.      Venue is proper in the United States District Court for the Northern District of Alabama pursuant to 28 U.SC. § 1391 because Defendant resides in the state of Alabama and the acts and omissions giving rise to this lawsuit occurred in the state of Alabama.

## PARTIES

6.      Plaintiff Michael W. Rondini is also the Administrator and Personal Representative of the Estate of Megan Elizabeth Rondini, deceased, by appointment of the Probate Court for Travis County, Texas.

7.      Plaintiff's decedent, Megan Rondini, was a Texas citizen, maintaining her Texas driver's license, enrolled at The University of Alabama in Tuscaloosa, Alabama. She resided in Tuscaloosa, Alabama from approximately August 2013 through May 2014, August 2014 through July 5, 2015, and August 2015 through early October 2015 and was considered a non-Alabama resident for tuition purposes by the University of Alabama. Megan Rondini was 21 years old when she took her life on February 26, 2016, in Dallas, Texas.

8.      Defendant Terry Jackson Bunn, Jr. ("Defendant Bunn") is over the age of nineteen and is a resident and citizen of Tuscaloosa County, Alabama.

## <u>FACTUAL ALLEGATIONS</u>

9.      In July 2015, Megan was 20 years old and entering her junior year at UA as a pre-med honors student. She was majoring in biology, employed in a biology research laboratory, and working towards becoming a veterinarian. She had a 3.812 cumulative GPA.

10.     On or about the night of July 1, 2015, Megan went to the Innisfree Irish Pub ("Innisfree") with several friends. Innisfree is located across the street from ST Bunn Construction Company and a few blocks from campus. Defendant Bunn was a frequent patron of Innisfree.

11.     Bunn was 34 years old at the time and not a student at the University of Alabama. His family is prominent in Tuscaloosa as business owners, and as University of Alabama athletics boosters. Defendant Bunn is also well-known in the community as a "big game" hunter.

12.     Over the course of the evening at Innisfree, Megan had several beers, which impaired her judgment. By the time she left Innisfree, Megan was intoxicated and was there that evening.

13.     At some point in the evening, Defendant Bunn and Jason Barksdale picked up Megan in his white Mercedes while she was walking home from Innisfree alone on University Boulevard. Defendant Bunn drove Megan to her apartment where they consumed alcohol. At this point Defendant Bunn surreptitiously and intentionally added a drug to Megan's drink, in order to render her mentally incapacitated. Megan's recollection of the evening had large gaps including this time period, establishing her clear impairment.

14.     At some point in the evening, Defendant Bunn, still accompanied by Jason Barksdale, convinced Megan to come home with him that evening. He drove Megan to his home ten miles outside of town at 1570 Cedar Drive in rural Cottondale, Alabama. At this point, Megan was still aware enough of what was happening to be fearful of Defendant Bunn's driving ability, given that he was grossly intoxicated. On the drive, Megan changed her mind about going to

Bunn's home. She repeatedly and urgently asked him to take her back to her friends; he refused to do so and drove on to his home. When they arrived at Bunn's home, Defendant Bunn ordered Megan to go to his bedroom.

15.     When Defendant Bunn arrived at his bedroom, he locked the bedroom door, took Megan's phone from her, and then insisted that Megan join him on his bed and have sex with him. She resisted to the best of her ability. She begged Defendant Bunn numerous times to take her home or back to her friend's residence. He refused.

16.     Defendant Bunn forcefully removed Megan's clothing and intentionally forced her to engage in oral sex. She told him "NO!" He then held Megan down, forced himself on her, and raped her. The sexual assault was completely against Megan's will and without her consent.

17.     When Defendant Bunn finally fell asleep after he was finished, Megan discovered that he had locked the only door out of his bedroom, and she was trapped. She tried to wake Bunn up to beg him to let her go. He would not awaken. She found her phone on a table, and she found a ring of keys, but they were not hers. She became frantic and immediately began contacting friends through multiple text messages describing her terrifying circumstances and urgently seeking help.

18.     With no alternative, Megan took a very dangerous means of escape and crawled through Defendant Bunn's second story bedroom window onto the roof. She then jumped onto a gate then onto the ground below. Megan waited alone in the pitch dark in the early morning hours, knowing help from her friends on campus was at least 20 minutes away. Although she had no money on her person, she also called a cab to get away from Defendant Bunn's house as soon as possible.

19.    Terrified and confused, Megan looked in Defendant Bunn's car hoping to find her keys, which she had not found prior to escaping from Defendant Bunn's room. Instead, she found a loaded gun in the car, which she picked up to protect herself. When she picked up the gun, however, she accidentally discharged it, frightening herself further. She dropped the gun in Bunn's yard.

20.    Not finding her keys in his car, terrified at the thought that he would have them, and knowing Defendant Bunn was passed out, Megan climbed back up on the roof and slipped through the window back into his room to try to locate her keys. She did not find them, but she found $3 on the floor in Bunn's pants pocket, which she took to pay for the cab ride. Fortunately, Megan's friends arrived at Bunn's house at about the same time as the cab, and she left with her friends.

21.    Megan's friends took her to their apartment and then immediately to DCH Hospital in Tuscaloosa. At DCH, Megan reported the attack to medical personnel and the Tuscaloosa Sheriff's Department. A rape examination and a urine sample were performed at the hospital and delivered to law enforcement. Immediately following completion of the rape examination, Megan travelled from DCH to the Tuscaloosa Sheriff's Department for a law enforcement interview.

22.    Around that same time, Megan had also called her parents. Megan's mother, Cindy Rondini, immediately began to drive from her home in Austin, Texas to Tuscaloosa. Upon the advice of a friend with an understanding of sexual assault issues, Megan's father contacted the Women and Gender Resource Center ("WGRC") at University of Alabama to ensure that a victim advocate would be present at the hospital to support Megan through the exams and interviews.

23.    Megan's father, Michael, spoke with Investigator Jones of the Tuscaloosa Sheriff's Department in the early morning after the attack, and before Megan arrived there for the second

round of interviews. When he learned of Defendant Bunn's prominence in the community, Mr. Rondini expressed reservations about the interviews.

24.     Early on the morning of July 2, 2015, the police went to Defendant Bunn's house to speak with Defendant Bunn and Jason Barksdale. The police inexplicably did not record the interview with Defendant Bunn. However, in response to questioning, Defendant Bunn lied and denied having Megan over to his house.

25.     During the time that Sheriff's Department officers were at his house, Defendant Bunn was left alone in his bedroom, and officers heard him shut a window outside their presence. When officers confronted Defendant Bunn about his actions, he demanded an attorney.

26.     Although they failed to record the Defendant Bunn interview, Sheriff's agents did videotape the Bunn home as they walked through it. The videotape shows the officers having a congenial discussion with Defendant Bunn, the focus of which was not on the sexual assault, but on an allegation by Defendant Bunn that Megan stole credit cards from his wallet. This allegation was false and was later proven to be false.

27.     The medical/forensic evidence gathered from the Sheriff's Department investigation indicated that Megan tested positive for a sexually transmitted disease that she contracted from having sexual contact with Defendant Bunn.

28.     When Bunn was later questioned by police at the Sheriff's Department, he was left alone in a room with his attorney. His conversation with the attorney was videotaped. In that conversation, he admitted to his attorney that he had no recollection of the evening whatsoever because of being intoxicated. This revealed that his testimony to the investigators about the events of the evening and Megan's supposed consent to sexual activity were totally fabricated.

FOURTH AMENDED COMPLAINT AND JURY DEMAND — Page 6

29.     On or about July 4, 2015, Megan returned to Austin, Texas.  Once home in Texas, Megan received medical attention for the sexually transmitted disease she had received from Defendant Bunn, and she began seeing a psychotherapist for trauma. Megan was diagnosed with anxiety, depression, and post-traumatic stress disorder (PTSD) from the assault.

30.     On July 5, 2015, in a series of text messages to a friend at UA which demonstrate the effect of the assault, Megan stated "I don't know if I can handle going back in the fall."

31.     Later in the conversation, she speculated that her keys may have been left in the trophy room and relayed that "My dad passed out when I called them that morning. The police looked for my keys in his room and car but they didn't look in the rest of the house and I know I left them in the room with all of those animals. The officer didn't even believe me at first and insisted that I'd forgotten them at my apartment so we drove to look and of course I didn't leave them in my own apartment. I had the locks changed to my apartment[,] but he still has my car key."

32.     Megan continued her texts regarding the events of the evening and her fear that her keys had not been found: "The only reason I found his wallet is [because] I was going through his pants to try and [find his] keys because I was locked in the f***ing room."

33.     On or about August 2, 2015, a licensed clinical social worker prescribed Megan a dog to serve as an emotional support animal to help mitigate the painful symptoms she was experiencing from the assault and the aftermath of her rape report.

34.     Despite the rape, Megan decided to return to UA in August 2015 to fulfill a leadership responsibility (Rho Chi) during sorority recruitment.  She hoped to continue with her education in the fall semester as a step toward regaining a normal life with friends she trusted.

However, she encountered a severe emotional setback when she saw Defendant Bunn in downtown Tuscaloosa during the time she was fulfilling her responsibilities serving in Rho Chi.

35.    As she learned more about Defendant Bunn and his family, Megan became rightfully fearful that she would encounter Defendant Bunn on campus, and that he would attack her again or retaliate against her for reporting the rape. On August 25, 2015, Megan visited the WGRC and spoke with a victim assistant, telling her that she was having anxiety and wanted to receive medication. The WGRC representative told Megan to go to the Student Health Services for medication.

36.    Megan's fear that she would see Defendant Bunn on campus was heightened enormously when she learned that an honors course in which she was enrolled required her to work on a Habitat for Humanity Tuscaloosa ["HHT"] project. Megan knew that HHT was sponsored by the Bunn company.  Megan also learned from a volunteer coordinator that a "special guest" would be preparing a "wild game" barbeque for them in conjunction with the HHT project.

37.    On August 31, 2015, Megan reported to the WGRC office that her honors class included a Habitat for Humanity project, and that she was afraid Bunn would participate in it. She told the WGRC victim advocate that she could not continue in her honors class with the specter of Defendant Bunn's participation in it and she wanted to be transferred to another class. Megan filled out a consent form that day to allow the advocate to relay her request and the reason for it to Beth Howard in the Title IX Office, in the hopes that Howard would quickly ameliorate the situation. Because of the urgency of the situation, the advocate escalated the request and informed the Title IX Office of Megan's situation by phone that same day.

38.    Megan was scheduled for an appointment with Dr. Susan Arnold at UA's Student Health Center on September 25, 2015. As part of her psychiatric evaluation of Megan, Dr. Arnold

obtained some, but not much, specific information from Megan regarding the incident and her state of mind. Megan was too emotionally distraught to provide details again.

39.     In Megan's medical record from that session, Dr. Arnold reported that Megan's "Affect" at her first appointment was "tearful, sad, flushing, overwhelming emotion shown, it was painful to see." Megan's "Thought Content" was "very very afraid, in constant fear." Megan described extreme fear associated with the possibility of seeing Defendant Bunn on campus. Dr. Arnold's "Treatment Plan" for Megan included prescribing medication for anxiety and depression. It also included a personal note: "Hope I can help her with this awful situation." Based on her examination, Dr. Arnold also diagnosed Megan with anxiety, depression, and post-traumatic stress disorder. With truly telling prescience, Dr. Arnold in her daily notes stated that "It is very upsetting that [Bunn] got off so easily, mostly because of his family."

40.     As a direct and proximate result of the sexual attack by Defendant Bunn, Megan's fears, anxiety, depression, and PTSD grew increasingly worse. She withdrew from UA in October 2015 and returned home to Austin, Texas. She never returned to Alabama.

41.     When Megan formally withdrew from UA and moved back to Texas, she sought medical, psychological, and psychiatric help. Because of the rape and false imprisonment, she had ever-increasing fears, anxiety, sleeplessness, panic attacks, weight loss, feelings of worthlessness and hopelessness, loss of motivation, and a severe decline in her cognitive and overall functioning. Megan continued treatment for depression, anxiety, and PTSD. She ultimately believed that her injuries were permanent, and that she could never recover.

42.     On February 21, 2016, Megan sent a text to the same friend whom she confided in during the July 5, 2015 text messages. Clearly still affected by the assault, she says "Do you ever feel like you just don't want to deal with sh*t anymore?"

43.     On February 24, 2016, Megan completed a "Health History Form" to receive counseling at Southern Methodist University. On the form, she indicated that she was having suicidal thoughts and problems with "PTSD, depression, [and] anxiety stemming from the sexual assault and rape on July 1, 2015." In answering whether "there had been major losses, changes, or crisis in [her] life," Megan wrote that she had been "raped, bullied by police, and changed university."

44.     On February 24, 2016, Megan communicated in a text message to a close friend: "When all is said and done, I wonder what I could've accomplished if one man didn't completely rip everything away from me."

45.     Early in the morning between 2:00 a.m. and 8:30 a.m. on February 26, 2016, Megan took her own life by hanging herself in her apartment. The autopsy report indicated that Megan "had post-traumatic stress disorder, depression and anxiety following a sexual assault in 2015." Bunn's rape was a substantial factor and direct cause of Megan's death by suicide.

46.     The Tuscaloosa District Attorney's Office thought there was enough evidence to present Megan's case to a grand jury. However, Megan died and was not able to testify in front of the grand jury. As a result of the state losing their main witness, the case was no billed at the grand jury.

## CAUSES OF ACTION

### COUNT I: WRONGFUL DEATH of Megan Rondini

47.     Plaintiffs hereby adopt and reallege each and every allegation in the foregoing paragraphs of this Complaint as if fully set out herein.

48.     This claim is brought pursuant to Ala. Code 1975 §6-5-410, by Michael W. Rondini as Administrator of the Estate of Megan Rondini for the benefit of the Estate of Megan Rondini.

49.     Defendant Bunn unlawfully and intentionally detained and imprisoned Megan Rondini against her will for a length of time whereby he deprived her of her personal liberty. He intentionally and falsely imprisoned her in his car on the way to his Cottondale home when he refused to return her to her home or her friend's residence. He intentionally and falsely prisoned her in his home when he locked the door to his bedroom to prohibit her from leaving the bedroom during or after the time he raped her.

50.     Defendant Bunn intended to cause Megan imminent, harmful or offensive contact with her person when he forcefully and intentionally raped Megan.

51.     As a direct and proximate result of Defendant's intentional and wrongful conduct, Defendant Bunn caused Megan extreme depression, anxiety, PTSD, fear, panic attacks, decline of cognitive functions and general well-being, weight loss, and feelings of worthlessness and hopelessness, all of which directly led to Megan's loss of life.

52.     In addition, Megan's death was the direct and proximate result of Defendant's intentional and malicious actions evidencing a conscious indifference to Megan's rights and welfare. Thus, under Alabama Law, Plaintiff, as Administrator of Megan's estate is entitled to exemplary and punitive damages.

53.     WHEREFORE, MICHAEL W. RONDINI, as Personal Representative of the Estate of MEGAN ELIZABETH RONDINI, his deceased child, demands judgment against the Defendant, jointly and severally, for punitive damages, plus interest and costs.

## PRAYER FOR RELIEF

THEREFORE, Plaintiff respectfully requests the following relief:

a.      A judgment against the Defendant for all damages caused by the conduct of the

Defendant in an amount exceeding the minimum amount required for federal court

jurisdiction in diversity of citizenship cases;

b.      A judgment against the Defendant for punitive damages in an amount necessary

and sufficient to punish Defendant and deter Defendant and others from similar conduct

in an amount exceeding the minimum amount required for federal court jurisdiction in

diversity of citizenship cases;

c.      All other relief to which Plaintiffs are entitled or that the Court deems just and

proper.

## JURY DEMAND

Plaintiff requests a trial by jury.

Respectfully submitted,


By:      /s/ Leroy Maxwell Jr.

Leroy Maxwell, Jr.
**MAXWELL LAW FIRM**
2100 1st Ave North
Birmingham, AL 35203
205-216-3304
205-409-4145 (fax)
**maxwell@mxlawfirm.com**

**Of-Counsel:**
Julie E. Heath
**FARROW-GILLESPIE HEATH WITTER LLP**
1700 Pacific Ave., Suite 3700
Dallas, Texas 75201
(214) 361-5600 (telephone)
(214) 203-0651 (fax)
julie.heath@fghwlaw.com

Patricia H. Davis
**FARROW-GILLESPIE HEATH WITTER LLP**
1700 Pacific Ave., Suite 3700

Dallas, Texas 75201
(214) 361-5600 (telephone)
(214) 203-0651 (fax)
Patricia.Davis@fghwlaw.com

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system on this 1st day of August, 2018, serving the following individual:

Thomas Coleman, Jr.
SMITH SPIRES & PEDDY PC
2015 2nd Avenue North
Suite 200
Birmingham, AL 35203
205-251-5885
205-214-8642 (fax)
<u>tom@ssp-law.com</u>

By: */s/ Leroy Maxwell, Jr.*