## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | |
|---|---|
| **MICHAEL W. RONDINI, et al.,** } | |
| } | |
| **Plaintiffs,** } | |
| } | |
| **v.** } | **Case No.:  7:17-cv-01114-RDP** |
| } | |
| **TERRY J. BUNN, JR.,** } | |
| } | |
| **Defendant.** } | |

## MEMORANDUM OPINION

This case is before the court on Defendant Terry J. Bunn, Jr.'s ("Defendant") Motion for

Summary Judgment. (Doc. # 121). The Motion has been fully briefed (*see* Docs. # 122, 139, 141)

and is ripe for review.[1] After careful review, and for the reasons discussed below, this case is due

to be stayed pending certification of a question to the Supreme Court of Alabama.

## I.    Background

Plaintiffs Michael and Cynthia Rondini ("Plaintiffs") have sued Defendant and asserted

claims arising out of the alleged sexual assault of their daughter, Megan Rondini, and her tragic

---

[1] The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994). The court, *sua sponte*, acknowledges that this record may raise hearsay issues at trial. The court finds it prudent to highlight at least three categories where this is the case: (1) statements by Megan Rondindi to her treating physicians; (2) statements by Megan to the police; and (3) documents relating to Megan's death. Of course, the court is not precluded from relying on potential hearsay statements at summary judgment if at trial it can be reduced to admissible form. *See McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996) ("[O]therwise admissible evidence [may] be submitted in inadmissible form at the summary judgment stage, though at trial it must be submitted in admissible form.") (citing *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013 (11th Cir. 1987)) (emphasis omitted). Here, the parties have not suggested that the statements at issue could not be reduced to an admissible form, if the case were to go to trial. In any event, the court reserves all rulings on hearsay objections for trial.

suicide.[2]

According to a transcript from a video interview between Megan and the police on July 2, 2015, 20-year-old Megan Rondini met Defendant, a 34-year-old man, at a Tuscaloosa pub on July 1, 2015.[3] (Doc. # 122-13 at 6).[4] While leaving the pub, Megan was approached by Defendant, who drove Megan first to her apartment where they drank alcohol, and then to Defendant's residence in Cottondale, Alabama. (*Id.* at 10, 39; Doc. # 122-1 at 42). Once inside Defendant's house, Megan stated that Defendant asked her to go upstairs to his bedroom. (Doc. # 122-13 at 15). Contemporaneously, Megan sent a few text messages to her friends, saying things such as (1) "pick me up in the morning," (2) "we are going to guck." (Doc. # 122-11 at 2).

After Megan went to Defendant's bedroom, she stated that when Defendant came into the room, "he went and sat on his bed and he, like, wanted me to sit with him and I was just kind of, like, and then he kind of, like, made comments like he wanted to have sex and I really didn't want to and he walked over to me and, like, started trying to kiss me and I didn't really want to."[5] (*Id.* at 17). During that time, Megan stated that she "wasn't really looking at him, I kind of – I had already said, like, I needed to leave and he wasn't really responding to that, so I kind of just let him do it. (*Id.* at 19).

While Defendant was asleep, Megan went into the bathroom, "kind of panicking," and she

---

[2] For ease of reference, this Memorandum Opinion often refers to Megan Rondini, Michael Rondini, and Cynthia Rondini by their first names. All other individuals are referred to by their surnames.

[3] It is undisputed that Defendant and Megan had met prior to this encounter over Thanksgiving break (approximately eight months before). (Doc. # 122-3 at 40).

[4] When citing to the record, the court cites to court-filed page numbers, not the page numbers in the actual document.

[5] This fact is disputed. Defendant states that Megan sat on a chair in his room and he sat on the edge of his bed. (Doc. # 122-1 at 47). Defendant stated that throughout the encounter, they did not talk, and that Megan walked over to the bed, "she removed her clothing," and they had "consensual sex." (*Id.* at 47-48).

was trying to get her shoes on when she began contacting her friends asking them to come get her. (*Id.* at 22). Some of the text messages Megan sent to her friends included: "I can't get out of the room help," "Omg I . . . he's asleep I can't get out help," "I can't get out the door is locked," and "please help me." (Doc. # 122-7). Megan then realized that the door to exit the bedroom was locked by a "little pin" that would not open. (Doc. # 122-13 at 22). She resorted to jumping out of a second-story bedroom window to leave Defendant's residence. (*Id.* at 23).

Before anyone arrived to pick her up, Megan searched for her keys but could not find them, so she climbed back up through his window to search for them in Defendant's room. However, she still could not find them. (Doc. # 122-10 at 10-11). Finally, her friends arrived and drove her home.

Megan's friends took her to their apartment first and then "to DCH Hospital in Tuscaloosa," where she reported to medical personnel and the Tuscaloosa Sheriff's Department that she had been raped. (Doc. # 122-13 at 25). Megan underwent a rape examination at the hospital. (*Id.*).

That same day, police officers spoke with Defendant at his residence. (Doc. # 122-2 at 8-9). Defendant denied Megan's presence at his residence during the prior evening. (Doc. # 122-1 at 54). When Defendant was later questioned by the police at the Sheriff's Department, he and his attorney were left alone to talk. During this conversation, which was videotaped, Plaintiffs assert that Defendant admitted to his attorney that he could not remember anything from that evening because he was intoxicated. (*Id.* at 62).

After staying with her parents in Austin, Texas for a few months, in August 2015, Megan returned to the University of Alabama for the fall semester. She saw a psychotherapist, Dr. Susan Arnold, on September 25, 2015 and October 2, 2015, who diagnosed her with post-traumatic stress

disorder ("PTSD") and anxiety stemming from PTSD. (Doc. # 122-15 at 13). During Megan's first psychiatric evaluation with Dr. Arnold, Dr. Arnold reported that Megan was "very tearful and upset while she described [her rape]." (*Id.*). Dr. Arnold also stated that Megan's thought content was "very[,] very afraid; in constant fear." (*Id.* at 17). After Dr. Arnold developed a treatment plan for Megan, which primarily consisted of medication for her anxiety and PTSD, Megan withdrew from the University in October 2015. (Doc. # 122-3 at 61). She returned to Austin, Texas after learning that one of the classes she was registered to take involved a volunteer project that was sponsored by one of Defendant's companies.[6] (*Id.*).

While in Texas, Megan began seeing a therapist by the name of Betty Bewley. (*Id.* at 65). Megan saw Ms. Bewley weekly from October 2015 to December 2015. (*Id.*). Ms. Bewley also recommended that Megan see a psychiatrist, so Megan began seeing Dr. Ziba Rezaee. (*Id.*). Dr. Rezaee "confirmed Megan's diagnosis of anxiety, depression, and PTSD" and prescribed her medication for those disorders, as well as medication for nightmares. (*Id.*).

Around this same time, Megan was admitted to Southern Methodist University and began taking classes there. (*Id.* at 69). While at SMU, Megan began seeing Dr. Donna Cozort, a psychiatrist, in Dallas, Texas in late January/early February 2016. (*Id.* at 71). However, Megan did not like Dr. Cozort, so she only met with her once. (*Id.*). Megan then sought additional counseling at the SMU Health Clinic.

On February 24, 2016, Megan filled out a "Health History Form" at the SMU Health Clinic. (Doc. # 139-1 at 16). She reported suicidal thoughts on the form. (*Id.*). She recounted her history of "PTSD, depression, [and] anxiety stemming from sexual assault and rape on July 1, 2015." (*Id.*). She reported the rape, police bullying, and her change of universities as major losses, changes, or

---

[6] Although Megan did not know for sure whether Defendant would be at the volunteer event because she did not ask, she dropped the course there because she was too afraid of seeing Defendant. (Doc. # 122-3 at 62).

crises in her life. (*Id.* at 19). On the morning of February 26, 2016, Megan committed suicide. (Doc. # 139-2 at 2).

Plaintiffs' Fourth Amended Complaint was filed on August 1, 2018. (Doc. # 100). Plaintiffs' Fourth Amended Complaint only contains one count: Wrongful death. (Doc. # 100 at 11, ¶¶ 49, 50). Specifically, Plaintiffs claim that: (1) Defendant "unlawfully and intentionally detained and imprisoned Megan Rondini [both in his car and then in his bedroom] against her will for a length of time whereby he deprived her of her personal liberty;" and (2) Defendant "intended to cause Megan imminent, harmful or offensive contact with her person when he forcefully and intentionally raped Megan." (*Id.*).

## II.     Standards of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323.  Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub.*

*Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient

disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

### III.     Analysis

Plaintiffs' sole remaining cause of action in this case is a claim for wrongful death. Under Alabama Code § 6–5–410(a):

> A personal representative may commence an action and recover such damages as the jury may assess in a court of competent jurisdiction within the State of Alabama, and not elsewhere, for the wrongful act, omission, or negligence of any person . . . whereby the death of his testator or intestate was caused, provided the testator or intestate could have commenced an action for such wrongful act, omission, or negligence if it had not caused death.

In the court's January 8, 2018 Order, it concluded that Plaintiffs could not maintain a wrongful-death action based on Defendant's alleged negligence, but that they could potentially maintain such a claim upon an alleged *intentional* act committed by Defendant. (Doc. # 60 at 24). The court addressed *Gilmore v. Shell Oil Company*, 613 So. 2d 1272 (Ala. 1993) (addressing when a decedent's suicide is an "intervening efficient cause" that breaks the chain of causation flowing from a defendant's *negligence*) and *Prill v. Marrone*, 23 So. 3d 1 (Ala. 2009) (addressing when a defendant's *negligent* conduct causes a decedent to experience an "uncontrollable impulse" to commit suicide), and found that neither standard squarely applied to a wrongful-death claim based on a defendant's *intentional* conduct.

Plaintiffs' wrongful death claim is based on wanton (*i.e.*, intentional) and wrongful conduct on the part of Defendant. Specifically, Plaintiffs claim that Defendant intentionally falsely imprisoned Megan, intentionally sexually assaulted her, and that his conduct was an assault and

battery and outrageous under Alabama law. The primary questions the court must answer are (1)

whether there is substantial evidence that Defendant committed an intentional tort against Megan

(*i.e.*, false imprisonment, assault and/or battery, and outrage), and (2) if so, whether those torts

caused her emotional distress so severe that it was the cause in fact and proximate cause of

Megan's suicide.

The court addresses each question, in turn.

### A. Plaintiffs Have Presented Evidence Raising A Genuine Issue of Fact Regarding Whether Defendant Committed an Intentional Tort Against Megan

#### 1. False Imprisonment

Under Alabama Code § 6–5–170, "[f]alse imprisonment consists in the unlawful detention

of the person of another for any length of time whereby [s]he is deprived of [her] personal liberty."

> For there to be a false imprisonment, there must be some direct restraint of the person; however, it is not necessary that there be confinement in a jail or a prison. Any exercise of force, or the express or implied threat of force, by which in fact the other person is deprived of his liberty, compelled to remain where he does not wish to remain, or to go where he does not wish to go, is an imprisonment.

*Big B., Inc. v. Cottingham*, 634 So. 2d 999, 1001 (Ala. 1993), *superseded by statute on other*

*grounds*, Ala. Code § 6–11–21 (1975). Here, whether Defendant falsely imprisoned Megan -- that

is, whether he confined Megan in his bedroom by locking the door -- is disputed, and therefore a

question of fact to be decided by a jury.

The Rule 56 evidence indicates that Megan got into Defendant's car, went to her apartment

with him and his friend, Jason, left her apartment with both Defendant and Jason, rode in

Defendant's car to Defendant's home, and, once inside the home, went into Defendant's bedroom.

(Doc. # 122-13 at 10, 11, 39; Doc. # 122-1 at 42). While the record evidence could be interpreted

to indicate that Megan traveled with Defendant voluntarily, the question is what occurred after she

and Defendant reached his home. Based on the Rule 56 evidence, a reasonable trier of fact could

find that Defendant locked the door to his bedroom in a manner that prevented Megan from leaving after the room.

Affixed to Defendant's door was a privacy lock. (Doc. # 122-1 at 51; Doc. # 122-2 at 11-12). Defendant argues that there is a specific way to lock and unlock the door: "It's a very simple push lock that you operate with two fingers. You push it in to lock the door and you just take and pull it out to unlock it." (Doc. # 122-1 at 51). However, Megan was unable to unlock the door after numerous attempts and communicates that fact to her friends via text message. (Doc. # 122-10 at 22) ("[I]t is like a little pin like where you would turn it to lock it, I guess, but it didn't matter if I turned it right or left or kept turning it left, it wouldn't open."). Moreover, although the police were shown how to unlock the door (*see id.* at 35; Doc. # 122-1 at 51), the questions here are whether Megan was able to do so and whether Defendant intentionally wanted to keep her in his room. A reasonable jury could conclude from the Rule 56 evidence that she could not open the door and that Defendant intended to keep her in the room.

Megan reported that the only point of escape from the room was to jump out of a second-story window. (Doc. # 22-13 at 23-24). Additionally, Megan told Defendant that she "needed to leave" multiple times and pleaded for help in her text messages to her friends. (Doc. # 122-10 at 23-24). Moreover, Megan stated: "I was trapped in a room and I could not leave if I wanted to and like, that is really scary to me . . . ." (Doc. # 122-10 at 35).

Essentially, Defendant's argument is that there was an easy-to-solve restraint employed here. But there is a dispute of fact about whether it really was "easy to solve." "[I]t has been stated that the true test in determining false imprisonment is not the extent of the restraint, or the means employed, but the lawfulness of the restraint." *Lolley v. Charter Woods Hosp., Inc.*, 572 So. 2d 1223, 1225 (Ala. 1990). Viewing at the Rule 56 evidence in the light most favorable to Plaintiff,

whether Megan was intentionally falsely imprisoned is a question for the jury.

### 2. Sexual Assault

Plaintiffs claim that Defendant "intended to cause Megan imminent, harmful[,] or offensive contact with her person when he forcefully and intentionally raped her." (Doc. # 100 at 11, ¶ 50). Plaintiffs argue that Defendant committed the intentional torts of (1) assault, (2) battery, and (3) outrage (or intentional infliction of emotional distress).[7] The court addresses each tort, in turn. It concludes that there is a genuine dispute of material fact as to whether Defendant committed each tort. The court also finds that there is sufficient evidence in the Rule 56 record for a reasonable jury to find that the torts committed by Defendant were the cause-in-fact of Megan's suicide. However, the court concludes it would be prudent to certify to the Supreme Court of Alabama the question of whether suicide is an intervening cause that breaks the chain of causation stemming from a defendant's intentional tort when, as here, the suicide occurs several months after the commission of the intentional torts.

### a. Assault & Battery

Under Alabama law, an assault is defined as:

> [A]n intentional, unlawful offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented.

*O'Rear v. B.H.*, 69 So. 2d 106, 117 (Ala. 2011), *abrogated on other grounds*, *Ex parte Vanderwall*, 201 So. 3d 525 (Ala. 2015) (citations omitted). "A successful assault becomes a battery, which consists of the touching of another in a hostile manner." *O'Rear*, 69 So. 2d at 117 (citations omitted). "An actual injury to the body is not a necessary element of a civil assault and battery."

---

[7] Alabama law recognizes that sexual assault can be actionable as an assault and battery *and* an outrage claim. *Thompson v. City of Birmingham*, 5 F. Supp. 3d 1304, 1329 (N.D. Ala. 2014).

*Surrency v. Harbison*, 489 So. 2d 1097, 1104 (Ala. 1986).

Here, Plaintiffs argue that the summary judgment evidence satisfies the elements of assault and battery because Megan expressed that she did not want to engage in sexual activity with Defendant. On the other hand, Defendant maintains that there is no evidence that Defendant committed assault or battery against Megan because she not only consented to sexual intercourse with Defendant but also had the willing intention to do so. It is undisputed that Megan and Defendant had sex. It is disputed whether Megan consented to do so. Whether Megan consented to Defendant's touching is not for the court to decide. "[W]hen there is conflicting evidence . . . the issue of whether there was, in fact, an assault and battery at all is a question for the jury." *Surrency*, 489 So. 2d at 1104. Therefore, whether Defendant committed assault and battery against Megan is a question properly reserved for a jury.

### b. Outrage

Because the court concludes that whether Defendant committed an assault and/or battery against Megan is a question for the jury, it necessarily follows that the same conclusion must apply to the outrage claim.

Under Alabama law, in order to establish the tort of outrage, one must prove that the defendant's conduct: "(1) was intentional or reckless; (2) was extreme and outrageous; *and* (3) caused emotional distress so severe that no reasonable person could be expected to endure it." *Harrelson v. R.J.*, 882 So. 2d 317, 322 (Ala. 2003) (quoting *Thomas v. BSE Indus. Contractors, Inc.*, 624 So. 2d 1041, 1043 (Ala. 1993)). Alabama has defined the tort of outrage as follows:

> [O]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress. The emotional distress thereunder must be so severe that no reasonable person could be expected to endure it. Any recovery must be reasonable and justified under the circumstances, liability ensuing only when the conduct is extreme. By extreme we refer to conduct so outrageous

11

in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.

*Harrelson*, So. 2d at 331-32 (citing *Am. Road Serv. Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1980)) (internal citations omitted); *see Thompson v. City of Birmingham*, 5 F. Supp. 3d 1304, 1329 (N.D. Ala. 2014) ("[T]he tort of outrage is 'a limited remedy to be applied only in flagrantly egregious circumstances.'"). The Supreme Court of Alabama has recognized this tort in three areas: "(1) wrongful conduct within the context of family burials; (2) an insurance agent's coercing an insured into settling an insurance claim; and (3) *egregious sexual harassment*." *Callens v. Jefferson Cty. Nursing Home*, 769 So. 2d 273, 281 (Ala. 2000) (emphasis added) (citations omitted).

Viewing the facts in the light most favorable to Plaintiffs (the nonmoving parties), as with Plaintiffs' assault and battery claims, there is a genuine issue of material fact regarding whether Defendant intended to inflict emotional distress or knew or should have known that severe emotional distress was likely to result from his alleged conduct.

Based on the Rule 56 record, there is a question of fact as to whether Defendant acted intentionally and/or recklessly. For instance, Megan reported that when they got to Defendant's house, she told Defendant that she "need[ed] to go . . . find her friends and [Defendant] just kind of ignored [her]." (Doc. # 122-10 at 12). Megan also testified that when Defendant came into the bedroom:

> [H]e went and sat on his bed and he, like, wanted me to sit with him and . . . then he kind of, like, made comments like he wanted to have sex and I really didn't want to and he walked over to me and, like, started trying to kiss me and I didn't really want to. And I kind of like was just saying I need to leave and he . . . just ignored me and I thought if I just kind of let him do whatever and . . . . I didn't look at him.
>
> . . . .
>
> . . . I wasn't really looking at him, I kind of -- I had already said, like, I needed to leave and he wasn't really responding to that, so I just kind of just let him do it.

12

(*Id.* at 17-18).

Based upon this evidence, whether Defendant did, in fact, intend to cause or acted recklessly in causing Megan severe emotional distress is not for the court to answer here; it is for a jury.

Moreover, the court does not hesitate to conclude that a reasonable juror could find Defendant's alleged conduct extreme and outrageous. The conduct alleged is that of unwanted sexual contact. *See Busby v. Truswal Sys. Corp.*, 551 So. 2d 322, 324 (Ala. 1989). In *Busby*, among other inappropriate conduct, the defendant "attempted to follow one of the plaintiffs into the restroom and when she asked him where he was going, said that he was going to help her," and "put his arm around the plaintiffs, grabbed their arms, and stroked their necks." *Id.* The court held that "[t]he deposition evidence presented by the plaintiffs present[ed] evidence from which a jury could reasonably determine that [the defendant's] conduct rose to [the level of outrage]." *Id.* Additionally, because a reasonable juror could find that Defendant committed an assault and/or battery against Megan, the totality of such conduct could also be viewed by as extreme and outrageous.

The Rule 56 evidence indicates that Defendant continued to make advances towards Megan after she told him she needed to leave. This is undoubtedly unwanted sexual contact. And, because the Alabama Supreme Court has held that egregious sexual harassment is actionable under the tort of outrage, a reasonable jury could determine that the incident between Megan and Defendant qualifies as egregious sexual harassment (or the like).

There is also a material dispute over whether Defendant's conduct could cause emotional distress so severe that no reasonable person could be expected to endure it. After Megan's encounter with Defendant, it can be inferred from the Rule 56 record evidence that Megan experienced a tremendous downturn in her mental health. Dr. Arnold testified that when Megan

13

first saw her on September 25, 2015, she exhibited "extreme emotions of crying, flushing, and shaking." (Doc. # 122-15 at 16). Additionally, Dr. Arnold testified that Megan needed to see a therapist regularly, separate from Dr. Arnold's medication management. (*Id.* at 40).

Here, Defendant argues that Plaintiff's expert Dr. Barbara Ziv, a psychiatrist, did not offer any causation testimony. Notably, Alabama does not necessarily require expert testimony to prove causation in these situations. *See Brown v. State Farm Fire & Cas. Co.*, 342 F. Supp. 3d 1234, 1246 (N.D. Ala. 2018) ("[A] jury is free to consider [lay] witness perceptions (along with all the evidence) when determining causation."). Dr. Ziv testified that, based on all of Megan's records, Megan "had no psychiatric symptoms prior to July 2, 2015" (the day after the encounter with Defendant). (Doc. # 122-16 at 13). Dr. Ziv noted that, according to the record provided to her, after the encounter, Megan began experiencing issues with anxiety, depression, and PTSD, prompting her to seek counseling from Dr. Susan Arnold at the University of Alabama Student Health Services. (Doc. # 122-15 at 13). Dr. Ziv also opined that it is telling that Megan continued to seek additional treatment and medication from other professionals as time went on, such as Dr. Rezaee.

Additionally, in response to questioning at her deposition as to how Megan's life had changed between the time she saw Dr. Arnold and the time she committed suicide, Dr. Ziv stated:

> She continued to feel bad, she felt you know, increasingly hopeless, obviously as evidenced by her final act. And the fact that she attributed this two days before her desperate feelings to the sexual assault on July 1st is testimony to what was at the core of what she was feeling.

(Doc. # 122-16 at 107). Dr. Ziv also stated that it was "significant" that on Megan's death certificate it was indicated that PTSD was listed as a secondary cause as to why Megan committed suicide. (*Id.* at 20).

Therefore, based on this testimony and the Rule 56 record as a whole, whether Defendant's

conduct was enough to cause severe emotional distress and whether Megan did in fact suffer severe emotional distress as a result is a question for the jury.

### B. Plaintiffs Have Presented Substantial Evidence that Defendant's Intentional Torts Were the Cause-in-Fact of Megan's Suicide

Finally, the court must analyze whether Defendant's *intentional* actions were the cause in fact and the proximate cause of Megan's suicide. As the court concluded in its prior Order on Defendant's Motion to Dismiss (*see* Doc. # 60), generally, "[i]f the suicide is traceable to injuries *negligently* inflicted by defendant, the weight of authority is that no action for wrongful death will lie." *North Shore Pharmacy Servs. v. Breslin Assoc. Consulting LLC*, 2004 WL 6001505, at *4 (D. Mass. June 22, 2004) (emphasis added). This conclusion is consistent with *Gilmore*, which held that suicide is an intervening cause that breaks the chain of causation flowing from a defendant's *negligence*. However, *Gilmore* does not supply the applicable standard here.

Another way to analyze Plaintiffs' claim is under the *Prill* standard. In *Prill*, the Alabama Supreme Court held that "[w]here there is neither a custodial relationship which would indicate the foreseeability of suicide, or a claim of irresistible impulse, Alabama law provides that 'suicide . . . is unforeseeable as a matter of law, and civil liability will not be imposed upon a defendant for a decedent's suicide.'" *Prill*, 23 So. 2d at 8 (quoting *Vinson v. Clarke Cty., Ala.*, 10 F Supp. 2s 1282, 1304 n.21 (S.D. Ala. 1998)). A custodial relationship is one where "[the court] expect[s] the defendant to take reasonable steps to protect the decedent from deliberate and self-destructive injury," *Prill*, 23 So. 2d at 7 (citing *Gilmore*, 613 So. 2d at 1275-76), such as in hospitals and prisons. *Missilldine v. City of Montgomery*, 907 F. Supp. 1501, 1505 (M.D. Ala. 1995). Additionally, an "irresistible" (or uncontrollable) impulse, though not specifically defined under Alabama law, has been described by other jurisdictions as "a delirium, frenzy[,] or rage, during which the deceased commits suicide 'without conscious volition to produce death.'" *Id.* at 8 (citing

15

*McMahon v. St. Croix Falls Sch. Dist.*, 228 Wis.2d 215, 225, 596 N.W.2d 875, 880 (Wis. Ct. App. 1999) (quoting *Bogust v. Iverson*, 10 Wis.2d 129, 138, 102 N.W.2d 228, 232 (1960)). It is also noted that "[t]he key to finding an 'uncontrollable impulse' is finding that 'the defendant actually causes the suicide.'" *Prill*, 23 So. 2d at 8.

Defendant argues that Plaintiffs' claim cannot proceed under a *Prill* theory of liability. The court agrees. Even viewing the Rule 56 record in the light most favorable Plaintiff, the court finds that there is no genuine issue of material fact as to whether Megan committed suicide while in a "delirium, frenzy[,] or rage" caused by Defendant's intentional acts. Alabama courts have recognized that "when suicide results from a 'moderately intelligent power of choice,' even if the choice is made by a disordered mind, the suicide is a new and independent cause of death that immediately ensues." *McMahon*, 228 Wis.2d at 225. And here, there is no Rule 56 evidence indicating that Megan lacked a "moderately intelligent power of choice" in deciding whether to take her life. Notably, the alleged rape occurred approximately seven months before Megan took her life,[8] and Megan sought help and treatment from numerous sources, including Dr. Susan Arnold and Dr. Ziba Rezaee.[9] It is also clear from the Rule 56 record that the circumstances surrounding her death are not those of someone who suffered from a delirium, frenzy, or rage.

But neither *Gilmore* nor *Prill* apply here because Plaintiffs claim that, even if Megan did not commit suicide while in a delirium, frenzy, or rage, she nevertheless took her own life because of Defendant's intentional violation of her rights. Thus, the court is left to answer a very muddled

---

[8] Megan's alleged rape occurred on July 1, 2015. Megan took her life on February 26, 2016—approximately seven months after the event.

[9] For example, in *Missildine*, the court held that the Rule 56 evidence was "insufficient to support a claim of wrongful death as a result of an irresistible impulse on the part of [the decedent] to commit suicide," finding persuasive the fact that the decedent "committed suicide approximately fourteen months after the alleged beating." *Missildine*, 907 F. Supp. at 1506.

question (and one that the Supreme Court of Alabama has not yet weighed in on): Whether a

defendant's *intentional* conduct can be the cause in fact and proximate cause of a plaintiff's

suicide. Other courts have held that with intentional conduct, the standard is not as rigid as the one

applied with respect to mere negligence:

> [W]here [a] plaintiff's claims are for intentional wrongs, not negligence, the rules
> are different and the tort victim's suicide generally is not considered a supervening
> cause, at least where the plaintiff can demonstrate that the defendant's intentional
> conduct caused severe emotional distress that was a substantial factor in bringing
> about the suicide.

*North Shore Pharmacy Servs.*, 2004 WL 6001505, at *4; *see Dargie v. Cty. of Hillsborough*, 1995

WL 73339, at *7 (D.N.H. Feb. 23, 1995). With respect to cause in fact:

> [While] a reasonable inference sufficient to create a trial issue of fact cannot be
> based on mere possibility, conjecture, or speculation . . . [, t]he plaintiff [need only]
> . . . introduce evidence which affords a *reasonable basis* for the conclusion that it
> is more likely than not that the conduct of the defendant was *a* cause in fact of the
> result.

*Action Marine, Inc. v. Continental Carbon Inc.*, 481 F.3d 1302, 1310-11 (11th Cir. 2007) (quoting

*Ogletree v. Navistar Int'l Transp. Corp.*, 535 S.E.2d 545, 548 (Ga. 2000)). "Proximate cause[, on

the other hand,] is an act or omission that in a natural and continuous sequence, unbroken by any

new independent causes, produces the injury and without which the injury would not have

occurred." *Martin v. Arnold*, 643 So. 2d 564, 567 (Ala. 1994).

Based on this Rule 56 record (including the proffered expert testimony), a reasonable juror

could conclude that Defendant's conduct was the cause-in-fact of Megan's suicide. However,

proximate causation is less certain. This state's Supreme Court has yet to weigh in on the question

of whether suicide is an intervening cause that breaks the chain of causation stemming from a

defendant's intentional tort to the decedent's death, particularly when the suicide occurred several

months after the commission of the intentional tort(s). Thus, while genuine issues of fact remain,

before ruling on Defendant's Motion for Summary Judgment, this question requires resolution. The Supreme Court of Alabama is in the best position to answer the key legal question in this case. *See Peoples Gas Sys. v. Posen Constr., Inc.*, 931 F.3d 1337, 1340 (11th Cir. 2019) ("When substantial doubt exists about the answer to a material state law question upon which the case turns, [we] should certify the question to the state supreme court in order to avoid making unnecessary state law guesses and to offer the state court the opportunity to explicate state law." (quoting *Fla. VirtualSchool v. K12, Inc.*, 735 F.3d 1271, 1274-75 (11th Cir. 2013))).

## C. Conclusion

For the reasons stated above, Defendant's Motion for Summary Judgment (Doc. # 121) is due to be administratively terminated and this case is due to be stayed pending certification to the Supreme Court of Alabama the question of whether suicide is an intervening cause that breaks the chain of causation stemming from a defendant's intentional tort. An Order consistent with this Memorandum Opinion will be entered.

**DONE** and **ORDERED** this January 13, 2020.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE