To the Supreme Court of Alabama

| | |
|---|---|
| <u>Michael w. Rondini, et al.,</u><br>　　　Appellant | In the Supreme Court of Alabama |
| v. | |
| <u>Terry J. Bunn, Jr.,</u><br>　　　Appellee | Action No:<u>7:17-cv-01114-RDP</u> |

### **CERTIFIED QUESTION FROM FEDERAL COURTS**

Pursuant to ARAP Rule 18, the United States District Court for the Northern District of Alabama, Western Division requests the Supreme Court of Alabama to answer a question of law which is deemed determinative of an action before said federal court to which there is no clear controlling precedent in the decisions of the Supreme Court of Alabama.

In support of said certificate, the following facts are shown to the court:

### **STYLE OF CASE**

1. The case of Michael W. Rondini, et al., v. Terry J. Bunn, Jr., is before the United States District Court for the Northern District of Alabama, Western Division on Defendant Terry J. Bunn, Jr.'s ("Defendant") Motion for Summary Judgment.

**STATEMENT OF FACTS**

2. Plaintiff Michael Rondini ("Plaintiff") has sued Defendant Terry J. Bunn ("Defendant") and asserted claims arising out of the alleged sexual assault of their daughter, Megan Rondini, who died by suicide on February 26, 2106.

3. Megan Rondini, a 20-year old student at the University of Alabama encountered T.J. Bunn, a 34-year-old man, on the evening of July 1, 2015 at a local Tuscaloosa pub, Innisfree.

4. While leaving walking home from the pub near midnight, Megan was approached by Defendant, who drove Megan first to her apartment where they drank alcohol, and then to Defendant's residence in Cottondale, Alabama

5. Although Megan did not remember going with Bunn and Barksdale to her apartment, serving them drinks, and then accepting Bunn's offer to go to his house, videos indicate that this initial trip occurred.

6. Once inside Defendant's house, Megan stated that Defendant asked her to go upstairs to his bedroom. After Megan went to Defendant's bedroom, she stated that when Defendant came into the room, "he went and sat on his

bed and he, like, wanted me to sit with him and I was just kind of, like, and then he kind of, like, made comments like he wanted to have sex and I really didn't want to and he walked over to me and, like, started trying to kiss me and I didn't really want to."

7. During that time, Megan stated that she "wasn't really looking at him, I kind of – I had already said, like, I needed to leave and he wasn't really responding to that, so I kind of just let him do it."

8. While Defendant was asleep, Megan went into the bathroom, "kind of panicking," and she was trying to get her shoes on when she began contacting her friends asking them to come get her.

9. Some of the text messages Megan sent to her friends included: "I can't get out of the room help," "Omg I . . . he's asleep I can't get out help," "I can't get out the door is locked," and "please help me."

10.    Megan then realized that the door to exit the bedroom was locked by a "little pin" that would not open.

11.    She resorted to jumping out of a second-story bedroom window to leave Defendant's residence.

12. Before anyone arrived to pick her up, Megan searched for her keys but could not find them, so she climbed back up through his window to search for them in Defendant's room because she was certain he was passed out. However, she still could not find them.

13. Finally, her friends arrived and drove her home.

14. Megan's friends took her to their apartment first and then "to DCH Hospital in Tuscaloosa," where she reported to medical personnel and the Tuscaloosa Sheriff's Department that she had been raped.

15. Megan underwent a rape examination at the hospital. That same day, police officers spoke with Defendant at his residence.

16. Defendant denied Megan's presence at his residence during the prior evening.

17. When Defendant was later questioned by the police at the Sheriff's Department, he and his attorney were left alone to talk.

18. During this conversation, which was videotaped, Defendant admitted to his attorney that he could not remember anything from that evening because he was intoxicated.

19. After staying with her parents in Austin, Texas for a few months, in August 2015, Megan returned to the University of Alabama for the fall semester.

20. She saw a University psychiatrist, Dr. Susan Arnold, on September 25, 2015 and October 2, 2015, who diagnosed her with post-traumatic stress disorder ("PTSD") and anxiety stemming from PTSD, both arising from the rape.

21. During Megan's first psychiatric evaluation with Dr. Arnold, Dr. Arnold reported that Megan was "very tearful and upset while she described [her rape]."

22. Dr. Arnold also stated that Megan's thought content was "very[,] very afraid; in constant fear."

23. After Dr. Arnold developed a treatment plan for Megan, which primarily consisted of medication for her anxiety and PTSD, Megan withdrew from the University in October 2015.

24. She returned to Austin, Texas after learning that one of the classes she was registered to take involved a volunteer project that she believed was sponsored by one of Defendant's companies.

25. Although Megan did not know for sure whether Defendant would be at the volunteer event because she


did not ask, she dropped the course there because she was too afraid of seeing Defendant.

26. While in Texas, Megan began seeing a therapist by the name of Betty Bewley.

27. Megan saw Ms. Bewley weekly from October 2015 to December 2015.

28. Ms. Bewley also recommended that Megan see a psychiatrist, so Megan began seeing Dr. Ziba Rezaee.

29. Dr. Rezaee "confirmed Megan's diagnosis of anxiety, depression, and PTSD" and prescribed her medication for those disorders, as well as medication for nightmares.

30. Around this same time, Megan was admitted to Southern Methodist University in Dallas, Texas and began taking classes there.

31. While at SMU, Megan began seeing Dr. Donna Cozort, a psychiatrist, in Dallas, Texas in late January/early February 2016.

32. However, Megan did not like Dr. Cozort, so she only met with her once.

33. Megan then sought additional counseling at the SMU Health Clinic.

34. On February 24, 2016, Megan filled out a "Health History Form" from the SMU Health Clinic.

35. She reported suicidal thoughts on the form.

36. She recounted her history of "PTSD, depression, [and] anxiety stemming from sexual assault and rape on July 1, 2015."

37. She reported the rape, police bullying, and her change of universities as major losses, changes, or crises in her life.

38. On the morning of February 26, 2016, Megan died by suicide.

39. Plaintiffs' Fourth Amended Complaint was filed on August 1, 2018.

40. Plaintiffs' Fourth Amended Complaint only contains one count: Wrongful death.

41. Specifically, Plaintiffs claim that: (1) Defendant "unlawfully and intentionally detained and imprisoned Megan Rondini [both in his car and then in his bedroom] against her will for a length of time whereby he deprived her of her personal liberty;" and (2) Defendant "intended to cause Megan imminent, harmful or offensive contact

with her person when he forcefully and intentionally raped Megan."

42. After the court reviewed Defendant's Motion for Summary Judgement, the court found that there was sufficient evidence in the Rule 56 record for a reasonable jury to find that the torts committed by Defendant were the cause-in-fact of Megan's suicide.

43. The issue of proximate causation, the court found, is less certain.

**QUESTION**

44. This State's Supreme Court has yet to weigh in on the question of whether suicide is an intervening cause that breaks the chain of causation stemming from a defendant's intentional tort to the decedent's death.

45. The United States District Court for the Northern District of Alabama, Western Division therefore poses the following question to be weighed in upon by the Supreme Court of Alabama:

> Whether a PTSD-induced suicide, is an intervening act that breaks the chain of causation connecting a defendant's intentional tort (in this case: sexual assault, battery, unlawful restraint, and outrage

are alleged) to the decedent's death, particularly when the intentional torts committed by the defendant are the cause of the of decedent's PTSD and when the suicide occurred only several months after the commission of the intentional tort(s).

46. Other courts have held that with intentional conduct, the standard is not as rigid as the one applied with respect to mere negligence:

> [W]here [a] plaintiff's claims are for intentional wrongs, not negligence, the rules are different and the tort victim's suicide generally is not considered a supervening cause, at least where the plaintiff can demonstrate that the defendant's intentional conduct caused severe emotional distress that was a substantial factor in bringing about the suicide.

*North Shore Pharmacy Servs. v. Breslin Assoc. Consulting LLC*, 2004 WL 6001505, at *4 (D. Mass. June 22, 2004); *see Dargie v. Cty. of Hillsborough*, 1995 WL 73339, at *7 (D.N.H. Feb. 23, 1995).

Additionally, the Supreme Court of Illinois held that where a plaintiff seeks to recover damages for wrongful death based on the decedent's suicide caused by the intentional infliction of emotional distress by the defendant, a plaintiff must plead facts demonstrating that the suicide was foreseeable, i.e., that it was likely a result of the defendant's conduct. *Turcios v. DeBruler Co.*, 2015 IL 117962, P40, 32 N.E.3d 1117, 1128, 2015 Ill. LEXIS 507, *23, 392 Ill. Dec. 541, 552

This certificate has been prepared by said federal court.

OFFICIAL SEAL

_____
Clerk, The United States District Court for the Northern District of Alabama, Western Division

_____
Address