

Barbara Long, M.D., Ph.D.
3527 Woodhaven Road
Atlanta, GA 30305-1010
Phone: 404-812-0346
blong@post.harvard.edu

Thomas Coleman, Jr.
Smith, Spires, Peddy, Hamilton & Coleman, P.C.
2015 2nd Avenue No.
Suite 200
Birmingham, AL. 35203
(205)251-5885
tom@ssp-law.com

7 February 2019

Re: Michael W. Rondini and Cynthia M. Rondini, as the surviving parents of Megan Elizabeth Rondini, their deceased child; Michael W. Rondini, as Administrator and Personal Representative for the Estate of Megan Elizabeth Rondini, deceased, DOB 11/8/1994 (Age 20 at death), Plaintiffs, v. Terry J. Bunn, Jr., Beth Howard of the University of Alabama, Cara Blakes of the University of Alabama, Sheriff Ronald Abernathy of the Tuscaloosa Sheriff's Department, and Investigator Adam Jones and Deputy Joshua Hastings of the Tuscaloosa Sheriff's Department.

Filed in United States District Court Northern District of Alabama Case 7:17-cv-01114-TMP Filed 7/2/2017

Dear Mr. Coleman:

You have asked that I review records and an expert psychiatric report dated 10/2/2018 prepared on behalf of the plaintiffs by Barbara Ziv, M.D. and to issue any psychiatric opinions that might be pertinent and appropriate in the case of a suicide by Megan Rondini on 2/26/2016 between 2 AM and 8:30 AM.

I reviewed extensive records supplied by your office. The list is attached.

In summary, in my opinion, the objectivity of Dr. Ziv's opinions is compromised by several problems that broadly may be described as bias from advocacy. An overview of the types of problems will be presented along with examples and data that render her opinions of questionable validity. Problems include issuing opinions on facts, omitting information that opposes her opinions, factual errors, opinions based on limited information, and opinions that risk ethical breach. Examples of these problems include:

Disputed facts surrounding the incident on July 1 and 2, 2015 with defendant T.J. Bunn, issues of consent, rape, Bunn's intentions, and Megan's state of mind on and after the night in question.

1. Dr. Ziv opined that Megan "made a credible allegation of rape on July 2, 2015."

In support of this opinion, Dr. Ziv cites texts beginning 1:04 AM to 2:13 AM, when Megan was picked up by friends. She texted friends for help, stating that she was crying, could not open the

bedroom door, and that she was with "some rich dude." Dr. Ziv concluded that Megan must have felt "alarm" being in Bunn's house and "had no choice but to comply" with having sex with Bunn.

However, Dr. Ziv omits Megan's texts that give a more complete context to the sequence of events. Beginning 12:08 AM, for instance, Megan texts Michelle Arcia (MA) from Bunn's house: "We are going to guck." MA: "Do it. Wear a condom. Good luck." Megan: "Ewww but I'll make it real good." MA: "Haha like a tru horseback rider." Videos show her giggling in the trophy room and a text stating, "I'll shoot a zebra," inconsistent with an opinion that she was alarmed in Bunn's house at that time.

That Megan had "no choice but to comply" with sex, again is speculative at best. Questions remain about her state of mind during the incident and what may have been ambivalent feelings about consent. Her ambivalence is illustrated by her report to DCH that "He did not hold me down. It wasn't forceful but I knew I didn't have a choice."

Afterward, Bunn was asleep and Megan had wanted to leave but could not open the bedroom door. She tried unsuccessfully to awaken Bunn to help her with the door. Then she climbed out of his bedroom window, searched his car for her keys, and climbed back into the window into his bedroom in order to search for her apartment keys. She called a taxi and friends, departing with a friend at 2:13 AM.

Unanswered questions include: If she felt she did not have a choice and had been raped, why did she not choose to call 911? Why would she choose to try to awaken the rapist and risk returning to the scene of the rape for any reason? Text messages sent by Megan to her friends while with Bunn indicate consent. Whether she consented, then revoked consent, is not for the expert to determine.

Subsequent texts to her friends after the incident state that "bad stuff happened" [unspecified] but do not say she was raped. The father also testified that when she contacted her parents she had not said "rape" but had said she was "sexually assaulted."

2. Dr. Ziv states further that Megan's "behaviors were entirely consistent with a victim of sexual assault, and that she was traumatized by both the actions of Bunn and the actions of the Tuscaloosa Police Department...who contributed to Ms. Rondini's overall deterioration and tragic suicide."

Regarding the alleged behaviors consistent with a victim of sexual assault, Dr. Ziv, in my opinion, over-reaches. Mr. Rondini testified that he knew that his daughter had been "seriously drunk" when she was in the trophy room with Bunn. Mr. Rondini acknowledged that after the incident, when she had texted "Help, help I need help or something about needing help and her friends had texted, what do u need, a condom" her friends were not taking her seriously (169).

However, she had consumed alcohol, and her texts suggest that in an unfamiliar house with a man that she had met the previous year but whom she did not know well and with whom she had not previously had sex, Megan appeared to emotionally labile and understandably anxious, especially since she could not operate the door mechanism in the bedroom. However, although these non-

2

specific behaviors may reflect her situational anxiety in the moment, in my opinion, one cannot conclude that they support a specific fact of sexual assault/rape.

Extending this reasoning further, Dr. Ziv opined, based on the disputed facts around the sexual incident, that Megan had developed PTSD, a specific diagnosis requiring "exposure to actual or threatened death, serious injury, or sexual violence." The presence of specific symptoms of the disorder are required to make the diagnosis. Since Megan stated that no force was used, there is a question of the validity of this diagnosis based on the disputed nature of the incident.

Under questioning following the incident, Megan stated that she was "pretty sure I'm not going to press charges at all. I don't want to make this a big to do; I just want it to be done. I just want to move on, you know." Her parents took her back to Austin and arranged for her to see Betty Bewley, LPC. This was the first therapist Megan saw. Ms. Bewley said that she had been raped but added that "she said she was feeling better-stronger-and resting and owning her authenticity" (July 7 and July 14, 2015). Ms. Bewley encouraged her to get involved with the lawsuit.

From her meetings with Ms. Bewley forward, Megan began a series of therapeutic encounters with "sexual assault" therapists, who, like Ms. Bewley, assume that she has been sexually assaulted/raped based on subjective report, rather than maintain a therapeutically neutral stance, since the facts around the incident were not established. Under these circumstances, to issue any opinions on the issue of sexual assault/rape or any resulting diagnoses, especially PTSD is, in my opinion, problematic at best.

3. Dr. Ziv issues opinions on the intentions and "nature" of Bunn are problematic and reflect bias. For instance, she described Bunn's having "nefarious" intentions in taking Megan to his house. Further, she stated that "T.J. Bunn showed Ms. Rondini, a college student who informed him or her interest in helping animals, a room filled with gun racks and taxidermized remains of animals he had killed, can only be interpreted as an act intended to intimidate and cow Ms. Rondini. It is small wonder that Ms. Rondini then complied with Mr. Bunn's order that she go to his room as he put his friend to bed." However, other interpretations are possible for a student veterinarian whose education would involve dealing with dead animals. And as indicated above, rather than expressing fear or feelings of intimidation Megan's videos to her friends from Bunn's trophy room show that she was giggling as she saw the trophies and texted "I'd shoot a zebra."

Further, offering opinions on the mental state and "nature" (character) of Bunn, an individual that Dr. Ziv had not personally evaluated, falls into the realm of ethical problems. First, no one knows the "intentions" of Bunn on the night in question, and rendering psychiatric opinions on the character of a person, like Bunn, who was well-known in Tuscaloosa, without personally evaluating him is considered a professional breach of ethics.

4. Further, Dr. Ziv issued unfounded opinions on the cause of Megan's suicide, stating that Bunn "bears the primary responsibility for her untimely death." This opinion on the ultimate fact of causality to be decided by the fact-finder is inappropriate for Dr. Ziv to make, particularly in light of the limited information available about her state of mind on the night she took her life. For instance, we do not have a suicide note that might explain her intent, and it may be that her death was unintentional. Nor do her texts to friends preceding her death reveal her intent or plan to kill herself or mention Bunn. Instead, her texts to her friends feature back and forth chit chat discussions of

3

boys, sorority, and her concerns about SMU classes being much harder than those at Alabama, the high GPAs of the members of sororities at SMU, and the wealth and attractiveness of the women there. None mention lingering anguish about the alleged "rape" by Bunn of 8 months prior, although litigation, initiated by her parents, which began as early as August 2015 introduced a significant stressor to Megan's life as she left Alabama, where she had friends, social support from her sorority, a job she enjoyed, and a strong academic record, and faced adjusting to a new college that she found both challenging academically and socially. In fact she later texted friends that she had no friends at SMU.

Factual inaccuracies:

Dr. Ziv concluded that Megan "did not have any risk factors for suicide; she was not previously depressed, did not use drugs, engage in self-injurious behavior, or have a history of previous suicidal thoughts." But a more comprehensive look at the information available is inconsistent with these opinions.

There is a history of prior depression and a panic attack in 8th grade (mother's testimony), and she was prescribed Vyvanse in the past. On 9/28/2013 she texted Danielle Surtain at 12:03 AM stating that she had been on antidepressants since 8th grade but was "still fucked up." Her father testified that he did not know that she had previously taken antidepressants, and when asked about the above text from Megan (age 18) to Danielle Surtain on 9/28/2013 at 12:06 AM, her father testified that "There's a lot of hyperbole in these things when you write them back and forth...I don't know if she's trying to make somebody be feel good, I don't know if she's just expressing frustration, I don't know (pp. 180-181). This prior use of Vyvanse is mentioned She and friends texted each other about emotional issues. Danielle expressed distress from another girl's apparent involvement with a boy. Megan said that she would text that a boy had asked her to fuck the prior week; she was so depressed she had napped for four hours.

Megan and her friends expressed their emotions in texts, expressing hating life sometimes. Megan said that "People say that life gets better but in reality it only gets harder but you learn to manage." Megan said that life "also brings lots of regrets" (10/12/2013).

According to the mother, after returning to Texas, Megan became depressed, having lost the structure, support, and successes she had achieved at Alabama. She lost a significant amount of weight, and on the SMU form, she noted hair loss, weight loss, anxiety and depression.

Similarly, there is a history of substance use/abuse. Although Megan denied to her treaters that she used substances, she used alcohol to intoxication on a weekly basis. Her father testified that Megan had a fake ID and texts show that she had frequented the following bars: Harry's, Innisfree, and Beartrap. In September 2013, when she and Danielle texted each other. Megan said that she was "drinking everclear [vodka] and sprite while doing my hw" (9/26/2013).

In a Selfie she took in May 2015 she appeared to be altered by drugs and/or alcohol as she discussed allowing a male to have anal sex, referring to that experience with "Eww."

4

According to the blood level in the ER following the incident, and as noted in her mother's deposition, she used alcohol to intoxication, and the mother testified that Megan had told her that she had had five beers in Solo cups and a shot at the bar; unclear if more was consumed at Megan's apartment on the night in question.

In addition to alcohol, the mother testified that she knew that her daughter smoked weed.

Her friends knew that Megan had prescription stimulants that she was willing to distribute. There were text exchanges regarding passing Vyvanse. On 11/27/2013 Haley Loftus reminded Megan that she owed Sam some Vyvanse. When Megan said that she had some recollection of this but asked why, Haley said, "Because he impressed you, one, because he let you give him another haircut, and one or two because he's going to give you his organic chem tests and help you with your schedule." Megan replied, "LOL." On the same date she texted Danielle, who had wanted to buy some Vyvanse from Megan that she had five or six Vyvanse at home that she was bringing back to campus but "there's a kid on campus I can get it from if you want some." Another time Megan wanted to purchase six Vyvanse for $30. On 4/8/2014, Megan texted that she had combined alcohol and Vyvanse and had a bad reaction. Her friend advised her to lay off the alcohol.

The autopsy report noted cocaine was present along with a high alcohol level and her antidepressant—a combination that may have been a significant factor in her death.

Dr. Ziv's opinion that Megan did not "engage in self-injurious behavior" is also refuted by the medical examiner's report of cutting injuries on her arm.

Dr. Ziv stated that she socialized in an "age-normative" manner but does not elaborate on her adjustment. What is known about her adjustment is limited.

In her Southern Methodist Hospital MHC form completed just prior to her death, she pointed out that she was closest to her younger sister and grandmother, rather than her parents. Her father described her as an introvert in high school (deposition 247).

Megan's texts indicate significant sexual behavior prior to the incident and prior to college. In one note beginning 5/28/2011, when Megan was age 16, she began listing the of initials of 10 men with whom she had sex and the corresponding dates. Sexual activity continued both at UA and SMU.

Megan reported that the last consensual sex had occurred on 7/1/2015 [with "Party James," the bartender at Harry's Bar, who was engaged to someone at that time], who had texted her at 1:30 AM about getting together. Whether she contracted an STD from Bunn, Party James, or someone else, is unknown.

After the incident at issue, when she was at SMU, she discussed by texts cute boys and having sex. It is unclear how to interpret her remark that she did not enjoy sex as much as before. Whether this was related to negative heterosexual interactions, including the incomplete sexual

5

encounter with Bunn, or questions about her sexual orientation or overall depressed state is unknown. There are texts about feeling attracted to other women. Meg Ryan visited her in Austin in December 2015. A series of texts beginning on 12/12/2015 at 12:11 AM in which Megan tells Ryan, "Meggy you can come sleep with me anytime if you want to." The next morning at 9:17 AM, Megan texts Ryan, "Where did you go?" to which Ryan replied, "I'll come back after I gather my life" (frowny face emoji). Megan texted Michelle Arcia on 1/21/2016 when she is in SMU, about seeing "the hottest girl I have ever seen, I can't stop looking at her, I have never been so attracted to a girl in my life, and I would be completely satisfied if we got married." Megan noted that the girl was not wearing a bra and had on a low cut shirt with no back."

Advocacy

Dr. Ziv spends considerable time in her report discussing the investigation and interview of Megan by the Tuscaloosa Police Department, citing its deficiencies and alleged bias in Bunn's favor. Dr. Ziv's specific education and training to offer opinions on how procedures used by law enforcement in conducting such interviews is unclear. In observing alleged bias in favor of Bunn, however, Dr. Ziv omits mention of the bias in favor of the subsequent narrative of Megan as a victim of sexual assault/rape, beginning on the night in question. Dr. Ziv said that Megan did not have a supportive adult person with her, but in her videotaped interview with the Sheriff Ms. Stewart, a "victim's advocate" sat with Megan during the videotaped interview. Ms. Stewart provided interpretations of Megan's actions (p. 29), tells her she's not to blame, finishes sentences for Megan, speculates legally ("I don't know that someone could argue that you went consensually with him," p. 49) and says "that kind of stuff can have a major effect on a lot of other areas of life, like school and academics and stuff like that." (Interview Megan #3 transcript). These statements begin to shape an advocacy view of Megan as a "victim" of Bunn in a young woman who had expressed that she did not want to bring it to court—just "wants it to go away" and to "move on" from the incident.

This advocacy view continued and became entrenched after Megan contacted her parents in connection with the events on July 2. They became actively involved in the subsequent events, including her treatment, legal action, and after her death, media involvement.

Her father explored sources of therapy for sexual assault victims and recommended that she contact the Women's Resource Center for counseling. Their website states:

"The WGRC provides free, confidential, and voluntary counseling and advocacy services to members of The University of Alabama community who are victims/survivors of interpersonal violence. Services are also provided to family and friends who have been impacted by the abuse, to Shelton State students, and to anyone who is victimized on The University of Alabama campus.

Additionally, the Women and Gender Resource Center offers a variety of programming designed to promote social justice and address gender disparities in academia, government, and the workforce. These programs include year-long efforts such as the Student Leadership Council, gender specific mentoring programs, and Momentum: Women's Dissertation and Thesis Support Group, as well as one-time programs like Start Smart Pay Negotiation Workshops and Elect Her."

Megan saw Kathy Echols from this advocacy center but could not continue due to a conflict of interest in knowing Bunn. Mr. Rondini testified that he searched the internet to find Beverly Bewley, a sexual assault therapist in Austin, whom his daughter saw (256). Ms. Bewley has since

6

retired, but her two sessions with Megan—July 7 and 14, 2015, not October 2015 (260). Mr. Rondini testified that Ms. Bewley had diagnosed PTSD, though it is unclear if Ms. Bewley had the appropriate training to make DSM diagnoses.

Dr. Ziv does not describe the problems of legal and therapeutic advocacy that compromise an understanding of Megan's mental health after the incident. She mentions only the mental health treatment by Dr. Arnold and two records from the Southern Methodist Hospital Mental Health Center. She does not mention the impact of active litigation on Dr. Arnold's psychiatric evaluation, treatment, or the treatment provided by Dr. Rezaee and others in Austin or the possible iatrogenic harm introduced by the advocacy.

What is known is that her parents thought that their daughter had blossomed at the University of Alabama. She was on scholarship and doing well academically studying to be a veterinarian and working in a lab. She was a member of a sorority and even after the incident had returned to Alabama on August 3 in order to participate in the Rho Chi, a group of sorority members involved in rush of the new class.

Texts to friends reveal that she is chit chatting about rush, sorority functions, etc. In a text to Elizabeth Aune on 7/8/2015, Megan texts a photo of herself and says she is high. Texts discuss the sorority wanting girls to volunteer for downstairs [something about fucking.] Although she had texted Wes Barbee on 7/2/15 that something was "not so good. I'll call you about it later," but her later texts to him are upbeat, chit chatting about life, her dog, and other day to day matters. She is looking forward to seeing him and returning to school and sorority.

However at least by mid-August 2015, her parents' legal interventions were impacting Megan. On August 19, 2015, her father texted Megan, "Spoke with Scott he thinks very good grounds for a civil case and demand letter will ruin his day," and "he'll definitely want to pay versus a threat of having this made public." Megan's texts demonstrate anger toward Bunn as well toward other men, like Party James (text to Mary Pat Peebles January 15, 2016). Another text on August 26, she texted Kera "About to meet with my lawyer and the gut [sic] who put Sandusky in jail so if that doesn't make Hill Billy [?Bunn] shit his pants then idk." On September 7, her attorney Scott Meyer sent a demand letter to Bunn in regards to possible civil litigation.

Mr. Rondini testified that Megan had wanted to return to the University of Alabama after the incident, but her mother had made her agree to see a therapist there. The mother testified that what had prompted Megan to withdraw from Alabama was "she was threatened by Ivy Gilmore" [Bunn's attorney] (254), but her texts show that she was looking forward to returning to her friends and activities at Alabama.

Her life changed significantly when Megan learned that her mother had conferred with Beth Howard, the Title IX counselor at the University of Alabama, who had contacted Megan on October 7, 2015 to let her know that her parents had officially withdrawn her. This was the first time Megan heard of this decision, which was made by her parents, not her. She texted her father on October 7, "What?" Her father testified that when his daughter had learned of the withdrawal from the Title IX person, she had expressed concern because she was doing "really well" in her classes. She asked her parents what they were doing because she did not know about it. She did not know her father was driving to Tuscaloosa to get her (Mr. Rondini's deposition pages 249-251).

On October 16, her friend Michelle asked why Megan had left so suddenly. Megan texted, "They had people following me and my lawyer found out and told my dad."

Underscoring Megan's ambivalence about leaving Alabama, Mr. Rondini testified that her daughter had expressed wanting to visit her University of Alabama friends during spring break 2016 but her parents had said **no** reportedly because they were worried about her safety (268).

It is clear that Megan did not do well when she left University of Alabama and returned to Texas. Megan had no psychiatric treatment in Dallas. She expressed in texts to her friends and her father her reservations about SMU's being an expensive college and told her father that she was worried that she was too "middle class" for them but decided she could take it for a year and a half either way (9/21/2015). She also texted friends such as Mary Pat Peebles in January 2016 about her concerns about how wealthy the SMU students were everyone is and how she is on full scholarship and how the sorority girls had such high GPAs and says that the classes are hard and she was so lonely.

Megan tried to adjust to life at SMU, apparently continuing relationships with friends at Alabama and behavioral patterns she had established there around sex and substances. She and Mary Pat chit chatted and on 2/5/2016 Megan send a photo of a cute boy she had just met and texts Elizabeth Aune on the same date a photo of two cute guys, stating, "I just fucked the dude on the right" and that it was the first time she had "let anyone touch my vagina since July." When Elizabeth asked if it was nice, she said that "He was nice but I just don't like it as much as I used to." On 2/7/2016 she texted Elizabeth that he was "super cute" and that she had left her bra at his house and that they were talking all day and he called her five times last night but she had passed out at 11. She mentions doing cocaine with a boy, her neighbor, who was not in her bed. Megan said that she did not have her vagina shaved, but the guy put his face down there. Elizabeth said that guys don't care, but Megan said, "Bobby did but Bobby was a cunt. Bobby had a smaller penis than Hunt but Hunt knew what he was doing." She texts Wes Barbee on 2/7/2016 telling him that "school is a lot harder" and on 2/11/2016 asks him to help her with a math problem.

Mr. Rondini testified that once back home, his daughter did not have her friends around and got depressed (267). Her view of herself as a "victim of rape" became entrenched. Her mother said that her daughter felt isolated in Dallas and did not want her new friends to know about the "rape." She said that it did not bother Megan that she did not have a boyfriend even though her friends did. She said that two of Megan's roommates at SMU had boyfriends, and they talked about going on a cruise spring break, but Megan did not want to go. Her comment to Dr. Rezaee on 12/7/2015 that she felt "lost." Texts to friends suggest that she may have felt overwhelmed about SMU.

The mother said that her daughter had wanted to sue because there was no official record in the system of the alleged rape or her accusation of this, and the next victim would not know of this absent litigation. But in her texts to her friends after the incident, it is clear that Megan was trying to adjust and continue her life at Alabama where she was doing well socially and in her studies.

Once the litigation process began, Megan told friends she is going to court, although there were no court appearances. She texted Mary Pat Peebles on 8/4/2015 stating that she has to go to court every AM where "they call me an alcoholic whore." Mary Pat asks how long she has to go to court, and Megan said, "Well it happens off and on so probably November." Why Megan fabricated this is unclear.

8

The parents' depositions reveal that they had researched Bunn. Mr. Rondini testified that he learned that Bunn was a prominent person in Tuscaloosa. He said that "People have suggested T.J. had raped others (173), and there were emails about Bunn's alleged multiple DUIs, DUI hit and runs, assault, other rapes, avoiding warrants—"all kinds of outrageous behavior" (175-6). Megan accepted the therapists' and parent's views of the incident and her anger increased particularly after litigation began.

Examining texts in the days leading up to the suicide support the hypothesis that Megan was feeling overwhelmed at SMU. She texted Ashlee on 2/20/2016 stating that she thinks she looks "chubb" in photos, although she had lost weight and was thin. In her texts to Michele Arcia on 2/21/2016, Megan asks at 9:53 PM, "Do you ever feel like you just don't want to deal with shit anymore?" She texted Wes Barbee on 2/21 chit chatting. He asks if she's coming to visit as he missed her. She said that her mother had said no, but she was going to try to convince her mother to let her visit because she really wanted to. He hopes she visits before he leaves for the Marines. Then on 2/22/2016 at 3:50 PM she texts Arcia that she "hates" her new school "because I miss how everything used to be." Arcia asks if she thinks it is a better atmosphere for her. Megan replies at 5:57 PM, "It's safer and yeah I don't feel as bad when people go to Innisfree and stuff." On 2/22/2016 she told Mary Pat Peebles that she "hates Texas…just sad."

On 2/25/2016 Megan texted Mary Pat that she skipped a class because she was tired and asked, "Why does one eye always follow the other?" Also on 2/25/2016 at 4:56 PM Megan texted Elizabeth Aune the same bizarre question. Elizabeth asked, "What?" Elizabeth texts her at 2/26/16 at 1:45 AM, "Are you okay?" to which Megan says, "No."

A series of enigmatic texts to Courtney Rentas on 2/24/2016, two days before her suicide shows a photo of a part of an article stating, "When all is said and done, I never want to wonder what I missed." Megan amended this statement to say in her text, "When all is said and done, I wonder what I could've accomplished if one man [not identified] didn't completely rip everything away from me." Courtney replies, "Yeah but you seem like you're doing so well at SMU now even after everything that happened here." Megan replies, "I hate it" [unspecified].

**Opinions:**

1. Understanding Megan's mental state prior to, during, and after the incident is challenging. Information provided suggests the possibility of a mood and/or anxiety disorder possibly secondary to hypothyroidism (found by the medical examiner), or to alcohol and substance use/abuse. The finding of self-mutilation on her arms and possible sexual orientation questions are other issues, the diagnostic significance of which is unclear. Absent an opportunity to examine Megan personally, diagnostic considerations must remain speculative.

2. Complicating this case are issues of legal and therapeutic advocacy, both of which, in my opinion, contributed to Megan's ongoing difficulties adjusting after the incident at issue. The therapists' advocacy may have introduced iatrogenic harm.

3. Why Megan committed suicide is a question will never be unknown, but in my opinion, it is inappropriate to offer opinions on this issue of causality, particularly given the lack of a suicide note. Bunn is not specifically mentioned in the texts leading up to her suicide, and her remark

about what she might have accomplished but for one man is enigmatic. The presence of illegal drugs and alcohol, which were found in her system at autopsy, is significant.

4. It is inappropriate and against professional ethics to offer opinions about the "nature" or "intentions" of Bunn, a man whom Dr. Ziv did not personally examine.

5. The involvement of media has introduced further bias and prejudice into examination of the issues in this case.

6. I have no opinions on the police investigation, which falls outside of my professional expertise.

I hope that this addresses your questions. If not, please contact me. Note that these opinions, which are rendered to a reasonable degree of medical certainty, are based on information that your office provided. If it is discovered that any of the information is flawed, for instance, because of redactions, or if any new information arises, I reserve the right to amend my opinions if necessary.

You have my resume, which summarizes my qualifications to render these opinions, as well as my four year deposition and trial lists. I am compensated for time ($600/hour) and expenses, if any.

Very truly yours,

Barbara Long, M.D.