UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| **MICHAEL W. RONDINI, as Administrator and Personal Representative for the Estate of Megan Elizabeth Rondini, Deceased,** } } } } } | |
| Plaintiff, } } | |
| v. } } | Case No.: 7:17-CV-01114-RDP |
| **TERRY J. BUNN, JR.,** } } | |
| Defendant. } | |

## PRETRIAL ORDER

A pretrial conference was held in the above case on August 30, 2021, wherein, or as a result of which, the following proceedings were held, and actions were taken:

1. <u>Appearances</u>. Appearing at the conference were:

    For *Michael W. Rondini*: Julie E. Heath and Austin Russell

    For *Terry J. Bunn, Jr.*: Richard E. Smith, W. Ivey Gilmore, Rachel J. Moore and Laura J. Crissey

2. <u>Nature of the Action, Jurisdiction and Venue</u>.

    (a) The nature of this action is as follows:

    This is a civil action brought by Michael W. Rondini, as administrator and personal representative of the Estate of Megan Rondini against Terry J. Bunn, Jr. This is a civil action for wrongful death arising from the death of Megan Rondini as a result of an alleged sexual assault and false imprisonment committed by Terry J. Bunn Jr.

    (b) The court has subject matter jurisdiction of this action under the following statutes, rules or cases:

1

This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because complete diversity exists between the parties involved and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

    (c)    All jurisdictional and procedural requirements prerequisite to maintaining this action *have* been met.

    (d)    Personal jurisdiction and/or venue *are not* contested.

3.    Parties and Trial Counsel. Any remaining fictitious parties are hereby **STRICKEN.** The parties and designated trial counsel are correctly named as set out below:

|  | Parties: | Trial Counsel: |
|---|---|---|
| Plaintiff(s): | **Michael W. Rondini, as Administrator and Personal Representative for the Estate of Megan Elizabeth Rondini, Deceased** | **Leroy Maxwell, Jr., Julie E. Heath, and Austin Russell** |
| Defendant(s): | **Terry J. Bunn, Jr.** | **Richard E. Smith, W. Ivey Gilmore, Rachel J. Moore and Laura J. Crissey** |

4.    Pleadings.  The following pleadings have been allowed:

    1. Plaintiff's Fourth Amended Complaint and Jury Demand (Doc. 100)

    2. Answer to Plaintiff's Fourth Amended Complaint and Jury Demand (Doc. 103)

5.    Statement of the Case.

    (a)    Narrative Statement of the Case.

Plaintiff Michael Rondini ("Plaintiff"), on behalf of the estate of Megan Rondini ("Megan"), brought this action against Defendant Terry J. Bunn Jr. ("Defendant") alleging that Defendant falsely imprisoned and sexually assaulted Megan on July 1st and 2nd, 2015, and that

these intentional torts were the direct and proximate cause of Megan's death by suicide in February 2016. Defendant contends that he and Megan had a consensual sexual encounter. Plaintiff has asserted claims of the following:

- Count I Wrongful Death
    - Underlying Intentional Tort- Assault and Battery and Intentional Infliction of Emotion Distress
    - Underlying Intentional Tort- False Imprisonment
- Defendant denies these allegations and denies that any intentional tort occurred. Defendant further denies that any actions were the legal cause of Megan Rondini's death, almost eight months later. Defendant further pleads that the alleged sexual assault was a consensual act.

(b)     Undisputed Facts.

1.      Megan Rondini was a 20-year-old junior and Honors student at the University of Alabama in the summer of 2015.

2.      Terry Jackson Bunn (sometimes referred to as "T.J.") was 34 years old and a resident of Cottondale, Alabama in the summer of 2015.

3.      Sometime between 7:30 p.m. and 8:30 p.m. on July 1, 2015, T.J. Bunn arrived at Innisfree Bar in Tuscaloosa, Alabama.

4.      Sometime between 7:30 p.m. and 8:30 p.m. on July 1, 2015, Megan Rondini arrived at Innisfree Bar in Tuscaloosa, Alabama with friends.

5.      Megan Rondini left Innisfree by herself.

6.      Megan Rondini was walking down the sidewalk after leaving Innisfree.

Bunn asked if she wanted a ride.

7. Megan Rondini got into Bunn's vehicle with Bunn and Jason Barksdale.

8. Bunn drove Megan Rondini to her home at the Houndstooth apartment.

9. Megan Rondini, Bunn and Jason Barksdale got out of the vehicle, and they walked into her apartment.

10. Megan Rondini Bunn and Jason Barksdale went into Megan's apartment.

11. At some point on July 1, 2015, or July 2, 2015, Megan Rondini, Terry J. Bunn, Jr., and Jason Barksdale drove to T.J. Bunn's home in Cloverdale, Alabama.

12. At some point on July 1, 2015, or July 2, 2015, Megan Rondini, Terry J. Bunn, Jr., and Jason Barksdale arrived at Bunn's home in Cloverdale.

13. Megan was picked up from T.J. Bunn's house by Ciara Younger around 2:00 a.m. on July 2, 2015.

14. Megan visited DCH Regional Hospital (DCH) at approximately 2:43 a.m. on July 2, 2015.

15. Investigator Adam Jones and Investigator Josh Hastings were dispatched to DCH for "a possible sexual assault victim" where they interviewed Megan Rondini.

16. Megan Rondini and Bunn did not ever have any further communication after the alleged incident.

17. Megan committed suicide by hanging on February 26, 2016.

18. Bunn disputes Megan's allegations of sexual assault.

4

      (c)      <u>Plaintiff's Claims</u>.

**1.**      <u>**Count I Wrongful Death**</u>

On May 7, 2021, The Alabama Supreme Court held that one's suicide is not a superseding or intervening event which breaks the causal chain from a sexual assault to the victim's wrongful death. *Rondini v. Bunn*, No. 1190439, 2021 WL 1939171 (Ala. May 7, 2021). Generally adopting the rationale of *Mayer v. Town of Hampton.* 497 A.2d 1206. 1211 (N.H. 1985), Alabama's Supreme Court determined that in the case of an alleged sexual assault, "a wrongful-death action may be pursued against a defendant when there is a substantial evidence both that the defendant sexually assaulted the decedent and that the assault was a cause in fact of the decedent's later suicide. *Rondini v. Bunn*, No. 1190439, 2021 WL 1939171, at *5 (Ala. May 7, 2021).

Plaintiff's wrongful death claim is supported by the above allegations of the existing of the underlying torts and the severe emotional toll the actions took on Megan. Megan reported that she had been raped immediately upon escaping from Bunn's home. She sought counseling in the aftermath at the University of Alabama. Susan Arnold, M.D., who treated Megan, found her allegations of severe emotional distress supportable and concluded that she was not being deceptive in her report. In addition, Megan sought help from several other Psychiatric professionals prior to her death. Megan was treated by Dr. Betty Bewley and Dr. Ziba Rezaee for PTSD, Anxiety, Depression stemming from her encounter with Bunn. Finally, two days before her death, Megan completed a medical form to Dr. Donna Cozart seeking mental health treatment on which she indicated that she was still suffering due to the trauma of being sexually assaulted.

**2.     Underlying Intentional Tort: Assault and Battery and Intentional Infliction of Emotional Distress**

In civil cases in Alabama, the crime of sexual assault is most often plead as the torts of "outrage" (or "intentional infliction of emotional distress") and/or "assault and battery." *See Harrelson v. R.J.,* 882 So.2d 317, 322 (Ala. 2003). Each of these torts is an intentional tort under Alabama law. *See id.; Wright v. Wright,* 654 So.2d 542, 544 (Ala.1995) (defining assault as an intentional act and commenting that a battery is a successful assault).

To prevail on an assault claim, a plaintiff must show an "intentional, unlawful offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented." *Wright*, 654 So.2d at 544. A successful assault becomes a battery and is defined as the touching of another in a hostile manner. *Id*. To prevail on an outrage/intentional infliction of emotional distress claim, a plaintiff must present substantial evidence indicating that the conduct at issue "(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it." *Thomas v. BSE Indus. Contractors, Inc.,* 624 So.2d 1041, 1043 (Ala. 1993).

In support of the assault and battery claim, Plaintiff intends to prove that Megan Rondini went to the home of Defendant T.J. Bunn late on July 1 or very early on the morning of July 2, 2015. Shortly after arriving, Megan told Defendant Bunn that she wanted to go back to her friends. Defendant refused to take her back to her friends and instead told her she would need to go to his room. Megan knew the Defendant came from a powerful and prominent family in Tuscaloosa, and so as not to anger him, she obeyed his instruction. She did not get on Bunn's bed; instead, she sat

6

in a chair across the room from the bed. Defendant Bunn did not allow Megan to remain in the chair, and he forced her to move to his bed. Megan told Defendant Bunn that she did not want a sexual relationship with him, and she wanted to return to her friends. Bunn did not take Megan back to her friends. In view of his refusal and in her muddled state of intoxication, Megan concluded that she could not reject the advances of such a powerful man. When Defendant Bunn attempted vaginal intercourse, Megan again said no and that she wanted to leave. Defendant refused to discontinue his advances and he completed the act of intercourse while holding Megan down by placing his hands on her hips. These factual allegations support Plaintiff's claim that Defendant Bunn assaulted and battered Megan.

Similarly, Defendant's conduct was extreme and outrageous and supports the tort of outrage. Defendant Bunn took a 20-year-old, intoxicated female to his home for the purpose of engaging in sex with her, knowing she was not able to consent and that she did not consent. His conduct was intentional—he was the driver of the vehicle, the instigator of the trip to his home, the one who locked Megan in his bedroom, and the aggressor in the sexual assault. Bunn's conduct caused emotional distress so severe that a previously emotionally healthy young woman chose to end her life rather than endure the memory of it.

### 3. Underlying Intentional Tort: False Imprisonment

Under Alabama law, false imprisonment consists of the "unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty." ALA. CODE § 6–5–170 (1975). False imprisonment requires some direct restraint of the person; it is not necessary that there be confinement in a jail or a prison. Any exercise of force, or the express or implied threat of force, by which the other person is deprived of his or her liberty or is compelled to remain

where he or she does not wish to remain or to go where he or she does not wish to go, is an imprisonment. *Crown Cent. Petroleum Corp. v. Williams*, 679 So. 2d 651, 653 (Ala. 1996).

Plaintiff intends to prove that Defendant unlawfully detained Megan, compelling her to "remain where [s]he [did] not wish to remain" and "to go where [s]he [did] not wish to go," on the evening of July 1 and the early morning of July 2. Defendant Bunn picked up Megan and drove her to his home. While in Defendant's vehicle, Megan told Bunn that she did not want to go with him, and she wanted to go back to her friends. Defendant ignored her and he continued driving to the destination where Megan did not want to go. When she arrived at Defendant's home, Megan told Bunn that she wanted to return to her friends; Defendant refused to take her back. Instead of allowing her to leave, Defendant told Megan to wait in his bedroom. Megan had no way of escape as Bunn's home was 20 minutes away from campus and she had no easy way of returning. In addition to refusing to return her to her friends, Bunn pressured Megan to wait in his bedroom. She did not want to do so, but she felt she had not choice because of Defendant's family's influence in the community.

When he got to the bedroom, Defendant locked the door with a privacy lock that Megan did not know how to operate. Megan again asked Defendant to take her back to her friends; he did not even respond. Instead, he took Megan's phone and keys, leaving her with no way to call for help or otherwise extricate herself from the situation. He then told Megan he wanted sex. When Defendant tried to kiss her, Megan again told him that she needed to leave. Bunn refused to stop his advances. Defendant's implicit threat the entire evening was that Megan would not be allowed to leave Defendant's house until he had sex with her. Defendant then sexually assaulted Megan,

8

using his superior strength to pin her against the bed. He physically held her down, thereby detaining her and depriving her of her personal liberty to leave.

After Defendant Bunn fell asleep, Megan began looking for ways to leave Bunn's bedroom. She began to panic when she realized the door to Defendant's bedroom was locked and she could not unlock it. As she told police about her attempts to unlock the door, "[I]t didn't matter if I turned it right or left it wouldn't open at all." She then tried to use Defendant's keys that she had found, but "none of them would [work]." Megan explicitly told police that she could not escape from Defendant's bedroom: "I sent like at least ten of those [texts] like the please come get me but I don't know when exactly those occurred, *I know for a fact I sent a lot of them when I was trapped in that room . . .*" One of the texts she sent to Ciara Younger shows that she thought she might die if she could not get out. Evidencing quite clearly that she "did not wish to remain" in Defendant's room, Megan escaped by climbing out a second-story window.

The above allegations support the conclusion that Defendant Bunn engaged in multiple acts of false imprisonment of Megan. First, he refused to allow her to leave his car; next, he refused to allow her to leave his home; and then he refused to allow her to leave his bedroom.

(d)     Defendant's Defenses.

Count I. Wrongful Death

Plaintiff has made a claim against Bunn for Megan Rondini's wrongful death by suicide based upon an alleged intentional tort of sexual assault. Megan Rondini took her own life by committing suicide almost eight months after the alleged sexual assault. Bunn denies that the purpose of Alabama's Wrongful Death Statute is for the benefit of Plaintiff.

9

Notwithstanding the foregoing, Bunn cannot be liable for Megan's suicide because it was unforeseeable and too remote in time and physical distance. There is no evidence that Bunn and Megan Rondini had communication concerning her psychiatric history, treatment or that she was suicidal. Bunn had no reason to know or suspect that his action could foreseeably lead to Megan taking her life almost eight months later.

In *Peevy v. Alabama Power Co.,* 393 So. 2d 971 (1981), the Alabama Supreme Court stated:

> Proof which goes no further than to show an injury *could have* occurred in an alleged way does not warrant the conclusion that it did so occur, where from the same proof the injury can, with equal probability, be attributed to some other cause. Such a condition is equivalent to the absence of evidence to the true cause, and when seen clearly to exist, imposes on the court the duty of determining, *as a matter of law,* against the right of recovery dependent upon the establishment of the causal connection between the injury and the alleged cause. *Maddox v. Ennis*, 274 Ala. 229, 230, 231, 147 So. 2d 788, 789 (1962),*quoting*, *Southworth v. Shea,* 131 Ala. 419, 30 So. 774 (1901).

*Peevy* at 973.

### Underlying Tort: Sexual Assault

Plaintiff has pled, under the umbrella of the tort of outrage, a claim for sexual assault. To prevail on an assault claim, a plaintiff must show an "intentional, unlawful offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented." *Wright v. Wright,* 654 So.2d 542, 544 (Ala.1995). Bunn denies that he sexually assaulted Megan Rondini.

Plaintiff's claim for sexual assault is not supported by the evidence, and Bunn pleads consent with regard to this claim. When she went to DCH, several hours after the alleged sexual

10

assault occurred, Megan Rondini told the representatives at DCH that no force was used on her. She also told the authorities during her interview that she was not physically restrained.

Megan Rondini's texts to her friends when she was at Bunn's house are clear: "We are going to guck." Additionally, Megan Rondini climbed out of Bunn's second story bedroom window after the alleged assault. She did not call 911, or otherwise, alert any law enforcement authorities. She realized she did not have her keys, so she went back through the second story window to Bunn's room, where he was sleeping, to look for her keys.

### Underlying Tort: False Imprisonment

Plaintiff also pleads a claim of false imprisonment against Bunn. Under Alabama law, false imprisonment consists of the unlawful detention of the person for any length of time in which he/she is deprived of personal liberty. "There must be some direct restraint of the person." *Big B., Inc. v. Cottingham*, 634 So. 2d 999 (Ala. 1993).

Bunn denies that he falsely imprisoned Megan Rondini. In this action, it is undisputed that Megan Rondini willingly went to Bunn's house. She told DCH representatives that there was no force used on her. She also told the authorities during her interview that she was never physically restrained by Bunn in his vehicle or his home.

The false imprisonment alleged by Plaintiff is that Megan Rondini could not unlock Bunn's bedroom door because she apparently could not work the lock to unlock the door. She climbed out of the second story bedroom window to leave. She, however, undisputedly went back through the very same window to enter Bunn's bedroom to look for her keys. Bunn was asleep in the bedroom. Throughout this entire time, Megan Rondini did not call 911 or any law enforcement. Under

11

Alabama law, Plaintiff cannot meet the burden of proof required to establish a claim of false imprisonment.

### Lack of causation

Bunn pleads the absence of proximate cause as it relates to any act or omission attributable to him in connection with Megan Rondini's suicide. Bunn further pleads that Megan Rondini's death, which occurred nearly eight months after the alleged intentional torts, was the result of independent, intervening and efficient causes, which were too remote, and that cannot be attributable to Bunn.

      6.      Discovery and Other Pretrial Procedures.

           (a)      Pretrial Discovery.

       X   Pursuant to previously entered orders of the court, discovery is closed with the exception that trial subpoenas for documents and witnesses may be issued.

           (b)      Pending Motions.

1. Plaintiff's Daubert Motion to Preclude Expert Testimony of Barbara Long (Doc. 173)
2. Defendant's Motion to Preclude Testimony of Plaintiff's Expert Barbara E. Ziv, M.D. (Doc 174).

           (c)      Motions In Limine.  Motions in limine must be filed at least one week in advance of the scheduled trial date and shall be accompanied by supporting memoranda.  As to each matter counsel seeks to exclude, counsel shall indicate whether the exclusion is "opposed" or "unopposed" by counsel for the other side.  Parties are encouraged to resolve evidentiary issues by stipulation whenever possible.

7. <u>Trial Date</u>.

    (a)     This case is set for **Jury** trial on **September 20, 2021**.

    (b)     The trial of this matter is expected to last **7** days.

8.     <u>Exhibit D</u>.  The parties are to comply fully with each provision contained in Exhibit D -- Standard Pretrial Procedures which is incorporated into this Order by reference as if fully set forth verbatim herein.

It is **ORDERED** that the above provisions be binding on all parties unless modified by further order for good cause shown.

**DONE** and **ORDERED** this August 30, 2021.

                                                                      **R. DAVID PROCTOR**
                                                                      UNITED STATES DISTRICT JUDGE

**EXHIBIT D -- STANDARD PRETRIAL PROCEDURES**

1.   **Damages**.  No later than twenty (20) calendar days prior to the date set for trial, the parties shall file and serve a list itemizing all damages and equitable relief being claimed or sought; such list shall show the amount requested and, where applicable, the method and basis of computation.

2.   **Witnesses – Exchange of Lists**.

   (a)   **Expert Witnesses**.  No later than twenty (20) calendar days prior to the date set for trial, the parties shall file and serve a list stating the names and addresses of all expert witnesses who have previously been identified in accordance with Fed. R. Civ. P. 26(a)(2) and whose testimony may be offered at trial.

   (b)   **Other Witnesses**.  No later than twenty (20) calendar days prior to the date set for trial, the parties shall file and serve a list stating the names and addresses of all witnesses (other than expert witnesses) whose testimony they may offer at trial.

   (c)   **Contents of Lists**.  The parties shall appropriately indicate on their witness lists: (1) the "primary" witnesses – those witnesses whose testimony the party expects to offer; (2) the "optional" witnesses – those witnesses whose testimony the party expects will not be needed, but the party has listed to preserve its right to offer such testimony should the need arise in light of developments at trial, and (3) those witnesses the party expects to present by means of depositions with a listing of the specific pages from the depositions to be used.

Unless specifically agreed by the parties in writing or allowed by the court for good cause shown, the parties shall be precluded from offering substantive evidence through any witness not included on the party's witness list.  The listing of a witness does not commit the party to have such witness available at trial or to call such witness to testify, but it does preclude the party from objecting to the presentation of such witness's testimony by another party.

As to any witnesses shown on such list to be presented by deposition, within ten (10) business days after the filing of such list, an opposing party may serve a list of additional pages of the deposition to be used and may serve and file a list disclosing any objections to the use of such deposition testimony under Rule 32 or Rule 26(a)(3)(B).  Any objections to deposition testimony should be accompanied by excerpts from the depositions including the testimony to which the objection relates.  Objections not made within such time, other than objections under Fed. R. Evid. 402 and 403, shall be deemed waived, unless such failure to timely object is excused by the court for good cause shown.

3.   **Exhibits**.

   (a)   **Exchange of lists**.  No later than twenty (20) calendar days prior to the date set for trial, the parties shall file and serve a list providing an appropriate identification of each document or other exhibit, including summaries of other evidence, separately

1

        identifying those exhibits that the party expects to offer and those exhibits that the party may offer if the need arises. Unless specifically agreed by the parties in writing or allowed by the court for good cause shown, the parties shall be precluded from offering as substantive evidence any exhibit not so identified.

        Courtesy copies of Exhibit Lists should be submitted to the Clerk's office (for delivery to the judge's chambers), as well as emailed to the chamber's email address at *proctor_chambers@alnd.uscourts.gov*, in either Word or WordPerfect format.

(b)    **Objections and Stipulations.** Upon receipt of Exhibit Lists, the parties shall immediately meet and confer regarding any objections to the listed exhibits. Most objections should be cured by discussion, and the parties should stipulate as to the admissibility of as many exhibits as possible.

        As to any document or other exhibit on which agreement cannot be reached, including summaries of other evidence shown on such list, no later than (10) business days before trial, an opposing party shall serve and file a list disclosing any objection, together with the grounds therefor, that may be made as to the admissibility of exhibits identified on such list. Objections not so disclosed, other than objections under Fed. R. Evid. 402 and 403 are waived, unless such failure to timely object is excused by the court for good cause shown. The court generally rules on objections to exhibits outside the presence of the jury and will do so prior to opening statements, to the extent possible.

(c)    **Counsel requiring authentication** of an opponent's exhibit must notify offering counsel in writing within ten (10) business days after the exhibit is identified and made available for examination. Failure to do so is an admission of authenticity.

(d)    **Marking**. Each party that anticipates offering more than five (5) exhibits as substantive evidence shall premark such exhibits in advance of trial, using exhibit labels and lists available from the Clerk of Court. The court will provide up to 100 labels; if any party needs more labels, that party must use labels of the same type as those supplied by the court. Counsel <u>must</u> contact the courtroom deputy for the appropriate exhibit list form for use at trial. The court urges counsel to be judicious in determining which documents actually are relevant to necessary elements of the case.

(e)    **Examination by Opposing Party**. Except where beyond the party's control or otherwise impractical (*e.g.*, records from an independent third-party being obtained by subpoena), each party shall make such exhibits available for inspection and copying. The presentation of evidence at trial shall not ordinarily be interrupted for opposing counsel to examine a document that has been identified and was made available for inspection.

(f) **Court's Copies**. In addition to the premarked trial exhibits mentioned above, the court requests for the bench an exhibit notebook of anticipated trial exhibits (to the extent possible and practical). The notebook should include a copy of the Exhibit List referenced in "(d)" above.

(g) **Special and Visual Exhibits**. Should either side desire to present exhibits via projection onto a screen or monitor or by enlargement, or other special means to present the exhibit to the jury, such exhibits will be limited to the twenty (20) most critical documents to that side's case. Counsel shall advise opposing counsel at the same time as submission of the Exhibit List which documents it plans to so present. Hard copies of such exhibits must first be identified before projection. Counsel is responsible for providing whatever technology may be necessary for such projection.

**THE PARTIES ARE REMINDED THAT THEY WILL NOT BE ALLOWED TO USE AT TRIAL ANY WITNESS OR EXHIBIT NOT DISCLOSED IN ACCORDANCE WITH FED. R. CIV. P. 26(a) OR 26(e), UNLESS EXTREMELY GOOD CAUSE IS SHOWN AND THE OFFERING PARTY CAN SHOW THAT ITS FAILURE TO DISCLOSE WAS HARMLESS.** *See* **Fed. R. Civ. P. 37(c)(1).**

4. **Use of Depositions at Trial**.

(a) The court will accept the parties' written agreement to use a deposition at trial even though the witness is available. In the absence of such an agreement, parties must comply with Fed R. Civ. P. 32.

(b) Before trial, counsel must provide the courtroom deputy with a copy of all depositions to be used as exhibits at trial.

(c) To the extent possible, counsel will designate the portion of any deposition that counsel anticipates reading by citing pages and lines in the final witness list. Objections, if any, to those portions (citing pages and lines) with supporting authority must be filed at least five (5) business days before trial.

(d) Use of videotape depositions is permitted and the parties must make good faith efforts to agree on admissibility or edit the videotape to resolve objections.

(e) In a non-jury trial, for any deposition offered as a trial exhibit, counsel shall attach to the front of the exhibit a summary of what each party intends to prove by the deposition testimony, with line and page citations, and include an appropriate concordance of the deposition pages offered.

5. **Trial Submissions to Court**.

No later than ten (10) business days prior to the scheduled trial date, each party will submit the following to the Clerk's office (for delivery to the judge's chambers):

- (a) A listing of what each party understands to be the essential elements of each of Plaintiff's claim(s) (separate listing for each claim).

- (b) A listing of what each party understands to be the essential elements of each Defendant's defense(s) (separate listing for each defense).

- (c) A listing of what each party understands to be the essential elements of each Defendant's counterclaim(s), if any (separate listing for each counterclaim).

- (d) A listing of what each party understands to be the essential elements of each defense to any Defendant's counterclaim, if any (separate listing for each defense).

- (e) A listing of any special evidentiary or other anticipated legal problems with citation to legal authority that supports the party's position.

- (f) Any special questions or topics for voir dire examination of the jury venire.

Parties may, if they desire, file trial briefs. Any such briefs must be filed at least ten (10) business days prior to trial. Opposing parties may respond to such trial briefs at least five (5) business days prior to trial. The briefs, if any, should not exceed ten (10) typed pages and must otherwise comply with this court's Exhibit A to the Scheduling Order. Additionally, three-hole punched courtesy copies of all briefs must be submitted to the Clerk's office (for delivery to the judge's chambers), as well as emailed to the chamber's email address at *proctor_chambers@alnd.uscourts.gov*, in either Word or WordPerfect format.

6. **Jury Charges**.

No later than five (5) business days prior to the scheduled trial date, the parties shall file a **single, joint proposed jury charge**, including all necessary instructions, or definitions applicable to the specific issues of the case. The parties need not submit standard generic instructions regarding routine matters, *e.g.*, burden of proof, credibility of witnesses, duty of jurors, etc.

- (a) **Each** requested **instruction** must be <u>numbered</u> and presented on a separate sheet of paper with authority cited.

- (b) In their joint, proposed jury materials, counsel are to include all necessary instructions or definitions, specifically including: (1) the *prima facie* elements of each cause of action and defense asserted; (2) legal definitions required by the jury; (3) items of damages; and (4) methods of calculation of damages. Counsel are to use the Eleventh Circuit Pattern Jury Instructions, or appropriate state pattern jury instructions, as modified by case law or statutory amendments, wherever possible.

               Any deviations must be identified, and accompanied with legal authorities for the proposed deviation.

(c)    Even if the parties, in good faith, cannot agree on all instructions, definitions or questions, the parties should nonetheless submit a single, **unified** charge.  Each disputed instruction, definition, or question should be set out in bold type, underlined or italics and identified as disputed.  Each disputed item should be labeled to show which party is requesting the disputed language.  Accompanying each instruction shall be all authority or related materials upon which each party relies.  **The parties shall also email the unified charge, in either Word or WordPerfect format, to the chamber's email address at** *proctor_chambers@alnd.uscourts.gov*.

**7.**    **Court's Expectations**.

(a)    The court will expect all parties to be ready for trial as of the trial date set in the Pretrial Order unless a continuance is requested within ten (10) business days after the date on which the court enters the Pretrial Order.  Continuances based on inadequate preparation will not be considered favorably.

(b)    The court calls to the attention of all parties the various time requirements in the Pretrial Order and Exhibits.  The court strictly adheres to these time requirements to avoid last minute requests for rulings.

(c)    Any case announced settled after the Pretrial Conference but before the scheduled trial date will be dismissed with prejudice and with costs taxed as paid on the scheduled trial date unless a different stipulated judgment form is submitted on or before the scheduled trial date.